JULIANA SANABRIA, demandante y recurrente, *v.* SUCN. DE MANUEL GONZÁLEZ MARTINEZ, compuesta de su viuda ANA MARÍA HERNÁNDEZ DE GONZÁLEZ, y sus hijos MANUEL, JOSÉ, RAMÓN, GUILLERMO, JORGE y LUIS ANTONIO, todos de apellidos GONZÁLEZ HERNÁNDEZ, demandados y recurridos.

Número 10726.

*Sometido:* 22 de junio de 1953. *Resuelto:* 8 de junio de 1961.

*Samuel R. Quiñones, Guillermo S. Pierluissi, Santiago Polanco*

*Abreu* y *Ernesto Juan Fonfrías,* abogados de la recurrente; *R. Rivera Zayas, G. Rivera Cestero, Milton F. Rúa* e *Iván Reichard,* abogados de la sucesión recurrida; *James R. Beverley* y *José López Baralt,* abogados de doña Ana María Hernández Vda. de González y de Jorge González Hernández, recurridos.

El Juez Asociado Señor Belaval emitió la opinión del Tribunal.

Se trata de una acción de filiación presentada por una hija natural contra la sucesión legítima de su padre. Las tres alegaciones fundamentales son las siguientes: que "hacia los años 1903, 1904 y 1905, Manuel González Martínez y Monserrate Sanabria, conocida también por Isilé Sanabria, sostuvieron relaciones de concubinato en el pueblo de Salinas, como resultado de las cuales relaciones nació la aquí demandante el primero de febrero de 1905"; que "a la fecha de la concepción de la demandante y por algún tiempo antes y después de dicha fecha, Manuel González Martínez y Monserrate Sanabria eran solteros y no tenían impedimento de clase alguna para contraer matrimonio con dispensa o sin ella, y durante todo dicho tiempo Monserrate Sanabria fue conocida viviendo en concubinato con Manuel González Martínez"; que "durante todo el tiempo transcurrido desde la concepción y el nacimiento de la demandante y hasta la fecha en que falleció Manuel González Martínez tuvo a la demandante por su hija, ocupándose de su sostenimiento y educación, llamándola hija en conversación, sosteniendo siempre con ella relaciones de padre a hija, teniéndola pública y privadamente como hija suya, y durante todo dicho tiempo la demandante estuvo siempre en la posesión continua del estado de hija natural de Manuel González Martínez, expresada y justificada por actos realizados por Manuel González Martínez así como por actos realizados por los familiares de Manuel González Martínez."

La recurrente en este caso nació el 8 de marzo de 1905 cuando las causas de pedir una filiación estaban dispuestas

por el artículo 189 del Código Civil Revisado de Puerto Rico de 1902, viniendo obligado el padre a reconocer al hijo: "1—Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad; 2—Cuando pública o privadamente lo tenga por hijo suyo o le haya llamado tal en conversación o se ocupe de su educación o sostenimiento; 3—Cuando la madre fue conocida viviendo en concubinato con el padre al tiempo del embarazo o nacimiento del hijo o cuando éste haya nacido llevando sus padres relaciones amorosas."

Como se ve, a la fecha en que nació la recurrente, existían en nuestra legislación como causas de pedir una filiación, las siguientes: (1) el escrito indubitado; (2) cuando pública o privadamente el padre tuviera al hijo como tal; (3) cuando así lo hubiera llamado durante una conversación; (4) cuando el padre se ocupare de la educación y sostenimiento del hijo; (5) cuando la madre fuera conocida viviendo en concubinato con el padre al tiempo del embarazo; (6) cuando la madre fuera conocida viviendo en concubinato con el padre al tiempo del nacimiento; (7) cuando el hijo naciera llevando sus padres relaciones amorosas.

No hay duda que la segunda razón de pedir: "cuando pública o privadamente el padre tuviera al hijo como tal", constituye una norma más elástica que la famosa "posesión continua del estado de hijo natural del padre" de nuestra legislación posterior. Asimismo, la séptima razón de pedir: "cuando el hijo naciera llevando sus padres relaciones amorosas" es mucho menos rígida que la norma establecida por nuestra legislación posterior que ordena el reconocimiento si "la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo".

Desde el 1902 hasta el 1911, las normas que regían las causas de pedir una filiación ilegítima—incluida en ésta la natural—eran mucho más amplias, puesto que durante ese período, nuestro Derecho se vio libre de la dogmática espa-

ñola anterior que generalmente vedaba la investigación de la paternidad. Siendo esto así, no es difícil concluir que la interpretación de la prueba debe ser distinta: *Alicea v. Antuñano*, 50 D.P.R. 923, (*Travieso*), (1937), cita precisa a la página 932.

Por otro lado, al momento de fallar este caso, la ilustrada Sala sentenciadora no tuvo el beneficio de nuestras posteriores decisiones sobre el carácter y el *quantum* o calidad de prueba necesaria para dejar establecida la paternidad: *Figueroa v. Díaz*, 75 D.P.R. 163, (1953), (Negrón Fernández), (Marrero), (Ortiz), (Sifre), citas precisas a las págs. 174, 185, 189, 192 y 196. En *Figueroa v. Díaz*, supra, establecimos que la filiación debe resolverse de acuerdo con la preponderancia de la prueba, como cualquier otro litigio civil, descartando la doctrina anterior que exigía la presentación de una "prueba robusta y convincente".

Es indudable que en este caso, la ilustrada Sala sentenciadora, al momento de apreciar la prueba, aplicó el anterior criterio de la "prueba robusta y convincente", y en virtud de tal aplicación, descartó testimonios que implican claros actos de reconocimiento. Además hay expresiones suyas que nos permiten concluir que siguiendo el lenguaje de *Torres v. Sucesión Caballero*, 39 D.P.R. 724, (*Aldrey*), (1929), cita precisa a las págs. 729 *in fine* y 730, examinó la prueba sometida con "recelo" por haberse presentado esta acción después de la muerte del padre natural.

El lenguaje utilizado por el Juez Aldrey en el caso de *Torres* no podría entenderse a cabalidad, si no se recuerda, que el hijo ilegítimo nació el 3 de diciembre de 1895, estando la declaración de su estado regida por el inciso 2º del art. 135 del Código Civil Español. Es difícil que hoy pudiésemos trasladar dicho espíritu a una interpretación actual de nuestro ordenamiento filiatorio.

De todos modos, si dentro de la nomenclatura científica de una jurisprudencia, puede considerarse aún vigente el

principio establecido por el caso de *Torres* v. *Sucesión Caballero*, supra, en cuanto al extremo aquí estudiado, debe quedar revocado.

Además, como cuestión de ley, si el derecho a solicitar la filiación se extiende hasta un período de tiempo posterior a la muerte, es nuestra obligación de juzgadores darle sentido y efectividad a la norma legislativa, pues sin caer en la especulación, es posible pensar en una serie de circunstancias morales, sociales, económicas, y aun meramente sentimentales, por las cuales un hijo natural no quiera entablar durante la vida de su padre, una acción filiatoria.

La recurrente se querella que la ilustrada Sala sentenciadora no trató de armonizar la prueba de ambas partes, según la norma establecida por nosotros en el caso de *Meléndez* v. *Cividanes*, 63 D.P.R. 4 (De Jesús), (1944), cita precisa a la página 10. Hay cierta tendencia perceptible en las conclusiones de hecho y de derecho del ilustrado Juez sentenciador que parecen indicar que procedió a establecer una tajante separación en cuanto a la credibilidad de los testimonios, dándole excesivo crédito a los testigos de la sucesión demandada y escaso o ningún crédito a los testigos de la hija natural.

Si se examina cuidadosamente el grado de interés o desinterés de cada testigo de la sucesión demandada en el presente caso—relación de familia, relaciones sociales, relación de amistad, relación obrero-patronal, beneficios recibidos en el pasado o en el presente, tales como dotaciones, donativos, pensiones, regalías, viajes o mero interés de litigante—vemos que no es posible establecer la tajante división en la credibilidad que llevó a cabo la ilustrada Sala sentenciadora. No es difícil concluir asimismo que la posición cautelosa en que se situó el juzgador, sin duda alguna impresionado por el principio del caso de *Torres*, no le permitió en algunas apreciaciones, llegar a la realidad de los hechos. En este sentido, es conveniente recordar las sabias palabras del Juez

De Jesús en el caso de *Meléndez* v. *Cividanes* supra, cita precisa a la pág. 10:

"Empero, la experiencia nos demuestra que raro es el caso donde la evidencia testifical predomina, en que la evidencia de una y otra se ajuste estrictamente a la verdad. Y es que por lo general la verdad se halla distribuida entre ambas partes. Frecuentemente el testigo oculta o desfigura determinados hechos y, conscientemente unas veces e inconscientemente otras, los exagera o trata de imprimirles cierto colorido favorable siempre al litigante que lo ha traído a declarar. Pero así es y será siempre la naturaleza humana. Por eso en la apreciación de la prueba, en esa difícil etapa del proceso judicial, es donde el juez debe poner a contribución su conocimiento de la vida y de la naturaleza humana, para con arreglo a los dictados de una sana y juiciosa crítica, discernir lo verdadero de lo falso, lo verosímil y racional de lo dudoso o improbable, sin perder de vista las circunstancias todas en que se hayan desenvuelto los hechos declarados. Desentrañada así la verdad, tomando lo que haya de cierto en la evidencia de una y otra parte, fácil le será las más de las veces determinar a que lado favorece la preponderancia de la prueba."

Estamos seguros que el elemento mental que prevaleció en la conciencia del ilustrado Juez sentenciador no fue el de la parcialidad, sino que inducido por nuestra anterior teoría sobre la prueba en un caso de filiación, examinó la misma con demasiado recelo, buscando en ella la clásica calidad de la "prueba robusta y convincente". Esto nos ha obligado a examinar de nuevo toda la prueba para ver cuál sería el resultado de la misma si se aplica a este caso la teoría general de la prueba en un caso civil: la preponderancia de la prueba.

El método que utilizaremos es bastante sencillo: examinando en su totalidad el testimonio, sólo tomaremos de él aquella parte que aparezca ratificada o rectificada durante el contrainterrogatorio o aquella parte que aparezca corro-

borada en la prueba contraria. Estableceremos como hecho indisputado no solamente aquel establecido por prueba documental certificada por un funcionario público de Puerto Rico, sino aquella parte del testimonio oral que aparezca corroborada por la prueba de la otra parte o aquella parte de la prueba no contradicha. En cuanto a los hechos disputados trataremos de organizarlos de acuerdo con las categorías relacionales ordinarias: la cronológica, la del suceso memorable, la descriptiva o la puramente hilativa.

La prueba en este caso es extensa. Podría decirse que es uno de los casos de mayor extensión de prueba que ha llegado a este Tribunal. Resumirla en su totalidad estaría fuera del margen razonable de exposición que se espera de una decisión nuestra. Por eso nos ceñiremos a presentar aquellos hechos sobresalientes que deben ser considerados en la conclusión final del caso.

Empezaremos puntualizando algunos hechos indisputados que aparecen espontáneamente de la prueba: En algún momento antes del 1881, don Manuel González, siendo soltero, tuvo relaciones concubinarias o amorosas con Juana Sanabria, de cuyas relaciones nació en el 1881, una hija natural de don Manuel llamada Isabel González, quien fue recogida por su padre antes que la niña cumpliera siete años.

La madre de Isabel González, Juana Sanabria, posteriormente tuvo relaciones concubinarias o amorosas con otro hombre, cuyo nombre no consta de la prueba, y de esas relaciones nacieron, en algún momento antes del 1887, un hijo llamado Paco Sanabria y en el 1887 una segunda hija llamada Isilé Sanabria, los cuales fueron recogidos en su propia casa por don Manuel, a ruego de su hija Isabel, en algún momento después del 8 de agosto de 1899, fecha del ciclón de San Ciriaco.

Isabel González vivió en casa de su padre natural don Manuel González hasta el mes de junio o julio de 1903, según pretende la prueba de la sucesión demandada o hasta el mes

de agosto o septiembre de 1904, según pretende la prueba de la demandante. El hermano de Isabel González, Paco Sanabria vivió en casa de don Manuel hasta un año o dos antes de embarcarse don Manuel González para España en junio o julio de 1903, según demuestra la prueba de la sucesión demandada. La hermana de Isabel, Isilé Sanabria, vivió en casa de don Manuel hasta el mes de junio o julio de 1903, según pretende la prueba de la sucesión demandada o hasta el mes de agosto o septiembre de 1904, según pretende la prueba de la demandante.

La testigo de la sucesión demandada Isabel González, declara que cuando llegaron sus hermanos después del ciclón de San Ciriaco, ella y su hermana Isilé, dormían en la planta alta de la casa de don Manuel y su hermano Paco dormía en la planta baja (t. 1111). El testigo de la demandante Francisco Romero, declara, por el contrario, que cuando el ciclón de San Ciriaco tumbó la casa en la cual vivía Isilé Sanabria, don Manuel trasladó a Isilé a un cuarto (habitación) que había en los bajos de la casa de don Manuel (t. 32). Posiblemente hubo un período de tiempo en que las dos hermanas durmieran en la planta baja, pues según el propio testimonio de Isabel González, el ciclón de San Ciriaco le llevó el techo a la casa de don Manuel (t. 1098–1099) y la casa durante todo el tiempo cubierto por estos hechos sólo tuvo dos plantas. No hay prueba en cuanto al tiempo que duraron las reparaciones de la casa de don Manuel después del ciclón de San Ciriaco.

La prueba de la demandante trata de establecer dos períodos concubinarios o de relaciones amorosas entre don Manuel González e Isilé Sanabria: el primero durante los años 1901 y 1902 y el segundo durante el año 1904. El testigo Romero dice que estuvo en casa de don Manuel González, por primera vez, desde el 1899 hasta el 1901 y por segunda vez desde el año 1904 hasta el 1908. Durante los años 1902 y 1903, el testigo Romero dice que fue a vivir con su padre en Sabana Hoyos y que en el 1908 don Manuel lo mandó a

trabajar a la colonia Fortuna donde estuvo hasta el 1912 (t. 36 y 53) en que se salió y no volvió más.

La primera descripción de los amores de don Manuel con Isilé, entre los años 1900 y 1901, que ofrece el testigo Romero es la siguiente: don Manuel entraba en el cuarto de Isilé, se acostaba en la cama a jugar con ella y después cerraba la puerta y "tenían su amor ahí, amor que ellos lo demostraban" (t. 32–34): que algunas veces don Manuel entraba en el cuarto a la una de la tarde y otras veces por la noche (t. 34); que algunas veces permanecía dentro del cuarto dos horas y otras veces más (t. 35); que cuando eso ocurría no había nadie más en el cuarto (t. 35–36); que eso él lo vió "por espacio de muchas veces" (t. 36).

El testigo Romero declara que al regresar en el 1904 a vivir en la casa de don Manuel, le dijeron que Isilé había tenido un hijo:—"se decía eso pero yo no lo ví seguro (y) lo que uno no lo ve no debe decirlo" (t. 63). Es un hecho indisputado que el primer hijo de Isilé llamado Luis, nació alrededor del 14 de septiembre de 1903 y murió el 14 de diciembre de 1903 (Exhibit 4).

La segunda descripción de los amores de don Manuel con Isilé, en el 1904, que ofrece el testigo Romero es la siguiente: "Yo lo que veía era que (don Manuel) entraba al cuarto (de Isilé) que estaba un rato y después salía y se iba a voltear y volvía y eso lo hacía de vez en cuando" (t. 38) y a fines del 1904, el testigo vió que don Manuel envió a Isilé a casa de Severo Sanabria, un tío de ella que vivía en el barrio Coquí y "a los cuatro o cinco meses de haber estado allí dió a luz una muchacha" (t. 38). Es un hecho indisputado que el segundo hijo de Isilé, la aquí demandante Juliana Sanabria, nació el 8 de marzo de 1905.

El término descriptivo "a fines de 1904" hay que entenderlo como que se refiere a un período de tiempo que comprende de septiembre a diciembre de 1904. En Puerto Rico es frecuente el uso de los términos a "principios de año", a

"mediados de año" y a "finales de año". Una posible división del tiempo en esta descripción partitiva tan arbitraria, es considerar el año dividido en tres períodos de cuatro meses cada uno.

Para rebatir este testimonio de las relaciones amorosas entre don Manuel e Isilé Sanabria, la prueba de la sucesión demandada intenta probar tres grupos de hechos que podrían puntualizarse así: (1) que Francisco Romero no formaba parte de la servidumbre de don Manuel entre los años 1900 al 1904; (2) que en la fecha probable de la concepción de la demandante—mayo o junio de 1904—don Manuel estaba imposibilitado de tener contacto carnal con la madre de Juliana, Isilé Sanabria, no sólo porque no vivió en Salinas sino porque estaba enfermo o convaleciendo en los Baños de Coamo; (3) que el primer hijo de Isilé Sanabria, el malogrado Luis, era hijo de Higinio Pérez y no de don Manuel González, y por consiguiente el segundo hijo de Isilé, la aquí demandante, también era hija de Higinio Pérez.

1. Los testimonios que directamente se refieren al hecho que Francisco Romero no vivía en casa de don Manuel en el 1904 son los de Dolores Briganti y Flor Ortiz. La testigo Briganti lo sitúa en el Húcar, sin especificar el año, pero trabajando para don Manuel. Por el contrario, el testigo Ortiz sitúa a Francisco Romero entre Salinas y Barritos: "se fueron (la familia de Francisco Romero) en el 1902 (de Barritos para Salinas) después de las elecciones (noviembre de 1902). En el mismo año (el de las elecciones) se fueron y en el 3, el 4 o el cinco volvieron a Barritos a la misma finca". El testigo Ortiz dice que él conoce bien la vida de la familia Romero porque vivió maritalmente en Salinas, por tres años con una tía de Francisco Romero, llamada Visitación González (t. 2435). Notamos, sin embargo, que del propio testimonio del testigo Ortiz se desprende que éste vivió con Visitación González en Salinas del 1910 en adelante (t. 2440) cuando ya Francisco Romero vive en la colonia Fortuna

(t. 53). Parece que el ilustrado Juez sentenciador no puso en duda la estadía de Francisco Romero en casa de don Manuel durante los años comprendidos en su testimonio. Más bien, no le dio crédito al mismo por considerarlo inverosímil, exagerado y contradictorio, según veremos en el análisis final de la prueba.

2. Los testimonios que directamente se refieren a la imposibilidad de don Manuel González de tener contacto sexual con Isilé Sanabria a la fecha probable de la concepción de la demandante—mayo o junio de 1904—son los testimonios de Isabel González, doña Ana María Hernández, don Julio Benvenutti y don César Amy. Como antes hemos dicho, hay dos versiones de la imposibilidad: una, las reparaciones de la casa de don Manuel con motivo de sus bodas que le imposibilitaban vivir en Salinas, y otra, la enfermedad de don Manuel.

Isabel González declara que ella y su hermana Isilé tuvieron que abandonar la casa de don Manuel en junio de 1903, porque tan pronto se embarcó don Manuel para España en junio de 1903, le tumbaron el piso a la casa de su padre con idea de prepararla para la boda de don Manuel (t. 996). Es un hecho indisputado que don Manuel y doña Ana María Hernández se casaron un año y dos meses después del posible viaje de don Manuel a España, casándose el 3 de septiembre de 1904. Las reparaciones que le hicieron a la casa, según Isabel González, fueron las siguientes: "le hicieron más habitaciones y dos comedores, porque había un comedor chiquito" (t. 1175–1176); "le añadieron, le hicieron dos comedores para la familia y cuando viniera alguien y le pusieron inodoros" (t. 1176). De acuerdo con el testimonio de Isabel, cuando don Manuel regresa de España, a fines de noviembre de 1903, don Manuel va a vivir a su casa en Salinas e Isabel lo visita allí dos veces (t. 1182). Para esa fecha—fines de noviembre de 1903—a las reparaciones de la casa, sólo le faltaban algunas cosas (t. 1178); las habitaciones estaban casi listas para usarse y los baños e inodoros es-

taban listos (t. 1179–1180) ; sólo faltaba parte del cielo raso y la pintura (t. 1180). Dice que enseguida que regresó de España, don Manuel se enfermó (t. 1142) ; y se levantó en abril de 1904 (t. 1003) ; y se fue a los Baños de Coamo (t. 1003). Dice que después de irse don Manuel de Guayama a los Baños de Coamo, estuvo a visitar a Isabel en la casa de ella en Guayama (t. 1148 y 1160). Dice que a fines de 1903 ella estaba en Guayama (t. 998).

De acuerdo con el testimonio de doña Ana María Hernández, don Manuel se comprometió con ella el 29 de junio de 1903 (t. 2436) y enseguida se fue a España "porque decía que quería traer todo de España lo que íbamos a usar" (t. 3437) ; y regresó de España en septiembre u octubre de 1903 y desde esa fecha la fue a ver todas las semanas a los Baños de Coamo hasta diciembre de 1903, que ya no podía irla a ver porque estaba enfermo en Guayama en la casa de su hermano José (t. 3437). Dice que en febrero o marzo de 1904, don Manuel fue a verla a los Baños de Coamo, de paso para San Juan, a donde iba a que lo viera el doctor Ordóñez y cuando regresó de San Juan, se quedó en los Baños de Coamo (t. 3439). Dice que tuvo que quedarse viviendo en los Baños de Coamo porque ya él no tenía casa en Salinas porque la estaban arreglando para que la testigo fuera a vivir a ella después de su boda con don Manuel (t. 3440). Dice que a veces don Manuel salía a atender sus intereses (t. 3440) ; pero a renglón seguido añade que don Manuel no podía salir porque estaba enfermo (t. 3440) y que esa permanencia en los Baños de Coamo duró hasta el 26 de julio de 1904 (t. 3441). Dice que en esa fecha don Manuel le dijo: "voy a tener que ir a dar un vistazo para arreglar la casa, porque si no no nos podemos casar" (t. 3441).

Don Julio Benvenutti declara que don Manuel hizo un viaje a España en la primavera de 1903, en el mes de julio y regresó a fines de 1903 (t. 2799). Dice que al llegar don Manuel a su finca en Salinas lo atacó una fiebre malárica y el médico le recomendó que saliera de su finca y entonces

don Manuel se fue a casa de su hermano José González, quien residía en Guayama estando allí hasta principios de 1904, y en el 1904, ya mucho mejor, se fue a convalecer a los Baños de Coamo, donde estuvo convaleciendo hasta que se casó. Estuvo en los Baños de Coamo desde enero de 1904 hasta septiembre de 1904 que se casó (t. 2799). Dice que don Manuel le dijo que aceptaba a Isabel como hija suya porque era virtuosa (t. 2807-2809). Dice que Isabel González estuvo viviendo con don Manuel "hasta la primavera de 1903, que yo fui a despedirme de don Manuel que él se iba para España y le dije—¿dónde se queda Isabel?—y me dijo —Pues Isabel se va a una finca que yo tengo" (t. 2810). Dice que cuando don Manuel regresó de España fue a vivir a su finca (t. 2838). Ahora dice que don Manuel estuvo viviendo en Guayama durante los meses de "enero, febrero y hasta marzo, más o menos, que se fue a los Baños de Coamo" (t. 2849).

Don César Amy declara que en el mes de enero de 1904 le dio un ataque de malaria (t. 2588) y se fue a los Baños de Coamo en el mes de mayo de 1904 (t. 2589). Dice que don Manuel estaba en los Baños de Coamo convaleciendo (t. 2590). Dice que don Manuel "luego salía en coche y lo buscaban y salían de viaje, no se para dónde era que él salía de viaje" (t. 2591), pero que don Manuel salía en coche "con un cochero que venía de allá, de la colonia, a buscarlo" y "era de donde vivía don Manuel" porque venía en el coche de don Manuel (t. 2613). Dice que don Manuel estaba en los Baños de Coamo convaleciendo y el testigo no sabe si estaba enfermo o no "pero se decía que estaba convaleciendo" (t. 2613). Dice que don Manuel "salía entre días, él salía, por ejemplo un día en la semana después volvía tarde a comer pero yo no puedo decirle si estuvo toda la semana completa o salió en esa semana" (t. 2615).

La exposición ordenada de los cuatro testimonios arriba indicados indica el siguiente cuadro: Don Manuel sale de Puerto Rico hacia España, después de formalizar su compromiso matrimonial con doña Ana María el 29 de junio de

1903. Cuando regresa de España se va a su casa en Salinas, la cual ya está casi reparada para la boda, faltándole solamente parte del cielo raso y la pintura. En el mes de diciembre de 1903, don Manuel contrae una infección malárica y se traslada a la casa de su hermano José en Guayama, donde permanece durante los meses de enero y febrero de 1904. En este último mes va a San Juan a consultar al doctor Ordóñez y cuando regresa se queda en los Baños de Coamo a convalecer. Hay prueba que durante esta convalecencia, don Manuel sale de los Baños de Coamo a visitar a su hija Isabel a Guayama, va a su finca en Salinas en un coche que viene de su finca a recogerlo y atiende sus intereses. Este es el período de tiempo que se relaciona con la segunda descripción que hace el testigo de la demandante, Francisco Romero, de los amores de don Manuel con Isilé Sanabria: "Yo lo que veía era que (don Manuel) entraba al cuarto (de Isilé) y que estaba un rato y después salía y se iba a voltear y volvía y eso lo hacía *de vez en cuando*" (t. 38). Hay que descartar, pues, que las reparaciones de la casa de don Manuel, o su convalecencia en los Baños de Coamo, resultaran impedimentos absolutos para cualesquiera relaciones amorosas de don Manuel con Isilé Sanabria, allá por los meses de mayo a junio de 1904, fechas en que la demandante tuvo que ser concebida.

3. Los testimonios que directamente se refieren al hecho que el primer hijo de Isilé, llamado Luis Sanabria, era hijo de Higinio Pérez y no de don Manuel González, y por consiguiente, el segundo hijo de Isilé, la aquí demandante, era hija de Higinio Pérez y no de don Manuel González, son los testimonios de Isabel González y de Dolores Briganti.

Según lo expuesto anteriormente, Isabel declaró que ella y su hermana Isilé, tuvieron que abandonar la casa de don Manuel en Salinas en junio de 1903, porque al empezarse a preparar la casa para la boda de don Manuel con doña Ana María, le tumbaron el piso (t. 996). Dice que entonces ella y su hermana Isilé se fueron a Besosa—seguramente a casa

de Severo Sanabria, tío de Isabel e Isilé, puesto que la colonia o finca llamada Besosa queda en el barrio del Coquí (t. 2269) donde vivía Severo (t. 37). Otra indicación que contiene la prueba sobre el sitio donde han podido ir las dos hermanas a vivir, es la frase que le dice don Manuel a don Julio Benvenutti, cuando al visitarlo don Julio en la primavera de 1903 para despedirse de don Manuel, en la finca de Salinas de don Manuel, y al preguntarle donde se quedaría Isabel, don Manuel le contesta:—"Pues Isabel se va a una finca que yo tengo". Según Isabel, en Besosa estuvieron unos meses (t. 1125)—ha tenido que ser entre julio y agosto de 1903, según veremos más adelante—y de Besosa pasaron a darse los baños de mar a Las Mareas, donde estuvieron como quince días (t. 1125). Después de esto, según Isabel, ella se queda en Guayama (t. 993) e Isilé se va a vivir a Los Riegos con Higinio Pérez (t. 998).

Los únicos hechos indisputados que tenemos para organizar esta parte del testimonio de Isabel González, son el nacimiento del primer hijo de Isilé, llamado Luis, quien nace a mediados de septiembre de 1903 y la muerte del mismo, de tres meses de edad, acaecida el 14 de diciembre de 1903 (Exhibit 4). Parece que Isabel no está enterada de los amores de Isilé con Higinio antes de esa fecha. Dice que al salir ambas de casa de su padre no notó que Isilé estuviera embarazada (t. 1140). Sin embargo, a esa fecha, Isilé no podía tener menos de seis meses de embarazo. Es indudable que al irse Isilé de Las Mareas, dejando allí a su hermana, es para dar a luz su primer hijo, bien fuera en casa de su tío Severo Sanabria en el barrio Coquí, según asegura la testigo de la sucesión demandada Dolores Briganti, o bien fuera en una casa que se supone tuviera Higinio Pérez en Los Riegos, según asegura Isabel. De ser cierta la versión de Isabel, en el sentido, que su hermana se fue a Los Riegos, lo más probable es que Isilé fuera a tener su primer hijo a casa de su hermano Paco, quien vivía en Los Riegos.

Hay dos extremos de la prueba que parecen confirmar, en parte, la versión de Isabel: primero, el hecho que es Paco Sanabria quien declara en el Registro Civil la muerte del primer hijo de Isilé, y segundo, la afirmación categórica de la testigo Briganti que el único hombre que le puso casa a Isilé fue Gaspar Carrillo, y eso fue, según la testigo en el 1907 (t. 1474). Hay algunas aseveraciones contradictorias de la testigo Briganti, pero que se pueden trazar desde el "desembarco" de don Manuel, que parecen sostener el testimonio de Isabel, en el sentido, que Isilé parte de Las Mareas hacia los Riegos. El resto de la prueba de la sucesión demandada indica que los amores de Gaspar Carrillo con Isilé, han debido ser en el 1911.

Interrumpimos la exposición del testimonio de Isabel para referirnos ahora al testimonio de Dolores Briganti, con el fin de conservar cierto orden cronológico en la exposición de la prueba.

Por una exigencia metodológica nos vemos obligados a exponer *in extenso* el testimonio de la testigo Briganti. El testimonio de la testigo Briganti, septuagenaria (t. 1424), sorda (t. 1425), desmemoriada en todo lo que no sea la historia de este caso (t. 1581–1582) aunque se trate de sus propios hijos (t. 1504–1506) es una verdadera prueba para la ecuanimidad de un juzgador. Al declarar ante la ilustrada Sala de Primera Instancia el día 23 de junio de 1948, manifestó tener setenta años no cumplidos todavía (t. 1424). De acuerdo con este dicho ha debido nacer alrededor de 1879.

Dice que conoció a don Manuel González en el 1903, a principio de año (t. 1425) cuando vino de Salinas a vivir a la finca de la casa de don Manuel (t. 1425–1426). Pero a renglón seguido añade que primero vino a vivir a los Riegos, y entonces en el 1903, vino a vivir a la finca de la casa de él (t. 1426). Por la propia prueba de la sucesión demandada sabemos que los Riegos es bastante retirado de Sabater, la finca donde enclava la casa de don Manuel (t. 1873). Dice

que nació en el pueblo de Salinas (t. 1479) y fue al campo (¿a los Riegos?) a la edad de dieciocho años (t. 1480). De acuerdo con este dicho llegó al campo en el 1897. Dice que no recuerda cuando nació pero que cuando fue al campo (¿1897?) tenía ya marido y dos hijos (t. 1480). Dice que empezó a vivir con su marido a los diecisiete años (t. 1481-1490). De acuerdo con este dicho, en el 1896, todavía la testigo estaba en Salinas. Dice que a dos de enero estaba ya en el campo (t. 1487) y que la fiesta de Reyes las pasó en los Riegos (t. 1487). De acuerdo con este dicho, lo más probable es que se refiera al 2 de enero de 1897. Dice que fue a vivir "al frente de una puerta, a la salida de la carretera de Cayey para Sabana Llana" (t. 1487).

Recuerda que tuvo su primer hijo en los Riegos, siendo asistida por la comadrona Petrona Villegas (t. 1489) pero no recuerda la fecha en que nació su primer hijo (t. 1489) aunque recuerda que el primer hijo lo tuvo dos años después de empezar a vivir con su compañero de vida (t. 1490). De acuerdo con este último dicho su primer hijo ha debido nacer en el 1898. Ahora dice que ella tenía diecisiete o dieciocho años cuando nació su primer hijo (t. 1491). De acuerdo con este dicho ha debido nacer en el 1896 o 1897. Ahora dice que la tormenta de San Ciriaco—8 de agosto de 1899— la cogió en Barritos, un punto bastante retirado de los Riegos (t. 1492-1493) aunque en Barritos vivió como tres meses (t. 1493); y que fue de Barritos que salió a vivir para los Riegos (t. 1494). Ahora dice que todos sus hijos los tuvo en la finca de don Manuel (t. 1506), dos de ellos sin trabajar en la casa de don Manuel (Sabater) (t. 1507) y los otros dos en los Riegos (t. 1507). De acuerdo con este dicho, los dos primeros hijos los tuvo después del 1899, entre los años 1900 y 1901. Ahora dice que primero vivió en los Riegos y don Manuel, después, los cambió para Barritos, donde estuvieron tres meses y "entonces nos cogió el tiempo ahí" (San Ciriaco) (t. 1522).

Dice que estuvieron en los Riegos dos años y al cumplirse los dos años don Manuel los cambió para Barritos, y a los tres meses, los cambió para la finca frente a la casa de él (t. 1523). Dice que tuvo dos hijos en los Riegos (t. 1523) posiblemente entre los años 1897 y 1898—aunque añade que en 1900, mejor que en la casa de don Manuel, la testigo estaba todavía en los Riegos (t. 1524). Por fin admite que antes de 1903 no se recuerda de ninguna fecha y después de 1903 sólo se recuerda de algunas y que tampoco recuerda la fecha en que fue a vivir a la casa de don Manuel (t. 1524). Dice que después de vivir en Barritos tres meses, enseguida se la llevaron, no a la propia casa de don Manuel, sino a una casa frente a la casa de don Manuel (t. 1524). Como se ve, esto ha debido ser inmediatamente después del ciclón de San Ciriaco—8 de agosto de 1899—. Dice ahora que el mismo año que se la llevaron frente a la casa de don Manuel, éste se embarcó (t. 1525). La testigo se está refiriendo al viaje, que según la propia prueba de la sucesión demandada don Manuel hizo en el mes de junio de 1903. Por fin aclara que cuando se fueron de Barritos—después del 8 de agosto de 1899—no vinieron a vivir frente a la casa de don Manuel "porque nosotros vivíamos al lado de una parte para abajo cuando vinimos a vivir a la parte más abajo de la casa de don Manuel" (t. 1527); a una distancia retirada de la casa de don Manuel (t. 1528) y que fue cuando don Manuel se casó—el 3 de septiembre de 1904—que vinieron a vivir frente a la casa de don Manuel (t. 1528).

No importa la clase de estructura relacional que utilicemos, la única forma de conciliar este testimonio es: que Dolores Briganti y su compañero de vida llegaron de Salinas a las fincas de don Manuel dos años antes del ciclón de San Ciriaco que desvastó la Isla el 8 de agosto de 1899; que durante los dos primeros años—1897 y 1898—vivieron en los Riegos, donde nacieron sus dos primeros hijos. Posteriormente, tres meses antes del 8 de agosto de 1899, fueron tras-

ladados a Barritos por orden de don Manuel y allí los sorprendió el ciclón de San Ciriaco, y entonces "seguido" don Manuel los traslada a algún sitio lejos de la casa de don Manuel, donde nacieron sus otros dos hijos, posiblemente entre los años 1900 y 1901, quedándose allí hasta que se casa don Manuel el 3 de septiembre de 1904, en cuya fecha Dolores Briganti y su compañero de vida, se trasladan a vivir a una casa frente a la de don Manuel, para que Dolores Briganti pueda servirle de lavandera a doña Ana María.

Esta última aseveración se robustece más cuando la testigo Briganti declara sobre el sitio donde ella lavaba antes y después de casarse don Manuel. Dice que antes de casarse don Manuel lavaba en una quebrada más abajo de la casa de don Manuel, como a media cuerda de la casa (t. 1617); de lunes a sábado (t. 1624); durante todo el año de 1903 (t. 1624) y que después de retirarse don Manuel de allí (julio o diciembre de 1903) no volvió a lavar para la casa hasta que don Manuel se casó con doña Ana a fines de 1904 (t. 1645), aunque añade que siempre tenía que lavar algo porque lavaba en la quebrada la ropa de su casa y la del mayordomo (t. 1645). Dice que ella estuvo lavando en la quebrada hasta que don Manuel se casó con doña Ana María (t. 1620); que cuando don Manuel se casó con doña Ana— en septiembre de 1904—como era otra clase de ropa, una ropa más fina, ella se fue a lavar a los Riegos (t. 1514).

La descripción de los amores de Isilé Sanabria con Higinio Pérez que hace la testigo Briganti es la siguiente: En el 1903, a principios de año, como en febrero (t. 1630–1631) la testigo veía muchísimos "papeles de enamorados" entre Isilé e Higinio, "que se abrazaban y se besaban" (t. 1610–1611), lo mismo por la mañana que por la tarde (t. 1617). Dice que Higinio hacía los "papeles" en el pesebre (t. 1618), un pesebre que había pegado a la casa de don Manuel (t. 1627), y los "papeles" que Isilé hacía eran que ella pasaba por donde la testigo estaba, a buscar huevos

de guinea y al poco rato la testigo veía que pasaba Higinio para donde ella iba (t. 1618) por un camino que había (t. 1620), "tendrían que hacer algo" (t. 1619). Dice que la testigo cree que "tendrían que hacer algo" porque veía que pasaba uno antes y otro después. "Y otro detrás. Por eso" (t. 1626). Dice que Isilé iba a buscar los huevos de guinea por la mañana (t. 1625) y que los "papeles" de Higinio de besarse y abrazarse en el pesebre con Isilé, los veía por la tarde como de seis de la tarde a siete de la noche cuando la testigo dejaba de lavar (t. 1627–1628); que desde la quebrada no se podía ver la casa de don Manuel (t. 1627), ni el pesebre tampoco porque el pesebre estaba pegado a la casa de don Manuel (t. 1627).

La testigo Briganti sigue declarando que Isabel e Isilé permanecieron en casa de don Manuel "pues permanecieron después, anteriormente, antes de don Manuel embarcarse para España en el 1903 que se embarcó él para España, y entonces ellas desaparecieron de la casa de don Manuel y se fueron a vivir a Besosa" (t. 1433); "pues quedaron por el tiempo en el hogar de don Manuel" (t. 1433). Dice que don Manuel se había embarcado en junio de 1903 para España (t. 1433). Dice que después de eso, volvió a ver a Isilé en casa de Severo Sanabria, tío de Isilé, a la salida de la finca de don Manuel para la carretera central que va para Guayama y para Aguirre (t. 1434). Dice que no supo más de Isabel, pero que después de salir para Besosa, vio a Isilé, como a las dos semanas en casa de Severo Sanabria (t. 1538). Dice que ella pasó por allí a hacer su compra de los sábados a una sucursal que había en el barrio Coquí de la tienda de los sobrinos de don Manuel (t. 1444); como a una legua de la casa de Severo Sanabria (t. 1446). Dice que entonces le preguntó a Isilé quien la había traído y "me dijo que había venido allí con Higinio Pérez, porque se había venido con él" (t. 1443). Dice que en la casa donde Isilé estaba "yo veía a Higinio Pérez. A veces lo veía arriba; otras veces

en la cocina y otras veces frente a la carretera, sentado en la escalera". (t. 1446-1447). Dice que "al tiempo, en pocos meses, tuvo una *niña* ella, de Higinio Pérez" (t. 1447); que ella lo sabe porque la testigo entraba a la casa y salía— (¿una vez a la semana?)—porque Isilé era muy amiga de la testigo (t. 1448). Conducida de la mano por su abogado mejor que por su memoria, ahora declara que fue un *niño* lo que tuvo Isilé que se llamaba Luis y murió a los tres meses de nacido (t. 1448).

La testigo Briganti sigue declarando que Isilé estuvo viviendo en casa de Severo Sanabria como siete meses (t. 1557); y que a los siete meses de *estar* en casa de Severo Sanabria se fue a casa de su hermano Paco (t. 1560). De acuerdo con este primer cómputo de su memoria ha debido trasladarse a casa de Paco en enero 1904. Pero a renglón seguido añade que se trasladó a casa de Paco a los siete meses después de *muerto* el niño (t. 1561). El testimonio de la testigo Briganti no concuerda con la prueba documental sobre la fecha de la muerte del primer hijo de Isilé. De acuerdo con la prueba documental el primer hijo de Isilé, llamado Luis, murió el 14 de diciembre de 1903. De acuerdo con el testimonio de la testigo Briganti ella vio al primer hijo de Isilé en los últimos días de diciembre de 1903 (t. 1546) como de cinco días de nacido (t. 1547) y que dicho hijo murió a los tres meses de edad (t. 1448). De acuerdo con este segundo cómputo de su memoria, el niño que nació en los últimos días de diciembre de 1903, ha debido morir en los últimos días de marzo de 1904 y el traslado de Isilé a casa de Paco, siete meses más tarde de muerto el niño, ha debido ocurrir en los últimos días de octubre de 1904, o sea, cuatro meses antes de nacer Juliana Sanabria, quien nació el 8 de marzo de 1905.

Hay indicaciones en el testimonio de la testigo Briganti que demuestran que Isilé se fue a vivir a casa de Paco, en el 1903 y no en el 1904. Dice ella que Isilé se fue a vivir

a casa de Paco antes de desembarcar don Manuel (t. 1562) y que después de irse Isilé a casa de Paco, como a los tres meses, desembarcó don Manuel (t. 1563). El resultado de la prueba anteriormente expuesta es que don Manuel embarcó para España entre junio o julio de 1903 y desembarcó entre septiembre u octubre de 1903. Esta aseveración de la testigo Briganti confirma la de Isabel González, en el sentido, que su hermana Isilé salió de las Mareas, en algún momento antes de mediados de septiembre de 1903, hacia los Riegos. Si esto es así, el primer hijo de Isilé Sanabria, llamado Luis, nació en septiembre de 1903 en casa del hermano de Isilé, Paco Sanabria y no en casa del tío de Isilé, Severo Sanabria.

El testimonio de la testigo Briganti no es claro en cuanto a un extremo importante de este caso: hasta cuándo vivió Isilé en casa de Severo Sanabria. Sabemos cuando llegó porque la testigo Briganti nos dice que dos semanas después de salir las hermanas de casa de don Manuel, vio a Isilé en casa de Severo (t. 1538), y que "al tiempo, en pocos meses, tuvo una niña de Higinio Pérez" (t. 1447), que después cambió a un niño que se llamaba Luis, el primer hijo que le nace a Isilé a mediados de septiembre de 1903. La testigo Briganti no recuerda la última vez que vio a Isilé en casa de Severo Sanabria (t. 1564-1567). Acuciada por el contrainterrogatorio declaró que Isilé "tenía siete meses cuando salió de allí" (t. 1564). No sabemos si fueron siete meses desde que llegó en junio de 1903 a casa de Severo, en cuyo caso Isilé ha debido salir de casa de Severo en enero de 1904 o desde cualquier otra fecha. La testigo Briganti tampoco recuerda si vio a Higinio en casa de Severo la última vez que vio a Isilé allí (t. 1563-1564). Dice que la última vez que vio a Isilé en casa de Severo, Higinio trabajaba en Fortuna de Gual (t. 1564) y que ella (la testigo Briganti) "en la casa de Severo no lo veía" (t. 1565).

Uno de los abogados de la sucesión demandada trató de dejar afirmado el hecho que Isilé siguió viviendo en casa de

Severo Sanabria con Higinio Pérez hasta que pasó a vivir a casa de Paco Sanabria, y dos veces la testigo Briganti evadió la contestación categórica. La primera vez simplemente declaró: "El fue quien la llevó allá, el que la *trasladó* allí a la *edad de siete meses* del niño muerto" (t. 1594). La segunda vez al preguntarle si era Higinio quien la mandaba a casa de Paco, ella simplemente declaró, haciendo referencia a un lío de ropa "bueno que lo iba a mandar (a buscar) con él" (t. 1605). La testigo Briganti declara, no obstante que después que Isilé salió de la casa de don Manuel no volvió más a la casa (t. 1602–1603).

La prueba no es clara en cuanto a si Isilé Sanabria e Higinio Pérez vivieron juntos en casa de Severo Sanabria o de Paco Sanabria. En la casa de Severo, la testigo Briganti sitúa a Higinio Pérez ocasionalmente: "A veces (los sábados) lo veía arriba; otras veces en la cocina y otras veces frente a la carretera, sentado en la escalera" (t. 1447). En la casa de Severo, vivían, además de Severo, su mujer Juana, Isilé y posiblemente en el período de tiempo comprendido en la declaración hasta septiembre de 1903, Isabel González, la hija natural de don Manuel González. La testigo de la sucesión demandada, doña Ana María, declara que la casa de Severo era pequeñísima (t. 3350).

En la casa de Paco, la testigo Briganti afirma que veía a Higinio Pérez "que estaba a diario allí", (t. 1461) pero no especifica donde. Sabemos que Higinio Pérez no vivía en casa de Paco, porque según la testigo Briganti, en la casa los que vivían eran la señora de Paco (Fela Cartagena), el cuñado de Paco, (Alejandro Ramos Cartagena), Isilé Sanabria y su hermano Paco (t. 1463–1464).

La propia testigo Briganti nos dice que Higinio Pérez, quien era casado con Pascuala Romero, tía del testigo de la demandante Francisco Romero, vivió siempre en Fortuna de Gual (t. 1566) y que tenía la señora en Fortuna de Gual desde que vino a la finca de don Manuel (t. 1589). También

nos dice, según lo hemos visto anteriormente, que el único hombre que le puso casa a Isilé fue Gaspar Carrillo (t. 1474).

La alegada paternidad de Higinio Pérez del segundo hijo de Isilé, la aquí demandante Juliana Sanabria, la obtiene la testigo Briganti más por deducción que por observación de los hechos. La testigo Briganti había declarado que fue Higinio Pérez quien *trasladó* a Isilé a casa de su hermano Paco Sanabria, a la "edad de siete meses" después de muerto el niño (t. 1594). Según hemos visto, esto ha tenido que suceder alrededor de octubre de 1904. Dice que cuando ella vivía frente a la casa de don Manuel (t. 1638), "a muy poca distancia" de la casa de don Manuel (t. 1638), Isilé pasó frente a la casa de la testigo con Higinio Pérez y dejó un lío en casa de la testigo (t. 1603) y le dijo a la testigo que le mandara el lío con Higinio al otro día por la tarde (t. 1604). Dice que el lío lo llevaba Isilé y que Higinio no llevaba ningún lío (t. 1648). Dice que quien habló sobre eso de mandarle el lío al otro día a casa de Paco, fue Isilé pero Higinio no dijo nada (t. 1649). Dice que en casa de Paco Sanabria, "pues ocurrió que en el 1905 pues tuvo a Juliana Sanabria" (t. 1452). Presume que Juliana es hija de Higinio porque Isilé "pasó por mi casa y me dejó un lío en mi casa" (t. 1603) para "que se lo mandara con Higinio por la tarde al otro día" (t. 1604). Dice que ella veía a Higinio Pérez "que estaba a diario allí (en casa de Paco), que era el que yo veía a diario allí" (t. 1461). Este *estar* de Higinio Pérez ha tenido que ser por los alrededores de la casa de Paco, porque según la testigo Briganti, Higinio no vivía en casa de Paco.

Esta vez, Isilé no le dijo a la testigo Briganti quien era el padre de su hija, como alega se lo dijo la primera vez al encontrarla en casa de Severo Sanabria. La supuesta paternidad de Higinio de Juliana Sanabria la deduce la testigo Briganti de este *paso* de Isilé junto a Higinio Pérez frente a la casa de la testigo Briganti y de haber visto a Higinio Pérez cerca de la casa de Paco Sanabria.

· .De acuerdo con los únicos hechos indisputados que poseemos para organizar este aspecto del testimonio de la testigo Briganti—el matrimonio de don Manuel con doña Ana María el 3 de septiembre de 1904 y el nacimiento de Juliana Sanabria el 8 de marzo de 1905—este *paso* de Isilé con Higinio frente a la casa de la testigo Briganti ha debido ser después del 3 de septiembre de 1904, cuando ya Isilé tiene cuatro o cinco meses de estar embarazada de su hija Juliana. Es curioso observar que esta fecha coincide con la fecha, en que, de acuerdo con el testigo de la demandante Francisco Romero, Isilé sale de casa de don Manuel para la casa de Severo Sanabria.

La segunda versión sobre la posible paternidad de Higinio Pérez es la que nos ofrece la testigo de la sucesión demandada Isabel González. Dice Isabel que algún tiempo después de haber regresado la demandante Juliana Sanabria, en 1938, del convento de Cuba, donde se proponía profesar, y ya viviendo Juliana con Isabel en la casa de ésta, don Manuel se encontró con Juliana en casa de Isabel y al requerirle Juliana a don Manuel que la reconociera como hija natural suya, don Manuel le contestó que "el no era su padre, que su padre era un domador de caballos" (t. 1053–1054). De acuerdo con la prueba de la sucesión demandada, Higinio Pérez era un domador de caballos que trabajaba para don Manuel. Continúa diciendo la testigo González, que algún tiempo después de escuchar la conversación entre don Manuel y la aquí demandante, Juliana Sanabria, la testigo González quiso "asegurarse" si la pretensión de Juliana era legítima, y la testigo González le preguntó a don Manuel si Juliana era hija de él y "me dijo que no era hija de él" (t. 1209).

Esta afirmación queda en entredicho cuando se presenta el Exhibit II de refutación de la demandante. Se trata de un retrato de Isabel González, reconocido por ésta como suyo (t. 1245) y entregado por ésta a Juliana (t. 1246). Al dorso, el retrato está dedicado de la siguiente manera: "Un

recuerdo *a mi hermana* S. M. R. de Isabel". La prueba demuestra que mientras estuvo de novicia en un convento en Cuba, el nombre de religiosa de Juliana Sanabria era Sor María San Raimundo (t. 535). Isabel González declara que, por lo menos, recuerda que Juliana se llamaba cuando novicia "Raimunda" (t. 1248–1249 y 1250 *in fine*). Dice que el tratamiento de "Sor" es equivalente a "hermana" dentro de la etiqueta religiosa (t. 1249) y que en las cartas que Isabel González le dirigía a Juliana mientras estuvo ésta en el convento, la trataba de "Sor" (t. 1250). Lo que no recuerda es si el nombre de religiosa de Juliana era "María Raimunda" o "Raimunda" a secas (t. 1248–1249).

No es difícil concluir, que en su forma extensa, la dedicatoria dice: "un recuerdo a mi hermana Sor María Raimunda de Isabel". La testigo González intenta negar la dedicatoria, primero, mediante evasivas; más tarde, mediante negativas. Empieza dudando que la letra sea suya: "Me *parece* que esa no es mi letra"; "Me *parece* que no. Yo nunca dedico retratos a nadie"; "no *recuerdo* que yo haya escrito eso. Yo le dije que cogiera uno, pero no lo escribí, porque yo nunca dedico retratos" (t. 1247). La testigo González admite que ella le escribía a Juliana cuando Juliana estaba en el convento (t. 1248); pero en cuanto a la dedicatoria: "No recuerda haberle escrito nada. No acostumbraba dedicar retratos. Esto no es mío" (t. 1251–1252). Niega que haya firmado "Isabel" como aparece en la dedicatoria: "Bueno, porque las letras se imitan también" (t. 1252), por eso, no reconoce la firma del retrato "como que sea mi letra" (t. 1252). Dice que no *recuerda* haber escrito la palabra "Isabel" (t. 1253). Entonces ocurre un incidente, un tanto extraño. Está preguntando uno de los abogados de la demandante:

"P. Hágame el favor. Escríbame aquí una cosa que le voy a decir.

"Lic. RIVERA ZAYAS: Quiero decirle que instruya a la testigo la corte que si ella quiere voluntariamente hacerlo.

"R. ¿Hasta dónde escribo?

"P. Escríbame ahí "Isabel".

"LIC. RIVERA ZAYAS: Que se instruya a la testigo que si ella quiere voluntariamente escribir puede hacerlo, pero que si no lo desea, puede negarse. El compañero puede hacerle preguntas a la testigo, pero no decirle que escriba.

"SR. JUEZ: Está bien.

"LIC. QUIÑONES: Que se le instruya. Si no lo escribe, ya habrá un medio de que quiera.

"LIC. RIVERA ZAYAS: *Yo he dicho que se le instruya que no haga nada que pueda incriminarla.*

"LIC. QUIÑONES: Pero si está diciendo la verdad, ¿cómo se le va a incriminar?

"LIC. RIVERA ZAYAS: ¿Y si ella se negara?

"TESTIGO: Lo que ustedes digan es lo que yo hago.

"SR. JUEZ: Si usted quiere firmar, firme.

"TESTIGO: Yo no quiero firmar.

"P. ¿Ni quiere poner lo que le voy a decir que ponga ahí?

"¿Qué me va a decir?

"P. Yo le pido a la señorita que escriba lo siguiente ahí: Un recuerdo a mi hermana Sor María Raimunda, de Isabel. "¿Usted lo quiere escribir en ese papel?

"R. No, señor.

"P. No, no lo quiere escribir. Vamos, señorita, presentándole eso. Esa firma que está ahí escrita, ¿de quién es?

"R. Esa es mía, pero ésa no la reconozco.

"P. ¿La del retrato?

"R. La del retrato.

"LIC. QUIÑONES: Se le acaba de presentar a la testigo la página 19 de una Deposición tomada en este caso en el Salón de Jurados de la Corte de Distrito de Guayama el día 30 de abril de 1948, ante el Comisionado Dávila Monsanto, Lic. José M. Dávila Monsanto.

"P. Dígame, ¿usted no le mandó retratos a Juliana al Convento?

"R. Yo . . .

"LIC. RIVERA ZAYAS: Un momento. ¿Terminó el compañero de hacer constar eso? Para nosotros hacer constar que eso es innecesario en vista que ésta es una firma puesta por ella ante el Comisionado y la pregunta y contestación era completamente innecesaria y pedimos la eliminación.

"SR. JUEZ: Sin lugar.

"LIC. RIVERA ZAYAS: Es un documento oficial éste.

"SR. JUEZ: Pero eso no le quita el derecho a la parte de preguntarle si ésa es su firma. Adelante.

"P. Y este retrato que yo le estoy mostrando ahora, y que usted admitió que era suyo, y que niega la dedicatoria . . .

"R. Sí, señor.

"P. ¿Este usted se la mandó al Convento a Juliana?

"R. Yo no *recuerdo*. Yo sé que ella vio unos retratos míos.

"LIC. RIVERA ZAYAS: Objeción. Yo voy a solicitar que se le instruya a la parte contraria que tiene que limitar la repregunta. Varias veces ha contestado que en su casa . . .

"SR. JUEZ: Se permite la pregunta.

"P. Dígame, señorita, ¿verdad que usted le mandó un retrato a Cuba a Juliana?

"R. Pues mire, *no recuerdo* si se lo mandé. Quizás sería ese mismo; porque yo le escribía a ella como Hermana del Convento, porque yo tengo otra amiga que es monja, y así la trato, como Hermana; y no la trato como Carola en el mundo, sino como mi querida hermana, porque a las religiosas hay que tratarlas así.

"P. Entonces, ¿éste fue el que usted la mandó?

"R. *Sería ése*.

"LIC. QUIÑONES: Para identificar, Sr. Juez.

"R. Ella me registraba todo lo que yo tenía en el ropero y ella miraba todo lo que tenía."

El ilustrado Juez sentenciador no obligó a Isabel González a reproducir frente a él la dedicatoria ni la firma que la suscribía, sin duda impresionado por el argumento de la autoincriminación. Claro, esto fortalece la identificación de la letra de la remitente por la demandante Juliana Sanabria (t. 3686), y el retrato con la dedicatoria, aceptado como prueba por el ilustrado Juez sentenciador (t. 3694), forma parte de los hechos probados del caso. Del propio testimonio de Isabel González se infiere que ese retrato le fue enviado a Juliana por Isabel mientras la primera estaba de novicia en el Convento de Cuba. Esto queda fortalecido por el tratamiento de "Sor" empleado en la dedicatoria. Tal tratamiento no tendría sentido después de Juliana haber

renunciado sus votos, que es cuando por primera y única vez Juliana va a vivir a casa de su familiar Isabel González.

Isabel González tampoco pudo asegurar que el retrato de don Manuel, presentado por la demandante como entregado a ella por don Manuel, para que tuviera un recuerdo de cómo era cuando joven (Exhibit 4) lo hubiera obtenido la aquí demandante Juliana Sanabria de algún modo subrepticio. Aunque los abogados de la sucesión demandada trataron de obtener de ella alguna aseveración, en el sentido, que el retrato ha podido estar en poder de algún familiar de don Manuel, del cual lo adquiriera Juliana, Isabel González se limitó a contestar: "Puede que sea que ella (Juliana) tuviera un retrato" (de don Manuel) (t. 1073), por lo cual no tenemos más remedio que considerar, como hecho probado, que don Manuel le entregó ese retrato de él a Juliana, antes de ella partir hacia el convento de Cuba. La prueba presentada por la sucesión demandada, en el sentido, que el día en que Juliana dice haber recibido ese retrato, don Manuel estaba en San Juan, no desvirtúa el hecho de la posesión ni excluye la posibilidad que ella lo recibiera en cualquier otro día.

Pasemos ahora al examen de la prueba relativa a los primeros años de Juliana Sanabria, especialmente el período de tiempo comprendido entre el 8 de marzo de 1905—fecha del nacimiento de Juliana—hasta el 22 de octubre de 1912—fecha de la muerte de su madre Isilé Sanabria.— La prueba de la demandante trata de establecer el hecho que Juliana Sanabria vivió en casa de Severo Sanabria hasta la muerte de Isilé, menos en algunos períodos de tiempo que pasaba en casa de su tío Paco Sanabria. La prueba de la sucesión demandada trata de establecer que Juliana Sanabria vivió en casa de Paco Sanabria hasta el 1907, y de ahí en adelante en casa de Gaspar Carrillo, el último "marido" que tuvo Isilé.

Según hemos visto, el testigo de la demandante Francisco Romero, declaró que en el 1904, don Manuel se llevó a Isilé

a casa de un tío de ella llamado Severo Sanabria y que a los cuatro o cinco meses de haber estado allí, Isilé dio a luz una niña (t. 38), precisamente el 8 de marzo de 1905. Ahora declara que antes de Isilé dar a luz esa muchachita, don Manuel pasaba por casa de Severo Sanabria, entraba, sacaba la cartera y le daba dinero (t. 39). Dice el testigo Romero que él salía en calesa con don Manuel para abrirle los portones (t. 39) y mientras don Manuel se desmontaba de la calesa, el testigo Romero se quedaba junto al caballo, aguantando el caballo (t. 40). Dice el testigo Romero, que después de nacer la niña, don Manuel "mandó (a) *uno* que había en la casa que fuera allá y le mandó dinero y luego, después, como a los cuatro o seis días" (de nacida la niña) don Manuel pasó por casa de Severo y le dijo a Isilé: "traela acá que quiero ver qué es, varón o mujer, y ella le contestó: "mujer, va a ser una chancleta" (t. 42). Dice que entonces don Manuel siguió pero después, otro día pasó (por casa de Severo) se desmontó y fue a la casa (t. 42). Dice el testigo Romero que él vio a don Manuel acariciando a la niña: "le pasaba la mano por la cabeza y luego, después, viraba y se montaba en la calesa" (t. 43). Sigue declarando el testigo Romero que él estuvo *viendo* a Juliana hasta la edad de seis años, o sea, hasta el 1911, porque el testigo dejó el trabajo de don Manuel en el 1912 y no volvió más a las fincas de don Manuel (t. 43). Según el testigo Romero, durante esos años, don Manuel le daba dinero a Isilé: "le daba, le daba y le ayudaba para que ella (Isilé) pudiera tenerla (a Juliana) entonces ella (Isilé) estaba en casa del tío y él siguió ayudándola" (t. 43) aunque "unas veces (Isilé) estaba en casa de Paco Sanabria y otras veces en casa de Severo Sanabria" (t. 44). Afirma el testigo Romero que él sabe que durante esos años, don Manuel ayudaba a la niña "porque lo veía . . . porque veía que la acariciaba y pasaba, había veces que él se quedaba, volvía y. se montaba en la calesa y seguiamos viaje" (t. 46).

Esta descripción de las relaciones de don Manuel con la niña, que presenta el testigo Romero, ha debido ser desde el 1905 hasta el 1908, o sea, hasta que la niña tuvo alrededor de cuatro años, pues según el propio testimonio del testigo Romero, en el 1908 dejó la casa de don Manuel y por órdenes de éste se trasladó a Fortuna a trabajar, razón por la cual, se puede deducir, que ya no salía en calesa con don Manuel, aunque es posible que siguiera *viendo* a Juliana hasta el 1912 fecha en que se retira de las fincas de don Manuel.

El segundo testigo de la demandante es la misma demandante Juliana Sanabria, quien declara haber conocido a don Manuel en su casa desde que ella era "bien chiquita" (t. 447) mientras la testigo vivía en el Coquí (t. 447) con su madre Isilé Sanabria (t. 447) en una casa de don Manuel González (t. 448) donde también vivía un tío de la madre de la testigo llamado Severo Sanabria (t. 448–449). Sus primeras memorias de don Manuel parecen ser que don Manuel le daba paseos en calesa y "se ponía a tirar pesetas para arriba para yo recogerlas y me hacía caricias y cuantas veces él me veía subir en un portón cerca de mi casa, él se bajaba de la calesa y me daba nalgadas y me bajaba del portón" (t. 451-452). Dice que ella veía a don Manuel "casi todas las semanas; una o dos veces él iba" (t. 452) y alguna vez lo vio dentro de la casa, estando la testigo dentro de la casa (t. 452-453), además de Juana Vázquez, esposa de su tío Severo, su tío Severo y su madre (Isilé Sanabria) (t. 453). Dice que en una ocasión, al menos, don Manuel entró al cuarto y se quedó allí algún tiempo (t. 454-592) y después al salir acarició a la testigo y se fue (t. 454). Dice que don Manuel estuvo yendo a esa casa "hasta seis o siete años que yo viví allí (hasta) que mi madre murió" (t. 456). Dice que al morir su madre—22 de octubre de 1912—la testigo tendría como siete años (t. 457).

En cuanto al sostenimiento de la demandante, ésta declara que don Manuel le daba dinero a su madre o a Juana Váz-

quez, que fue quien asistió a Isilé cuando dio a luz a Juliana (t. 457) y que eso fue así hasta que Isilé murió (t. 458). Dice que después de morir Isilé, don Manuel fue a casa de un tío de ella que todavía vive (Paco Sanabria) y como la testigo tenía un traje de color, don Manuel le preguntó que por qué ella llevaba traje de color (t. 459) y ella no supo qué contestar, y entonces, don Manuel le dijo que su esposa doña Ana le mandaría a hacer los trajes de medio luto (t. 459) y a los pocos días le mandaron los trajes (t. 460).

Dice la demandante que su madre murió en casa del hermano de ella, Paco Sanabria (t. 460) y que ella estuvo viviendo unos días en casa de Paco Sanabria (después de muerta su madre) (t. 461). Dice que algún tiempo después don Manuel le dijo a ella que la "iba a entregar a Cristina Curet para que me cuidara y supiera en la escuela y que él le daría todo lo que yo necesitaba" (t. 461).

Sometida a contrainterrogatorio, la demandante declaró que algunas veces la llevaban a casa de Paco Sanabria, donde pasaba semanas, de vez en cuando (t. 584-585) y que llevaba como una semana en casa de Paco cuando su madre murió (t. 586). Dice que le es imposible precisar cuál fue la temporada más larga que pasó en casa de Paco (t. 587) aunque recuerda que cuando murió su madre llevaba una semana en casa de Paco (t. 587), "pero las otras veces no puedo decir el tiempo que pasáramos allí" (t. 587). Dice que en la casa donde vivía ella con su madre, allí vivió Severo, que murió, pero yo tengo una idea muy vaga de Severo. Mi mamá quedó allí con Juana, esposa de Severo, que era la señora de él y que me cuidaba a mí y era con quien yo pasaba más tiempo. Como era la que me cuidaba era la que andaba conmigo" (t. 588).

Sigue declarando la demandante que recuerda a don Manuel desde los cinco años en adelante—desde el 1910—entonces "desde que pude yo tener recuerdo, que usted sabe que al niño lo que le impresiona y le llama la atención es lo que

recuerda" (t. 589); aunque no puede decir el tiempo exacto que pasó desde la primera vez que recuerda haber visto a don Manuel—según su cálculo mental desde el 1910—(t. 457-589) hasta que murió su madre (1912), ya que "exactamente no podría decir si pasaría año y medio, dos años; una cosa así desde la primera vez hasta que murió mi madre" (t. 590).

En cuanto a los otros dos hermanos de ella que nacieron después de la testigo, dice que ella no los conoció (t. 593) y que ella "estaba sola, completamente sola y yo viví completamente sola hasta que murió mi mamá" (t. 594). Dice era Juana Vázquez la que estaba todo el tiempo con ella (t. 594) ya que su madre solía ausentarse: "Yo no puedo decir lo que ella haría porque la encargada de mí era Juana Vázquez, la señora del tío de mi mamá" (t. 594). Dice que no puede recordar si su madre pasó el año en que ella (Isilé) murió (1912) con la testigo (t. 595) pero sí puede decir que ella (Isilé) se ausentaba, pero que no podría decir el tiempo que su madre se ausentaba sin decir una mentira (t. 596). Dice que no vió a su madre llevando relaciones de marido y mujer con Alejandro Ramos Cartagena (t. 597). De acuerdo con la estipulación de las partes, las relaciones entre Isilé y Alejandro,—*si las hubo*, dice la estipulación— fueron a finales del 1907 o a principios del 1908. En estos años, la demandante Juliana Sanabria tendría de dos a tres años de edad. En la prueba no consta la fecha en que nació Nemesio, el supuesto hijo de Isilé con su concuñado Alejandro Ramos. Dice que supo de Nemesio "después que vine de Cuba (1938) porque se me puso en el Colegio de las Monjas y nunca me llevaron a Salinas a conocer la familia hasta últimamente que me he tirado a Salinas" (t. 598). Dice que no sabía del hijo de su mamá antes de nacer ella (t. 600) y no conoció ni vió en su casa a Rafael Gaspar Carrillo (t. 602) ni vió a la hija de Isilé con Gaspar Carrillo, llamada Olympia (t. 602). Dice que en casa de Paco estaban los hijos de Paco y su se-

ñora Fela (t. 603) y en casa de Juana Vázquez no hubo ningún otro hombre después que murió Severo (t. 603).

Dice que no averiguó quien le llevó los trajes de luto (t. 607) y que no sabe si fue don Manuel (t. 607). Dice que ella veía cuando don Manuel le daba dinero a Juana o a su mamá y que ella recuerda eso desde los cinco años en adelante hasta los siete (t. 609), o sea desde el 1910 hasta el 1912.

La testigo de la sucesión demandada Dolores Briganti había declarado que Isilé estuvo bastante tiempo en casa de Severo (t. 1449), según los cálculos de ella, hasta octubre de 1904, y después Isilé se fue a vivir a casa de Paco Sanabria en los Riegos (t. 1449 y 1561) y que allá, (en casa de Paco) "Pues ocurrió que en el 1905, pues tuvo a Juliana Sanabria" (t. 1452). Ahora declara que Isilé siguió viviendo en casa de Paco "hasta la edad en que la niña podía tener como un año y meses" (t. 1456), o sea, hasta el 1906 y meses, aunque posteriormente declara que Isilé vivió en casa de Paco "hasta la edad que tuvo Julia dos años y meses" (t. 1563), o sea, hasta el 1907 y meses pasando entonces en el 1907, madre e hija, a vivir con Gaspar Carrillo (t. 1583) que fue el único hombre que le puso casa a ella (t. 1474). De acuerdo con los hechos estipulados las relaciones sexuales entre Isilé y Alejandro Ramos Cartagena, de haberlas habido, empezaron a fines de 1907 o a principios de 1908, presuntivamente en casa de Paco Sanabria donde vivían ambos, según la testigo Briganti. No sabemos la fecha en que nace Nemesio, pero del hecho estipulado se puede deducir que ha debido nacer a fines del 1908 o a principios del 1909. De manera que el cálculo mental de la testigo Briganti, en cuanto a la fecha en que Isilé empezó a vivir con Gaspar Carrillo, está contradicho por la propia prueba de la sucesión demandada.

Haciendo uso del único dato indisputado que poseemos sobre los amores de Isilé con Gaspar Carrillo—el nacimiento

de la hija de ambos, Olympia, nacida el 1ro. de abril de 1912 —dichos amores han debido comenzar entre los meses de junio o julio de 1911, fecha de la concepción de la niña Olympia. De ambas fechas—1907 o 1911—nos parece más prudente escoger la última como la fecha en que Isilé se va a vivir con Gaspar Carrillo, quedando entonces el conflicto de la prueba reducido a determinar si entre el 1907 y el 1911 Juliana vivía con su madre en casa de Gaspar Carrillo o en casa de Juana Vázquez, esposa de Severo Sanabria.

La testigo de la sucesión demandada doña Ana María Hernández viuda de González, declaró que a fines del 1904 y en el 1905 ella salía con don Manuel para ver las fincas de pasto donde se criaba el ganado, e iban a "Fortuna", a "Besosa" que después se llamó "Florida", a "Aguirre" que era donde ella vivía con don Manuel, a "Rosales", a "Sabater", a la "Teresa" (t. 3348). Dice que el camino para entrar y salir a la casa de ellos, estaba cerca del Coquí y el Coquí estaba en la finca Aguirre (t. 3348). Dice que por esos años podían salir además por Sabater o por Fortuna (t. 3349) pero la entrada que más se usaba cuando ella se casó era la del Coquí (t. 3349). Dice que la persona encargada de vigilar el portón de entrada de la carretera a la finca donde ellos vivían era Severo, un tío de Isabel Sanabria (Isabel González) (t. 3349), quien vivía en una casita a la entrada de la misma carretera, al lado del portón, porque él (Severo) tenía la llave (t. 3349). Dice que el que llevaba la llave para abrir la puerta era el mismo Severo "y si no Juana, se llamaba Juana la mujer de él" (t. 3349). Dice que al pasar "siempre hablábamos (don Manuel y ella) con ellos dos" (t. 3350). Dice que no conoció a ninguna otra persona adulta viviendo con Severo y Juana, ni a ninguna niña (t. 3350). "No creo que viviera nadie allí, porque aquello era chiquito . . . la casita pequeñísima" (t. 3350).

De las incursiones de doña Ana María, por las fincas de don Manuel, el contrainterrogatorio nos obliga a descontar

ciertos períodos de tiempo durante los cuales ella estuvo viajando, bien sola o en compañía de don Manuel. Empieza declarando que en algún período de tiempo comprendido entre el 3 de septiembre de 1904—fecha de su matrimonio con don Manuel—y el 4 de julio de 1905—fecha del nacimiento de su primer hijo Manuel (t. 3391)—ella hizo un viaje a Estados Unidos para seguir a Francia y España "sin hijos y sin nada, Manuel y yo solos" a llevar a Rafael González a un sanatorio (t. 3383-3384) aunque, después, parece fijar este viaje en el 1907 (t. 3386). Si fue entre el 1904 y el 1905, este primer viaje de ella coincide bastante con el que recuerda la testigo Briganti, quien declaró que después de irse las dos hermanas de la casa de don Manuel, este se embarcó regresando en el 1904. Si fue en el 1907, queda sin sentido el término descriptivo "sin hijos y sin nada" pues a esa fecha ya ha nacido, por lo menos, su hijo Manuel. De las dos versiones, la que parece ser la más espontánea es la primera, en el sentido, que ese fue su primer viaje (1905) (t. 3385-3386 y 3394).

La versión del viaje que hizo en el 1905 está mejor formalizada. Sobre este viaje, doña Ana María declaró que en el 1905 al nacer su hijo Manuel—el 4 de julio de 1905—ella quedó un poco delicada y entonces fue a España (t. 3383) en septiembre (t. 3389) u octubre (t. 3391) de 1905, embárcandose sólo con la sirvienta y el niño (t. 3389) y su madre (t. 3383) y regresando a Puerto Rico a fines de 1906 (t. 3389). Dice que don Manuel la fue a buscar en mayo de 1906 (t. 3391) y él se quedó pasando el verano con su madre (t. 3389), o sea, desde el 25 de junio de 1906 al 25 de septiembre de 1906, período cubierto por la estación de verano, regresando ambos a fines del 1906 (t. 3389). De acuerdo con esta parte de su testimonio doña Ana María sale de Puerto Rico desde septiembre u octubre de 1905 y regresa a Puerto Rico entre septiembre y diciembre de 1906, mien-

tras que don Manuel sale de Puerto Rico en mayo de 1906 y regresa a Puerto Rico entre septiembre y diciembre de 1906.

Dice que mientras la madre de don Manuel vivió, y vivió durante todo el período cubierto por el examen de este período, ella y don Manuel iban a verla todos los · años (t. 3382-3390), saliendo cuando terminaba el cosecho (mayo) (t. 3393-3394) y regresando cuando iba a empezar la zafra. Declara que en casi todos sus primeros años de casada, por lo menos cinco meses del año ella no estaba en la finca de Salinas y que era don Manuel el que estaba en la finca (t. 3394). Hay prueba, fuera de estos viajes regulares a España de otros viajes a Estados Unidos en el 1907 y en el 1908 (t. 3381) y que en el 1909, debido a la enfermedad de la madre de doña Ana María, don Manuel dejó el cosecho y todo y se fue a acompañar a la madre de doña Ana María y a su esposa a un viaje a España regresando don Manuel en agosto de 1909 y quedándose doña Ana María hasta principios de 1910, que fue el padre de doña Ana María a buscarla (t. 3393-3394). Dice que en el 1910 nace su primera y única hija, la cual muere en el año 1911 (t. 3384) y que en el 1911 fue a Estados Unidos cuando su esposo pensaba comprar la Covadonga (t. 3388) y sigue para España, donde nace su hijo Guillermo —el 26 de junio de 1912— y de allí regresa a Puerto Rico directamente en el 1912 (t.3392).

También de las posibles incursiones de doña Ana María por las fincas de su esposo, hay que descartar ciertos períodos laborables durante los cuales, don Manuel ha debido estar imposibilitado de salir en calesa a voltear con su esposa doña Ana María. Como se ha visto, don Manuel salía hacia España en mayo y regresaba cuando iba a empezar la zafra. Del propio testimonio de doña Ana María se desprende que el tiempo de zafra era bastante azaroso para don Manuel, y que éste salía solo a la finca hasta la hora del almuerzo (t. 3400) a caballo (t. 3401) y algunas veces había que mandarle el almuerzo al sitio donde se cargaba la caña (t. 3401).

Hay, asimismo, una parte de su testimonio en la cual doña Ana María declara que ella no pasó por el Coquí, el sitio donde vivía Severo hasta el 1906 (t. 3404) que fue al tiempo que empezó a sembrarse caña. Dice que después que se arrendó Sabater, después de ella estar casada "puede que sean seis, cuatro, dos, cinco años" de estar casada, el sitio por donde con más frecuencia se salía era por Fortuna (t. 3410) porque entonces tenían tres salidas "la del Coquí que se quitó y quedó Sabater y Fortuna" (t. 3410). Dice que usaban con más frecuencia el camino de Fortuna porque era el mejor camino (t. 3411). Ahora parece rectificarse en parte, al decir, que durante sus tres primeros años de casada (1904-1907) no tenían más salida que la del Coquí (t. 3412) pero ratifica que el camino de Fortuna se arregló cuando empezaron a sembrar caña en el 1906 (t. 3413). Si esto es así, el período de tiempo estricto por el cual ella hubiera podido pasar por el Coquí hubiera sido desde el 3 de septiembre de 1904 hasta el 1906.

Contrastados los cuatro últimos testimonios se puede establecer el hecho indisputado, que durante los años 1905 al 1912, Severo Sanabria y su mujer Juana Vázquez, vivieron en el barrio Coquí, en una casa propiedad de don Manuel González. En cuanto al hecho disputado sobre quienes vivieron en casa de Severo durante ese mismo período de tiempo, las aseveraciones de la demandante Juliana Sanabria y del testigo de la demandante Francisco Romero, que Isilé Sanabria vivió en casa de Severo con su hija Juliana durante esos años, queda contradicho por la aseveración de doña Ana María, que durante los tres primeros años de su matrimonio con don Manuel, cuando todavía se utilizaba la entrada del Coquí, ella no vio a ninguna persona adulta, fuera de Severo y su mujer, o a ningún niño, viviendo en casa de Severo Sanabria, y por la testigo de la sucesión demandada Dolores Briganti, quien declaró que después de octubre de 1904, Isilé vivió con su hija Juliana en casa de su hermano Paco hasta el

1907 y meses, y después Isilé se llevó a la niña a casa de Gaspar Carrillo hasta que muere Isilé en el 1912. Su afirmación que después del 1907, Isilé y su hija Juliana pasaron a vivir a casa de Gaspar Carrillo, a su vez está impugnada por la propia prueba de la sucesión demandada que trata de establecer que a finales del 1907, Isilé empieza a tener relaciones amorosas con su concuñado Alejandro Ramos Cartagena. En las conclusiones finales del caso, resolveremos este conflicto entre la prueba de ambas partes.

El período de tiempo comprendido entre los años 1912 y 1919, o sea, desde la muerte de la madre de la demandante acaecida el 22 de octubre de 1912 hasta que la demandante pasa al cuidado de doña Ana María Hernández, en algún momento entre junio y agosto de 1919, presenta tres conflictos de prueba que nos proponemos examinar con riguroso método: (1) En que sitios y por cuánto tiempo vive la demandante durante estos años; (2) en que escuelas y hasta cuándo estudia la demandante durante ese mismo período de tiempo; (3) cuales son los actos de reconocimiento que pueden ser atribuídos al causante de la sucesión demandada, a su esposa o a su hija natural Isabel González. Como hasta ahora, trataremos de puntualizar especialmente los hechos, que aparecen corroborados por la prueba contraria.

1. La demandante Juliana Sanabria declaró que al morir su madre, "don Manuel me dijo que me iba a entregar a Cristina Curet para que me cuidara . . . y que él le daría (a Cristina) todo lo que yo necesitaba" (t. 461). Ahora declara que eso se lo dijo don Manuel después que pasaron los rosarios (t. 462). Habiendo muerto Isilé el 22 de octubre de 1912, los rosarios deben haber terminado a principios de noviembre de 1912. Entonces, esta conversación de don Manuel con Juliana ha debido ser en los primeros días de noviembre de 1912.

Sigue diciendo la demandante que Cristina la fue a buscar y la llevó a Guayama, a una parte que queda a la salida de

Guayama para Arroyo, yendo a vivir a un sitio que se llama Hoyo Inglés (t. 462-463). Dice que en Guayama no pasó un año completo, sólo *un curso escolar* en el 1913 (t. 463). Esto concuerda con lo que declara Isabel González, en el sentido que Juliana sólo estuvo "poco" en Guayama "fue unos meses" (t. 1020). Añade la demandante que don Manuel le dijo a Cristina que regresaron al campo porque la demandante podía asistir allí a la escuela (t. 468) y cuando terminó el *curso* se fueron a los Húcares (t. 468).

Dice la demandante que regresaron a una finca de don Manuel, cerca del barrio de Sabana Llana, a una casa grande donde vivía Juan Colón con su señora Juana Velázquez (t. 469) y que la casa era propiedad de don Manuel González (t. 470). Dice además que la demandante vivió allí (en casa de Juan Colón) al cuidado de Cristina Curet, durante dos cursos escolares (t. 471). Dice que estuvo en los Húcares dos años "cerca de dos años no completos, o sea dos *cursos* escolares" y entonces se fueron a vivir a una colonia llamada Sabater, propiedad de don Manuel González, en el pueblo de Salinas (t. 479), en cuyo último sitio (Sabater) vivió con Cristina "más de tres años" (t. 480) hasta el 1919 (t. 486); entonces, desde julio de 1916 hasta julio de 1919.

En cuanto al primer extremo de la declaración de la demandante, referente al tiempo que dura la estadía de la demandante Juliana Sanabria en Guayama, la única impugnación directa a las aseveraciones de la testigo Sanabria que contiene la prueba de la sucesión demandada, la encontramos en los testimonios de María Curet y de Sabad Reyes Aponte, Dice la testigo Curet que ella fue a ver a Cristina a casa de don Manuel y entonces: "ya ella (Cristina) tenía la niñita esta (la demandante) en la casa de don Manuel y ella (Cristina) me presentó la señora de don Manuel" y "después *al* transcurso de los días fue que ella (Cristina) acordó llevarme la niña a casa porque no la podía tener en el trabajo" (t. 1786-1787). De acuerdo con el testimonio de doña Ana

María, durante el viaje a España que hicieron ella y don Manuel en el 1912, en el cual había de nacer su hijo Guillermo en Barcelona el 26 de junio de 1912, don Manuel llegó a Barcelona en los primeros días de junio y regresó a Puerto Rico en septiembre u octubre de 1912 (t. 3203) mientras doña Ana María regresó en diciembre de 1912 o en enero de 1913, cuando su hijo Guillermo tendría como seis meses (t. 3203). Conciliando la propia prueba de la sucesión demandada tenemos que concluir que esta visita de la testigo Curet a casa de don Manuel, cuando "ya ella (Cristina) tenía la niñita" y "ella (Cristina) me presentó la señora de don Manuel" ha tenido que ser en diciembre de 1912 o enero de 1913. La fecha exacta en que la demandante Juliana Sanabria llega a casa de la testigo Curet queda flotando a merced de una frase vaga; "al transcurso de los días" (t. 1786). Añade la testigo Curet que después de ver la niña (la demandante), en casa de don Manuel, al traer Cristina a la demandante le dijo: "te traigo esta muchachita que es hija de una comadre mía que murió (Isilé, quien murió el 22 de octubre de 1912) y me la dio y yo no puedo tenerla en el trabajo y yo siempre te ayudaré" (t. 1780). Lo más probable es que la demandante llegara a casa de la testigo Curet en diciembre de 1912 o enero de 1913. La testigo Curet confirma este aserto, al declarar que la testigo no está segura si a la niña la trajeron a su casa en el 1912 o el 1913 (t. 1750).

La fecha en que la demandante Juliana Sanabria sale de la casa de María Curet en Guayama para irse al campo presenta otro conflicto de prueba entre el testimonio de Sabad Reyes Aponte y el de María Curet ambos testigos de la sucesión demandada. Según Sabad Reyes, él conoció a la demandante Juliana Sanabria, "cuando *chiquita*" en la colonia Sabater (t. 1842) donde vivía con Cristina Curet (t. 1844) y aunque no recuerda bien los años (cuando la conoció *chiquita*), ha podido ser "allá en el mil novecientos trece, una

cosa así" (t. 1843) y añade que después del 1913 el testigo siguió viendo a la demandante "poco tiempo después" (t. 1844). La demandante declara que en una de las visitas que hiciera ella con Cristina a la casa de don Manuel (en Sabater) vio a Sabad Reyes "una sola vez ... afuera ... cerca de la vaquería" (t. 636-637) y Cristina y ella esperaron que don Manuel hablara con Sabad Reyes para entonces hablar ellas con don Manuel (t. 637). Sabe el testigo Reyes que Juliana iba a la escuela porque la veía salir con los hijos de don Antonio Santiago (t. 1855). De acuerdo con la prueba de la sucesión demandada esto ha tenido que ser después de julio de 1916, según veremos más adelante.

Sigue declarando el testigo Reyes que él iba pocas veces a Sabater (t. 1874) y pocas veces vio a Cristina saludando a don Manuel porque "muy pocas veces la veía porque yo eran pocas las veces que iba allí a trabajar y muy pocas veces se presentaba él (don Manuel) también" (t. 1886-1887). Dice que a Juliana "*la veí* cuando chiquita allí, que llegó ella allí" (t. 1888) ; tendría como ocho a nueve años (t. 1888). De acuerdo con la fecha en que nació Juliana esto ha tenido que ser en el 1913 o 1914. No obstante, admite el testigo que entre el 1914 y el 1915 estuvo diez meses sin trabajar, recluído en su casa, porque se rompió una pierna (t. 1893) y para esa fecha no sabía donde estaba Juliana (t. 1894).

Por el contrario, la testigo de la sucesión demandada María Curet afirma que la demandante Juliana Sanabria llegó a casa de la testigo cuando era una niña de más o menos siete u ocho años (t. 1729)—1912 o 1913—y que ella cree que Juliana "estuviera (en casa de la testigo) más de dos años o algo menos de dos años" (t. 1730) (1912-1914 o 1913-1915), pero recuerda que Juliana salió de casa de la testigo antes de la testigo casarse el 14 de mayo de 1914 (t. 1731-1732 y 1751). Más tarde declara no estar segura si a la niña la trajeron a casa de la testigo en el 1912 o en el 1913 (t. 1750), pero recuerda que cuando Cristina se llevó

a Juliana de la casa de la testigo, Juliana había terminado el segundo grado (t. 1755-1768).

Si esto es así, Sabad Reyes no pudo ver a la demandante viviendo en Sabater en el 1913 puesto que vivía en Hoyo Inglés. Lo más probable es que la viera en ocasión de alguna visita de la demandante a la casa de don Manuel en compañía de María Curet según declara la demandante (t. 1735-1736). La declaración de la testigo Curet indica categóricamente que Juliana salió de la casa de María Curet en algún momento antes del 14 de mayo de 1914 (t. 1732).

2. Según la demandante, cuando terminó el curso escolar en mayo de 1913, ella y Cristina fueron a los Húcares (t. 468), una finca de don Manuel cerca del barrio de Sabana Llana (t. 468-469), a una casa grande donde vivía Juan Colón con su señora Juana Velázquez (t. 469) y que la casa era propiedad de don Manuel (t. 470). Dice la testigo que allí vivieron Cristina y ella durante *dos cursos* escolares (t. 471). De acuerdo con el propio testimonio de la demandante estos dos cursos escolares serían los correspondientes a los años escolares 1913-1914 y 1914-1915. La testigo de la demandante, Juana Velázquez, esposa de Juan Colón, corrobora a la demandante en cuanto al extremo que Cristina y la demandante vivieron con su esposo y ella en la casa grande de los Húcares durante *tres años* (t. 237).

El testigo de la demandante, Eladio Acosta Sánchez, corrobora también la declaración de la demandante, en el sentido que ésta estudió en una escuela del barrio de Sabana Llana de Salinas (t. 87). Esto ha debido ser durante el año escolar 1914-1915, porque al momento de declarar el 4 de mayo de 1948, el testigo Acosta dijo tener de cuarenta y dos a cuarenta y tres años, habiendo nacido entre el 1906 y 1907 (t. 87) y dice que fue a la escuela de Sabana Llana al "primer grado como de siete u ocho años" (t. 92). El testigo de la demandante, Pedro Cruz, dice que conoció a la demandante desde antes del 1914 en la escuela de Sabana Llana

(t. 279-280) y que cuando Juliana estaba en la escuela de Sabana Llana, Juliana vivía en el Húcar (t. 281) y él la vio en casa de Juan Colón (t. 303).

La prueba de la sucesión demandada trata de establecer que después de salir Juliana de la casa de María Curet en Guayama, en algún momento antes del 14 de mayo de 1914, Juliana se va a vivir a la colonia Sabater de don Manuel González, a un ranchón que se conocía como el "aeroplano".

Es conveniente puntualizar, un poco más, el momento en que, de acuerdo con la prueba de la sucesión demandada, Cristina sale de casa de don Manuel González y se va a vivir a Sabater, a un ranchón conocido por el "aeroplano", propiedad de don Manuel González. Doña Ana María Hernández, la esposa de don Manuel, declara que "Cristina debió ser cocinera de mi casa por ahí, por ahí, cuando murió mi hija" (t. 3452). Según el propio testimonio de doña Ana hay dos posibles fechas para la muerte de su hija, en el 1910 (t. 3452) o en junio de 1911 (t. 3199). Dice que después de la muerte de su hija, Cristina se enfermó y "entonces le dimos un cuarto en el 'aeroplano', para tenerla cerca, por si se me iba la cocinera poder mandar a buscarla" (t. 3452). Dice que cuando ella dice "le dimos un cuarto en el 'aeroplano', quiere decir ella y don Manuel (t. 3452-3453) y que "algún día que no teníamos cocinera (Cristina) venía y me ayudaba.... muy poco porque ella (Cristina) estaba enferma" (t. 3453).

Dice que Cristina le pidió permiso para tener una fonda y de esa fonda vivía ella con el marido (de Cristina) (t. 3453) aunque no era una verdadera fonda: "hacía comidas y le daba platos al peonaje. No es fonda precisamente" (t. 3454). Anteriormente doña Ana María ha descrito la fonda de la siguiente manera: "siempre tenía unas botellitas de maví que vendía y tenía sus frituras y cosas allí (t. 3422). Es preciso aclarar que el resto de la prueba no indica que Cristina tuviera marido, a la fecha que se refiere doña Ana María (t. 1803-1804). Posiblemente doña Ana confundiera

el caso de la mujer de Severo, Juana Vázquez, con el de Cristina.

La testigo Curet declara que Cristina se llevó a la demandante después que dejó de cocinar en casa de don Manuel (t. 1732). Cuándo es que Cristina sale de casa de don Manuel, no es un hecho claramente establecido por la prueba de la sucesión demandada. De acuerdo con el testimonio de doña Ana María, Cristina ha debido retirarse de su casa entre el 1910 y 1911. De acuerdo con el testimonio de María Curet, Cristina ha debido retirarse a principios del año 1913 (t. 1780). Declara la testigo Curet que cuando Cristina le entregó la niña, "ella (Cristina) estaba en casa de don Manuel y no podía tener la niña hasta que se salió del trabajo de allá y entonces se decidió a alquilar un cuarto en Sabater para vivir en Sabater y todo ese tiempo durante ella estaba cocinando, yo tenía la niña" (t. 1780). Si hemos de darle crédito a la declaración del testigo de la sucesión demandada Antonio Santiago (padre) él fue quien "fundó" el ranchón (el aeroplano) en el 1914 (t. 2290-2291) y que Cristina fue a pedirle un cuarto allí para trabajar "y yo le di un cuarto a ella en el mismo aeroplano cuando se terminó" (t. 2291). Parece que esto fue en los últimos meses de 1914 (t. 2321) posiblemente después de octubre (t. 2307).

El testimonio de doña Ana María indica que la "fonda" de Cristina en el aeroplano, se estableció tan pronto Cristina salió de su casa. La testigo Curet declara que después de Cristina dejar de trabajar en casa de don Manuel se fue al "aeroplano", pero la testigo no sabe si puso la fonda enseguida (t. 1782). De acuerdo con el testimonio de María Curet, Cristina tuvo el negocio de fonda en Sabater, durante dos períodos de tiempo; uno, después de salir de casa de don Manuel y otro, antes de casarse la testigo Curet el 14 de mayo de 1914. De acuerdo con esta declaración durante el primer período, 1913, la demandante Juliana Sanabria no vivía con Cristina en Sabater (t. 1734-35-1755 y 1780) sino

con María Curet en Hoyo Inglés en Guayama. Es durante el segundo período que Juliana va a vivir con Cristina en Sabater, posiblemente en los primeros meses del 1914 (t. 1765-66).

Los dos testigos de la sucesión demandada, Antonio Santiago hijo y Antonio Santiago padre, al principio de su declaración, pretenden referirse a un período de tiempo —principios de 1914— que establecería la solución de continuidad con el testimonio de la testigo Curet que determina la estadía de la demandante Juliana Sanabria en Hoyo Inglés, hasta algún momento antes del 14 de mayo de 1914. El testigo Antonio Santiago hijo empieza declarando que conoció a Juliana en Sabater, "desde el 1914 hasta el 1919" (t. 2245); que del 1914 "en adelante" (t. 2246), desde el mes de marzo de 1914, o sea dos meses después de enero de 1914 (t. 2266) y acaba aceptando que para el 1914 no sabe donde vivía Juliana porque "fue después que fue la vieja Cristina a pedir un cuarto" (t. 2267) y que Cristina llegó a Sabater a fines del 1914 y el testigo no sabe donde vivían Cristina y Juliana antes de esa fecha (t. 2267). Según el testigo Santiago, hijo, Cristina le fue a pedir la casa donde viviría con Juliana a mediados del 1914 y el padre del testigo no se la dio en esa fecha pero a finales de 1914 se la dio (t. 2268).

El testigo Antonio Santiago padre, empieza declarando que él llegó a Sabater a principios del año 1914 (t. 2307) y, a los pocos meses de llegar él a Sabater (t. 2310), como al mes y medio (t. 2311) cuando ya el testigo estaba acabando el ranchón ese (el aeroplano) (t. 2311), el testigo le dió una habitación a Cristina, quien se trasladó enseguida con una muchachita, Julia, "como de diez a once años" (t. 2312) y acaba aceptando que él llegó a Sabater en los últimos meses del año 1914 (t. 2321) en octubre de 1914 (t. 2307).

Después, el otro Santiago, testigo de la sucesión demandada, Miguel Santiago, hermano e hijo respectivamente de

los otros dos testigos Santiago, declara que su padre, Antonio Santiago, fue a trabajar a Sabater en el 1914, en los primeros meses de 1914 y después a fines del 1914, trasladaron a su padre a Florida (Besosa) (t. 2326) y estuvieron en Florida hasta el mes de julio de 1916 (t. 2327). Dice que a la demandante Juliana Sanabria la conoció en Sabater en el 1916 (t. 2324) ; que no recuerda haber visto a Juliana en el ranchón para el 1914 (t. 2330) aunque si la vio en el 1916 (t. 2331) y que tampoco vio a Cristina en Sabater a fines del 1914 (t. 2341). A base de esta declaración hay que concluir que la familia Santiago no llega a Sabater a principios o a fines del año 1914, (después de octubre), sino a mediados del año 1916 (después de julio).

3. Por el análisis anterior puede considerarse como un hecho indisputado, que la demandante Juliana Sanabria cursa su primer año escolar en el pueblo de Guayama. Hemos visto que este año escolar no ha podido ser el año 1912–1913 como pretende la demandante, y hasta cierto extremo, la testigo Curet, sino el año escolar 1913–1914. Siendo esto así, réstanos ahora determinar en qué escuela y hasta cuándo estudia Juliana durante los años escolares 1914–1915 y 1915–1916.

Declara la demandante Juliana Sanabria que don Manuel le dijo a Cristina que regresaran al campo porque allí la niña podía asistir a la escuela (t. 468). Que cuando se terminó el curso se fueron a los Húcares (t. 468) y entonces la demandante empezó a cursar su segundo grado en una escuela que quedaba en el barrio de Sabana Llana (t. 474), "antes eran escuelitas de mala muerte" (t. 628 y 641) pero que no tenía que cruzar el río para ir a la escuela (t. 628). Dice que había otra escuela después de pasar el río pero ella nunca fue allá (t. 644). Por las declaraciones de Eladio Acosta (t. 96) y Juan Colón (t. 1694) sabemos que la otra escuela estaba situada en Buena Vista, más allá del río. Dice que mientras vivió en los Húcares, "cerca de dos años no com-

pletos o sea dos cursos escolares" (t. 479); "estuve dos grados en los dos cursos porque se perdía mucho tiempo porque la profesora estaba enamorada de un gallego y se pasaba el tiempo hablando con él y perdíamos el tiempo" (t. 478). Esta frase "dos grados en los dos cursos" no tiene otra explicación posible que no sea que durante los dos cursos escolares, 1914–1915 y 1915–1916, la demandante estuvo en el mismo grado, el segundo grado, posiblemente sin aprobarlo. Por la descripción que ella hace de la escuela, "una escuela pequeña que tenía dos secciones, tres líneas de pupitres y una callejuela (pasillo) por el medio y tres líneas de pupitres" (t. 642), estando a un lado el segundo grado atrasado, y al otro lado, el segundo grado adelantado (t. 642), tal parece que en dicha escuela cada grado escolar estaba dividido en dos cursos, uno que se consideraba el "atrasado" y otro que se consideraba el "adelantado" (t. 642), aunque ambos a cargo de la misma profesora (t. 643), según la demandante, la señorita Silva (t. 643–629), aunque no puede decir si estudió con la señorita Silva el primer o segundo año de estar en Sabana Llana (t. 629). Hemos dicho que posiblemente Juliana no aprobara el segundo grado adelantado, porque ella misma, también declara, que cuando empezó a ir a la escuela del Coquí—en Sabater en 1916, según hemos visto— "volví otra vez a ingresar en el segundo grado y después me pasaron a tercero y hasta cuarto grado" (t. 480–481). La versión de que ella volvió a cursar el segundo grado al llegar a la escuela del Coquí la corroboran Antonio Santiago hijo (t. 2247) y Miguel Santiago (t. 2345–2346), ambos testigos de la sucesión demandada.

La aseveración de la demandante Juliana Sanabria en el sentido, que ella asistió a las escuelitas rurales del barrio de Sabana Llana está corroborada en bloque por los testimonios de Juana Velázquez, Pedro Cruz y Eladio Acosta. Las únicas contradicciones que hemos encontrado en la prueba de la demandante, se refieren exclusivamente al período de tiempo durante el cual la demandante estudió en la

escuela rural de Sabana Llana. De acuerdo con la propia
versión de la demandante, ella estudió en dicha escuela du-
rante los cursos escolares de 1913–1914 y de 1914–1915 y
que fue en el 1915 que se trasladó a Sabater (t. 631). Pero
también dice que vivió en Sabater con Cristina "más de tres
años" (t. 480) hasta el 1919 (t. 486). La prueba de ambas
partes coincide en cuanto al hecho que Juliana salió de Sa-
bater en el 1919 y fue a un colegio o asilo de Ponce
(t. 2245–3494). El único conflicto entre ambas pruebas
es si Juliana llegó al colegio a fines de septiembre de 1919
(t. 493), según asegura la demandante, o antes de junio
o julio de 1919, según asegura doña Ana María Hernández:
"Me la traen, *la llevo*, mejor dicho, la mando a las Huérfa-
nas, entonces al mes, eso debe ser como en *junio o julio*,
porque seguido la mando, la conocí hoy y al otro día se fue,
y al mes fue que la otra, Carmen Maneiro . . . que ya no
volví porque me embarqué en agosto (a Nueva York) a lle-
var otra vez los hijos y me quedé allí" (t. 3494). De ma-
nera, pues, que el mismo resultado tendremos, si se organizan
los testimonios desde el hecho indisputado de la muerte de
Isilé (22 de octubre de 1912) o desde el hecho indisputado
de la salida de Juliana de Sabater (junio a septiembre de
1919) ; Juliana vive en los Húcares del 1914 al 1916 y en
Sabater desde el 1916 al 1919.

La testigo Juana Velázquez no habla de período de tiempo
alguno. Se limita a declarar que mientras Juliana estuvo
en los Húcares iba a la escuela de Sabana Llana (t. 240).
El testigo Eladio Acosta Sánchez se limita a declarar que
estudió en una escuela del barrio de Sabana Llana de Sa-
linas y allí conoció a una compañera de escuela que le de-
cían "la gallega", (refiriéndose a Juliana) (t. 87–88). Dice
el testigo Acosta que él empezó en "primer grado como de
siete a ocho años" (t. 92). El testigo Acosta, al declarar el
4 de mayo de 1948, manifestó tener cuarenta y dos o cua-
renta y tres años (t. 87). Según esto ha debido nacer en el
1905 o 1906, y al asistir al primer grado "como de siete a

ocho años" ha tenido que ser entre el 1912 y el 1914. Posiblemente el testigo Acosta llegó a la escuela de Sabana Llana antes que la demandante, pues posteriormente declara, que mientras el testigo estaba en tercer grado con la señorita Silva y en cuarto grado con el señor Ocasio, la demandante estaba en segundo grado con la misma señorita Silva (t. 95), y que en ese mismo salón pasó el testigo a cuarto grado y cambió a otra escuela "en el sitio del centro, de Buenavista . . . al lado de allá del río" (t. 96). El hecho que una misma profesora enseñara más de un grado en las escuelas de Sabana Llana está corroborado por el propio testimonio de la señorita Silva (t. 1374–1376). No existe duda que el testigo Acosta estudió en las escuelas rurales de Sabana Llana, ya que así lo corroboran los propios testigos de la sucesión demandada, Serafín Pabón (t. 1291–1292) y Josefa Silva, (t. 1383–1384 y 1386). En lo que si puede haber conflicto es en el período de tiempo, durante el cual, el testigo Acosta estudia en dichas escuelas.

El testigo de la demandante Pedro Cruz declara que vio a la demandante Juliana Sanabria, antes del 1914, en la escuela de Sabana Llana (t. 279), una escuela que quedaba "en el mismo centro de Sabana Llana, en la orilla de la carretera de Salinas para Cayey" (t. 279–280). Dice el testigo Cruz que para esa "época"—antes del 1914—Juliana tendría de ocho a nueve años (t. 279–280). De acuerdo con la fecha en que nace Juliana—8 de marzo de 1905—esto ha debido ser en el 1913 o 1914. La testigo Curet corrobora esta observación del testigo Cruz, pues la primera declara que cuando la demandante fue a vivir a la casa de la testigo Curet, Juliana era una niña de siete a ocho años, "era muy pequeña, no se expresaba bien" (t. 1729–1730). De acuerdo con la fecha en que nació Juliana, esto *ha debido* ser en el 1912 o 1913. Dice el testigo Cruz que "esa vez" conoció a Juliana en la escuela "por poco tiempo" porque la familia del testigo pasó a Sabater, al morir la madre del testigo en el 1914 (t. 280–281) y después, desde el 1916 hasta el 1918,

vio a Julita (Juliana) y a Cristina en Sabater, en el "aero-plano" (t. 294). Como no consta el mes del año 1914 en que el testigo Cruz pasó a Sabater ni la fecha exacta en que murió su madre, no sabemos si ese término descriptivo "poco tiempo después" está o no comprendido en el año escolar 1914–1915, primer año que Juliana asiste a la escuela rural de Sabana Llana, según la organización de los testimonios que hemos hecho, desde los dos hechos indisputados que empleamos: la muerte de la madre de Juliana en el 1912 y el ingreso de Juliana en el Colegio o Asilo de Ponce en el 1919.

La impugnación a la prueba de la demandante en cuanto al sitio donde ésta estudia y el período de tiempo durante el cual estudia en ese sitio, lo realiza la sucesión demandada a través de los testimonios de Sabad Reyes, Serafín, Pabón y Juan Colón, éste último hijo de la testigo de la demandante, Juana Velázquez. El testigo Reyes declara haber visto a Juliana "cuando chiquita" en la colonia Sabater (t. 1842) y aunque no recuerda bien los años (cuando la conoció chiquita) sería "para allá en el mil novecientos trece, una cosa así" (t. 1843) y después del 1913 la siguió viendo "poco tiempo después . . . allí mismo en Sabater" (t. 1844). Dice que sabe que Juliana iba a la escuela porque la veía salir con los hijos de don Antonio Santiago para la escuela (t. 1855). Según hemos dicho, la propia prueba de la sucesión demandada demuestra que Juliana empieza a ir a la escuela del Coquí con los hijos de don Antonio Santiago después de julio de 1916. De manera que el testimonio de Sabad Reyes no impugna la aseveración rectificada de los testigos de la demandante, en el sentido, que ella asistió a la escuela del barrio Sabana Llana desde el 1914 al 1916, porque el testimonio del testigo Reyes se refiere al período en que Juliana está en Sabater, o sea, desde el 1916 al 1919. Aunque hay dos testigos de la sucesión demandada que sitúan a Cristina en Sabater antes de 1916—doña Ana María y María Curet —la misma prueba de la sucesión sitúa a Juliana de 1913 a 1914 en Hoyo Inglés en Guayama.

El testigo Serafín Pabón, declarando el 22 de junio de 1948, dijo tener de cuarenta y tres a cuarenta y cuatro años (t. 1266); ha debido nacer pues en el 1904 o 1905. Dice que empezó a estudiar a los siete años, (1911 o 1912) en la escuela rural de Sabana Llana (t. 1285), en cuya escuela hizo desde el primer al cuarto grado (t. 1267). Por el resto de su testimonio se deduce que estudió su primer grado durante el año escolar 1912-1913; su segundo grado durante el año escolar 1913-1914; su tercer grado durante el año escolar 1914-1915 (t. 1267-1268, 1265, 1270). Dice que durante el año escolar 1915-1916 se salió de la escuela porque se fue para Cayey (t. 1270), regresando durante el curso escolar 1916-1917 a estudiar su cuarto grado (t. 1267-1268). Y después del cuarto grado (1917) se fue al pueblo a estudiar (t. 1289).

Como se recordará, Juliana estudió en la escuela rural de Sabana Llana durante los años escolares 1914-1915 y 1915-1916. De acuerdo con el testimonio de Serafín Pabón es sólo durante el año escolar 1914-1915 que él hubiera tenido oportunidad de observar si Juliana estudió o no estudió con él en la escuela de Sabana Llana, puesto que durante el año escolar 1915-1916, el testigo Pabón se va a Cayey, y cuando regresa en septiembre de 1916 a estudiar su cuarto grado en Sabana Llana ya Juliana se ha trasladado de los Húcares a Sabater, y Juliana está estudiando en la escuela del Coquí. Tal vez fuera esto lo que indujo a Serafín Pabón a confesarle a los abogados de la demandante, cuando éstos estaban preparando la prueba de la demandante que quien podría saber si Juliana estudió en la escuela de Sabana Llana o no estudió era el testigo de la demandante Eladio Acosta (t. 1304-1306, 1311-1312), quien estudiaba en la escuela rural de Sabana Llana durante esa "época" (t. 1306), aceptando que no podría decir si una niña llamada Juliana Sanabria estaba en segundo grado (t. 1914-1915) mientras el testigo estaba en tercer grado (t. 1301), aunque puede afir-

mar, que Juliana no estudiaba con él (en tercer grado) ni la conoció mientras estudió en el campo. (t. 1301).

El testigo Juan Colón, hijo de Juan Colón y de Juana Velázquez, ésta última testigo de la demandante, viene a contradecir el testimonio de su propia madre, en cuanto a que ni Cristina Curet ni Juliana vivieron en casa de su padre Juan Colón en los Húcares (t. 1688-1689). Su testimonio sobre este extremo se debilita seriamente a través del contrainterrogatorio. Llega el momento en que declara que no podría decir los años durante los cuales vivió en los Húcares (t. 1713); que después fue a vivir con sus abuelos y de casa de sus abuelos no sabe donde fue a vivir (t. 1714). En medio de su declaración sufrió un colapso, perdió el conocimiento y el Juez tuvo que decretar un receso (t. 1709-1710). No sabemos si por la mortificación moral de tener que contradecir a su madre, o por alguna otra razón, en algunas ocasiones, "se le tranca la memoria".

Declarando el 24 de junio de 1948, dijo tener cuarenta y ocho años (t. 1673). De ser esto así, ha debido nacer en el 1900. Dice que antes de trabajar en Fortuna, a los dieciocho años (1918, entonces) (t. 1708) estudió en la escuela de Sabana Llana el primer, segundo y tercer grados (t. 1680), tres *años corridos* aunque no recuerda los años que fueron (t. 1681). Dice que tenía doce años cuando empezó a ir a la escuela (t. 1682). Dice que el primer grado lo cursó en la escuela de Buena Vista, un barrio que queda en Sabana Llana, "a la parte de abajo de la carretera" (t. 1694). De ser esto así, su primer año escolar ha debido ser el 1912-1913. De acuerdo con el resto de la prueba, la escuela de Buena Vista, quedaba, no a la orilla de la carretera, sino "al lado de allá del río" (t. 96), y Juliana estudiaba en la escuela frente a la carretera y no en la escuela que quedaba al otro lado del río (t. 628).

Dice que el segundo grado lo cursó en una casa que quedaba retirada del sitio donde estudió el primer grado

(t. 1698), una casa de madera y zinc frente a la carretera (t. 1683). De ser esto así, su segundo año escolar ha debido ser el 1913-1914 y la escuela donde estudió, la misma escuela donde estudiaba Juliana. En cuanto al tercer grado, empieza declarando que estudió el tercer grado en el mismo sitio donde estudió el segundo (t. 1702) pero casi a renglón seguido declara no recordar nada del tercer grado (t. 1703); dice que el tercero lo cursó pero no recuerda dónde (t. 1706).

Siendo este el resultado neto de su testimonio en cuanto a sus años escolares, lo que parece más posible dentro de la secuencia hilativa es que Juan Colón estudiara en las escuelas rurales de Sabana Llana durante los años escolares *corridos* de 1912-1913 y 1913-1914, si hemos de contar desde la edad en que empieza a ir a la escuela, según él, a la edad de doce años, o durante los años escolares 1916-1917 y 1917-1918, si hemos de contar desde la fecha en que deja de ir a la escuela para trabajar en Fortuna, según él, a la edad de dieciocho años.

Contrastando el testimonio de Juan Colón con el testimonio de su madre Juana Velázquez, lo más probable es que estos dos años escolares fueran los correspondientes a los años escolares del 1915-1916 y 1916-1917. Declaró Juana Velázquez que al tiempo de estar Julita en la casa de los Húcares, fue que se puso al mayor de sus hijos (Juan Colón) en la escuela (t. 247) y entonces iban juntos a la escuela, a pie (t. 247) por las mañanas, pero al mediodía el hijo de ella se quedaba en casa de su abuelo, Pilar Colón, quien vivía en Sabana Llana y entonces Julita regresaba sola (t. 248). En el testimonio de Juan Colón tenemos confirmada la existencia de este abuelo (Pilar Colón), a cuya casa iría a vivir Juan Colón después de salir de los Húcares (t. 1713-1714).

Al organizar este cuadro de hechos desde el único hecho indisputado que poseemos, el fallecimiento de la madre de la demandante Isilé Sanabria, acaecida el 22 de octubre de

1912, lo más probable parece ser que la demandante Juliana Sanabria llegara a casa de María Curet en Hoyo Inglés de Guayama en el mes de enero de 1913 y estudiara en Guayama su primer grado durante el año escolar 1913-1914, desde septiembre de 1913 a mayo de 1914; que en algún día antes del 14 de mayo de 1914, salió de Hoyo Inglés y pasara a casa de Juan Colón en los Húcares y estudiara en una escuela de Sabana Llana, a la orilla de la carretera, su segundo grado, durante los cursos escolares 1914-1915 y 1915-1916, pasando entonces a vivir a Sabater en un ranchón conocido por el "aeroplano" donde vivió hasta el año 1919.

3—En cuanto a los actos de reconocimiento que pueden ser atribuídos al causante de la sucesión demandada, don Manuel González, a su señora esposa doña Ana María o a la hija natural de don Manuel, Isabel González, la demandante declara que mientras vivió en Hoyo Inglés en casa de María Curet, don Manuel le proveía a la demandante todo lo que ella necesitaba, ropa, zapatos y los alimentos (t. 464) dándole el dinero para ello a Cristina (t. 464). Dice la demandante que cuando ella vivía en Guayama con Cristina, ésta venía al campo y traía a la testigo al campo para que don Manuel la viera (t. 465). La testigo de la sucesión demandada María Curet corrobora esta aseveración de la demandante al declarar, que durante el tiempo que Cristina estuvo en casa de la testigo (dos o tres meses) "nunca salía", aunque agrega que Cristina "salía para allá (a la casa de don Manuel) y después para acá (a la casa de la testigo) para quedarse" (t. 1735).

Dice la demandante que don Manuel le daba dinero a Cristina, en presencia de la testigo, y se lo daba en billetes (t. 465) y que en esa época Cristina no hacía nada más que cuidar de la demandante (t. 466). Dice que durante ese curso escolar vio a don Manuel en Sabater (Salinas) "como tres o cuatro veces en el curso escolar durante ese tiempo" (t. 466) y "había veces que lo veíamos en la misma casa

porque la señora aquella (Cristina) me traía para que doña Ana me viera" (t. 466). La testigo de la sucesión demandada María Curet corrobora en parte estas aseveraciones de la demandante al declarar que el dinero para la demandante, lo proveía Cristina (t. 1731-1734, 1778-1779), algunas veces Cristina "mandaba cinco, ocho o diez pesos, hasta más, me llegó a dar" y entonces "lo que ella me daba lo invertía en comprarle zapatos y ropitas a la nena para continuar en la escuela" (t. 1778-1779). La testigo Curet también declaró que mientras Juliana vivió en su casa, Cristina también vivió por un tiempo en casa de la testigo, "ella a casa fue una vez a descansar, porque no le gustaba vivir en Hoyo Inglés, *porque no tenía oportunidad de trabajar* y ella estuvo una vez en casa a tomar un descanso y estuvo un período de tiempo como de dos o tres meses y entonces definitivamente cuando ella (Cristina) se cansó vino para acá (Sabater) y se trajo la niña, se hizo cargo a ella" (t. 1734-1735). Según hemos visto anteriormente, en una visita de María Curet a Cristina, en casa de don Manuel, la testigo Curet vio a Juliana junto a Cristina en casa de don Manuel y en esa misma visita, Cristina le presentó a la esposa de don Manuel (t. 1786-1787).

Sigue declarando la demandante que don Manuel "tenía una manera que me trataba de juego y me decía: la 'taruga' ya sabe leer y me pasaba la mano por la cabeza y él tenía la manía de desabrocharme el trajecito para mirarme la espalda . . . porque en la espalda tengo un lunar que él también lo tenía y decía que si yo me perdía me encontraba por el lunar" (t. 467-468).

Dice la demandante que cuando ella vivía en los Húcares, en casa de Juan Colón, don Manuel iba dos o tres veces a la semana a Húcares, llamaba a la testigo y ella salía, él la cogía de la mano, "la montaba en el caballo y le daba una trillita" (carrerita a caballo) (t. 471-472). Dice que cuando don Manuel tenía que darle dinero a Cristina y Cristina no

estaba por allí, mandaba a la demandante en busca de Cristina (t. 472) y cuando venía Cristina, don Manuel le daba dinero a Cristina, "como una o dos veces al mes y particularmente cuando necesitaba dinero para ropa" (de la testigo) Cristina se lo pedía a don Manuel en presencia de la testigo, alegando que la demandante rompía mucho zapato (t. 473). Dice que "durante ese tiempo"—estadía en los Húcares desde el 1914 al 1916—Cristina no se dedicaba a otra cosa que no fuera a cuidar de la testigo (t. 473). Dice que cuando iba a la escuela de Sabana Llana, "iba siempre bien trajeada y *algunas veces* me encontraba a don Manuel por el camino y él me llevaba a la escuela . . . en la calesa" (t. 474) y en *alguna ocasión* cuando regresaba a su casa, (a la casa de Juan Colón), don Manuel encontraba a la testigo en el camino y la traía a la casa (t. 475). Dice que mientras estaba en Húcares, el primer año salía sola para la escuela de Sabana Llana y tenía nueve años (t. 649)—en el 1914, entonces—y que en el segundo año algunas veces iba con ella un hijo de Juana Velázquez que se llama Juan (t. 650).

Dice la demandante que don Manuel le preguntaba a Juana Velázquez "si yo me portaba bien y que tuviera cuidado conmigo que no fuera a ser que Cristina se descuidara de mí y que me atendiera" (t. 477). Dice que ella tomaba mucha leche porque don Manuel le dijo a Juan Colón que le tuviera una vaca a la demandante (t. 477) y cuando Juan Colón fuera a ordeñar sus vacas, ordeñara al mismo tiempo la de la demandante (t. 478). Dice que la primera vaca que le dieron se llamaba Carolina y era muy mansita (t. 478).

Dice la demandante que de los Húcares se fueron a vivir a la colonia Sabater, una propiedad de don Manuel González en Salinas (t. 479) y en Sabater fueron a vivir a una casa grande dividida en dos, la primera división para dormir los obreros y en la otra división, que estaba incomunicada, fue que don Manuel le ordenó a Cristina vivir con la testigo (t.

480). Dice que mientras vivió en ese sitio, don Manuel proveía los alimentos de la demandante, iba "muy a menudo allí y llamaba a Cristina y le daba dinero para mis alimentos" en presencia de la testigo (t. 481) y que Cristina era la que se ocupaba de la ropa y la atención personal de la testigo (t. 482). Dice que mientras la testigo vivió en ese sitio—más de tres años (t. 480)—don Manuel iba dos o tres veces a la semana, bien en calesa o a caballo (t. 482) y cuando la testigo quería comprarse algo extra, en vez de pedírselo a Cristina, se lo pedía a don Manuel (t. 483). Dice que una vez don Manuel le dio tres billetes de a peso y ella (Juliana) hizo una fiesta en la escuela (t. 483).

Sigue diciendo la demandante que ella estuvo en Sabater hasta el año 1919 (t. 486), terminando el curso escolar de 1919 (t. 493) y entonces don Manuel le dijo "que me iba a ir con ellos" (t. 486) para ponerla en un colegio de monjas, y a los pocos días, doña Ana María la fue a buscar (t. 486) y la llevaron a casa de don Manuel (t. 487). Dice que estuvo en casa de don Manuel desde que terminó el curso de 1919 (mayo o junio) hasta fines de septiembre (t. 493). Dice que mientras permaneció allí, en casa de don Manuel González, doña Ana María "me adiestró en las cosas de rezar, ella todas las noches me enseñaba a rezar y por la mañana me enseñaba a marcar y surcir cosa que cuando fuera al colegio ya estuviera adiestrada" (t. 488). Dice que ella comía en el comedor con los hijos de don Manuel y doña Ana (t. 494) y dormía "en un cuarto que quedaba anexo al cuarto de Pepito y de Manolo" (ambos hijos de don Manuel y doña Ana María) (t. 496). Dice que delante de doña Ana, don Manuel nunca le dijo a doña Ana que la demandante era su hija (t. 666) y que la testigo notaba que si don Manuel se ponía cariñoso con la testigo, doña Ana "hacía gestos" (t. 666).

Declarando a favor de la demandante, Juana Velázquez, esposa de Juan Colón dijo que un día mientras ellos vivían

en la casa grande de los Húcares (t. 234) don Manuel llegó
a casa de la testigo y le dijo al esposo de ésta que le diera un
cuarto de los de la casa. a Cristina y a Juliana (t. 236) ; y
como a la semana de haber hablado don Manuel, Cristina
y Juliana se mudaron a la casa de los Húcares (t. 236). Dice
la testigo Velázquez que don Manuel pasaba todas las sema-
nas por allí de paso para Barritos, "tocaba el timbre de la
calesa y entonces salía Doña Cristina y Julita a donde estaba
él a conversar" (t. 236). Dice que la testigo veía a don
Manuel dándole dinero a Cristina todas las semanas que
Cristina y Juliana vivieron en los Húcares y vivieron tres
años (t. 237). Dice que don Manuel no entraba en la casa,
se quedaba en una galería grande que había para ir a la co-
cina (t. 239) y un día llamó a Julita y le desabotonó un bro-
che que llevaba puesto la niña para verle un lunar que Julita
tenía y entonces dijo "que si la niña se perdía él la hallaría
por el lunar" (t. 239). Dice la testigo que ella presenciaba
las caricias de don Manuel a Julita cuando don Manuel le
pasaba la mano por la cabeza a Juliana (t. 240).

Dice la testigo Velázquez que en ese tiempo Cristina no
se dedicaba a nada, ni tenía nada suyo, a no ser el dinero que
le daba don Manuel (t. 242). Esto está corroborado por la
declaración de la testigo de la sucesión demandada María
Curet, quien declaró que cuando su tía Cristina fue a casa
de la testigo a descansar no tenía nada, y la fonda se le había
caído (t. 1764). Continúa diciendo la testigo Velázquez, que
cuantas veces don Manuel venía a los Húcares le decía a la
testigo que le tuviera cuidado a Julita y se la velara para que
no jugara con muchachos varones, porque "la muchacha era
su sangre" (t. 242). Dice que don Manuel le había dado
órdenes al esposo de ella (Juan Colón) que le diera a Juliana
una vaca de leche y "cuando esa vaca no daba leche venía
otra" (t. 243). Dice que Julita iba a la escuela a pie pero
en "bastantes ocasiones" don Manuel la traía en su calesa y
la dejaba en su casa (t. 244).

Declarando a favor de la demandante, Eladio Acosta dijo que mientras estudiaba en una escuela del barrio de Sabana Llana en Salinas (t. 87) vio dos o tres veces que don Manuel bajaba a Juliana de una calesa frente a la entrada de la escuela y entonces cuando don Manuel viraba la cabeza y se iba, ellos empezaban a gritarle a Juliana "gallega" "gallega" (t. 90–91). No hay duda de que este testigo estudió en la escuela de Sabana Llana desde el 1914 ó 1915 en adelante (t. 92). Los propios testigos de la sucesión demandada así lo declararon, según hemos visto.

Declarando a favor de la demandante, Pedro Cruz, primo de los testigos de la sucesión demandada Antonio Santiago hijo y Miguel Santiago (t. 312), dijo conocer a Juliana por poco tiempo en el año 1914 cuando ella vivía en el Húcar y estudiaba en Sabana Llana (t. 279–281). Dice que la conoció por más tiempo, desde el 1916 hasta el 1918 (t. 294) cuando ella vivía en Sabater (t. 281). Dice que en Sabater, Juliana vivía con Cristina Curet (t. 282) en una casa alta que le decían el "aeroplano", propiedad de don Manuel González (t. 281) donde vivían y dormían, trabajadores que venían a trabajar allí en una parte y en los dos cuartos últimos, que quedaban hacia la carretera de Ponce a Guayama, vivía Juliana Sanabria con Cristina Curet (t. 282).

Continúa declarando el testigo Cruz que vio por allí (en el "aeroplano") a don Manuel, "varias veces él iba allí, llamaba a veces, que no veía a Julita, que le decían la gallega, llamaba a doña Cristina y le preguntaba por ella, si no estaba, la llamaba" (t. 283). Dice que cuando Cristina la llamaba, venía la muchacha (Juliana) hasta la calesa donde estaba don Manuel (t. 292). Dice que Julita "se arrimaba a la calesa y muchas veces le cogía la mano así y se subía a la calesa" (t. 292–293) y don Manuel "la acariciaba" (t. 293). Dice que "eso" de las caricias lo vio dos o tres veces (t. 294). Dice que vio a Julita y Cristina en el aeroplano desde el 1916 hasta el 1918 (t. 294) porque el 29 de julio de 1918 se tuvo

que ir de soldado, pero cuando lo licenciaron en el 1919, volvió a ver a Juliana en casa de don Manuel (t. 294) "como dos veces" (t. 295). No hay duda que el testigo Pedro Cruz trabajó en Sabater durante los años 1916 a 1918 y volvió a trabajar en el 1919, según lo atestiguan los propios testigos de la sucesión demandada, Antonio Santiago hijo (t. 2262) Antonio Santiago padre (t. 2303) y Miguel Santiago (t. 2335).

Declarando a favor de la demandante, Angel Ramón Zayas, primo hermano del Lcdo. Rafael Rivera Zayas, uno de los abogados de la sucesión demandada, dijo haber llegado en el 1916 a Salinas, a la colonia Sabater donde trabajaba como apuntador (listero) (t. 149). Dice que "casi seguido" conoció a Cristina Curet (t. 149) y desde el primer día de salir a su trabajo, al regresar de la vuelta de la mañana, vio a la niña Julia en el balcón de la residencia de ella y paró su caballo "por el gran parecido . . . ." (t. 150). Dice que la niña Juliana Sanabria vivía en compañía de Cristina Curet "en una media agua larga que había, alta, en la parte sur pegada al canal grande de riego" (t. 152). Dice que la niña tendría "más o menos diez o doce años" (t. 152). En el 1916 la demandante Juliana Sanabria tenía once años de edad.

Dice que Julita y Cristina vivían de lo que don Manuel le daba a Cristina para el sostenimiento de Julia (t. 153) y esto lo sabe "porque yo lo vi con mis propios ojos" (t. 154). Dice que oyó a don Manuel diciéndole a Cristina "toma esto para el sostenimiento de ustedes dos, de mi hija y tú" (t. 154). Dice que "infinidad de veces" don Manuel se paraba en la calesa, llamaba a Cristina, "si no la veía, o si ella no lo veía a él", Cristina venía a hablar con don Manuel y él le preguntaba por su hija y Cristina llamaba a Julita diciéndole: "ven acá a tu papá" (t. 154) y entonces Julita se subía a la calesa, don Manuel "la cogía, la besaba, la abrazaba y hacía lo que hacía yo con mis hijos cuando tenían su edad" (t. 155).

Dice el testigo Zayas que él estuvo viendo eso como por

año y medio, hasta que lo cambiaron para otra colonia, y entonces, veía a Julita entre días, en la misma colonia Sabater (t. 155) y después la vio en casa de don Manuel viviendo allí "como en familia" (t. 156). Dice que él vio a Juliana en casa de don Manuel en el 1919 (t. 164) porque "iba a cobrar mi sueldo a la oficina, iba otras veces a buscar tickets a la oficina, otras veces iba a coger prestado a cuenta de mi sueldo y otras veces iba a llevar la nómina de la colonia para los pagos" (t. 165). Dice que vio a la demandante "en compañía de don Manuel y doña Ana" y en la casa estaban Ramón, Guillermo, Jorge, Luis, hijos de don Manuel y Doña Ana (t. 166). Dice que vio a la demandante en casa de don Manuel "distintas veces, dos o tres veces, la vi allí" (t. 167). Aunque el testigo no pudo ver al hijo de don Manuel y doña Ana, Jorge González, porque éste nació en Nueva York el 24 de marzo de 1920, el resto de los hijos nombrados ya estaban todos nacidos y estaban en Puerto Rico (t. 3179).

Sigue diciendo el testigo Zayas que vio a don Manuel en algunas ocasiones llevar a la niña en calesa, "él salía a Aguirre, a la colonia, la cogía y a veces regresaba con ella y a veces no regresa (ella) ni regresaba él tampoco, como él tenía otras colonias que atender" (t. 156). Dice el testigo Zayas que cuando don Manuel pasaba por Sabater eran horas de trabajo, pero como el testigo era listero "tenía que venir a la oficina después que daba una vuelta" (t. 188), porque su "trabajo como listero era dar vueltas a poner, a apuntar la gente que estaba trabajando, tenía que regresar a la oficina a picar los tickets para que los trabajadores cogieran en la tienda" (t. 189); otras "regresaba al 'chucho' y tenía que atender la gente del 'chucho' y a veces tenía que pesar hasta la caña" (t. 189). Este extremo de la declaración del testigo Zayas está corroborado por el testigo de la sucesión demandada Miguel Santiago, quien declara que vio al testigo Zayas hablando con don Manuel frente a la oficina de Sabater varias veces, así por rareza (t. 2351). No hay duda de que el tes-

tigo Angel Ramón Zayas estuvo en Sabater durante los años 1916 a 1919, según lo atestiguan los propios testigos de la sucesión demandada, Antonio Santiago hijo (t. 2283), Antonio Santiago padre (t. 2300) y Miguel Santiago (t. 2329).

La prueba en contrario que ofrece la sucesión demandada consiste de los testimonios de doña Ana María Hernández, Serafín Pabón, Juan Colón, María Curet, Sabad Reyes, Antonio Santiago hijo, Antonio Santiago padre, Miguel Santiago y Julia Beltrán.

Declara doña Ana María que durante los años 1913, 1914 y 1915 no recuerda haber conocido a un agregado de nombre Juan Colón (t. 3351). Dice que puede haber visto a la demandante "sin saber que se llamaba Juliana" entre otros muchachos de la colonia Sabater (t. 3420), pero que ella y su esposo don Manuel pasaban de largo por el sitio donde vivía Cristina (t. 3421) y aunque ella sabe donde vivía Cristina, nunca se detuvo a hablar con Cristina (t. 3422). No hay nada en la prueba que indique que doña Ana María pasara por los Húcares entre los años 1914 a 1916, fecha en que la demandante Juliana Sanabria vivió en los Húcares. En cuanto a los años 1916 al 1919, cuando la demandante vive en Sabater, sabemos que doña Ana María desde el 1916 a octubre de 1918 (fecha de los temblores) vivía en Nueva York (t. 3495). Su testimonio adverso cubriría exactamente desde octubre de 1918 a agosto de 1919.

Sigue declarando doña Ana María que ella no fue en automóvil a Sabater a buscar a la demandante (t. 3213) y que don Manuel no la acompañó a buscar a la demandante (t. 3213). Dice que la demandante nunca vivió en casa de la testigo, no ha almorzado, no ha comido, ni ha dormido un solo día en casa de la testigo (t. 3203-3204), aunque puede que durmiera en alguna ocasión con las Beltrán, unas empleadas que vivían abajo de su casa (t. 3204). Dice la testigo que nunca enseñó a la demandante a bordar, calar, ni re-

mendar porque no la conocía ni hubiera tenido tiempo para ello (t. 3206).

Dice que está segura de haber conocido a la demandante en el 1919: "La conozco. Me la traen, *la llevo*, mejor dicho, la mando a las Huérfanas, entonces al mes, eso debe ser como en junio o julio, porque seguido la mando, la conocí hoy y al otro día se fue" (t. 3494). Dice que ninguna persona fuera de ella había intervenido en el asunto de enviar a Juliana al asilo, "nadie más que yo, por caridad" (t. 3195) y que ella nunca le hubiese permitido a su esposo intervenir en sus obras de caridad (t. 3195 y 3213). Dice que su esposo nunca le dijo que hiciese algo por Juliana y la testigo no sabía que él conociera a la niña que ella iba a proteger (t. 3196).

El testimonio de Serafín Pabón se limita a contradecir los testimonios de Juana Velázquez y de Eladio Acosta, testigos de la demandante, en cuanto al extremo que don Manuel llevara a la demandante en calesa a la escuela. El testigo Pabón dice que recuerda haber visto a don Manuel voltear su finca, una finca que quedaba por allí (Sabana Llana) pero que nunca lo vio con nadie en la escuela (t. 1271) aunque recuerda haberlo visto por allí, solo (t. 1271-1272). Según hemos visto anteriormente, su testimonio queda circunscrito al año escolar 1914-1915 puesto que durante el otro año escolar que Juliana pasa en Sabana Llana, 1915-1916, el testigo se va para Cayey (t. 1309-1310).

El testigo Juan Colón dice que ni en casa de sus padres en los Húcares ni en la escuela de Sabana Llana conoció a una niña que respondiera al nombre de Juliana Sanabria, y aunque el testigo conocía a don Manuel, nunca lo vio ir a la escuela llevando en su calesa a una niña (t. 1686-1689). Por el análisis que hemos hecho anteriormente de su testimonio, su aseveración adversa quedaría reducida al año escolar 1914-1915, el primero de los dos únicos años escolares que Juliana estudia en la escuela rural de Sabana Llana.

La testigo María Curet declaró que su tía Cristina ayu-

daba a su hermana Justa, madre de la testigo (t. 1731). Dice que cuando Cristina cocinaba en casa de don Manuel, la testigo "venía a buscar donde ella (Cristina) la protección que ella (Cristina) me daba" (t. 1783). Dice que cuando Cristina ayudaba solamente a su hermana Justa y a su sobrina, la testigo María Curet, Cristina les daba siete, cuatro, cinco (pesos) "de acuerdo con lo que pudiera" aunque "hubo veces de llegar hasta diez pesos" (t. 1778). Dice que un día Cristina "llevó la niña (Juliana) para que partiéramos con la niña y ella (Cristina) nos ayudaba" (t. 1731). Dice que después de llegar la niña Cristina "mandaba cinco, ocho o diez pesos, hasta *más*, me llegó a dar" y entonces dice la testigo Curet "lo que ella (Cristina) me daba lo invertía en comprarle zapatos y ropitas a la nena para continuar en la escuela" (t. 1778–1779).

Sigue diciendo la testigo Curet que después que Cristina dejó de cocinar en casa de don Manuel (t. 1782), se decidió a alquilar un cuarto en Sabater (t. 1780) en el "aeroplano", una casa de don Manuel (t. 1783–1784) pero el cuarto se lo dieron gratis (t. 1783–1784). Dice la testigo que no sabe si cuando Cristina se fue a vivir al "aeroplano", puso la fonda enseguida (t. 1782) pero fue "después que dejó la cocina de casa de doña Ana" (t. 1783).

Continúa diciendo la testigo Curet que después (sin duda, después de instalar la fonda por primera vez) Cristina se enfermó (t. 1761) y salió de Sabater y fue a casa de la testigo Curet a convalecer (t. 1762) y en casa de la testigo estuvo dos o tres meses (t. 1763). Dice que en esos dos o tres meses que Cristina estuvo en casa de la testigo en Hoyo Inglés, "había caído la fonda, no tenía *nada* y entonces se fue a recuperar la salud porque se sentía enferma" (t. 1764). Dice la testigo Curet, que mientras Cristina estuvo en su casa, Cristina le dijo a la testigo que tenía mucha pérdida en el negocio por no tener quien la ayudara y entonces la testigo le dijo: "como la niña (Juliana) está preparada de conoci-

miento de letras puedes llevártela para que te apunte" y que entonces Cristina se trajo a la demandante para Sabater (t. 1755) y después puso el negocio otra vez cuando regresó (t. 1764). Dice que Juliana salió de la casa de la testigo antes de ésta casarse, o sea, antes del 14 de mayo de 1914, (t. 1732) aunque la testigo no recuerda si fue terminado el curso o antes (t. 1755).

Dice la testigo, que después de traerse a Juliana a Sabater, Cristina tenía otra vez una fonda y le daba manutención al peonaje (t. 1735, 1764) y que eso fue después que la testigo tuvo la niña en su casa (t. 1736), o sea, después de mayo de 1914. Dice que Cristina "mandaba al mismo que le compraba a que apuntara" lo que había comprado "y allí era que ella (Cristina) tenía las caídas y ella se quejaba mucho" (t. 1756). Dice la testigo Curet que Cristina le enseñaba a la testigo la libreta donde apuntaban los peones y entonces ella (la testigo) vio que cuando un peón cogía catorce centavos apuntaba cinco (t. 1757). Dice la testigo que ella *descubrió* que se apuntaban de menos unas cuantas veces, porque cuando la testigo visitaba a Cristina, ésta le daba la libreta a la testigo para que se la examinara. Dice que ese *descubrimiento* (el hecho de que los peones apuntaran menos de lo que cogían) ha podido ser del *1915 al 1916* que eran los años que la testigo visitaba con su esposo a Cristina (t. 1758). Dice que la fonda de Cristina era una cosa "ratona" y Cristina "perdía que era una barbaridad" (t. 1783).

El testigo Sabad Reyes declaró que veía a don Manuel González en Sabater que "pasaba por allí; daba sus vueltas" y hablaba con los mayordomos (t. 1852). Dice que en cuanto a las personas que vivían en el rancho (el "aeroplano"), "bueno, él llegaba allí y se paraba y con cualquiera que llegara hablaba, cosas así pasajeras" (t. 1853). Dice que directamente no vio a don Manuel visitando a Cristina ni a Juliana (t. 1854) aunque don Manuel "llegaba allí y se paraba y a

veces hablaba con ella (Cristina) y en seguida se iba, no formaba conversación con ella" y con Juliana "tampoco que yo viera" (t. 1854). Dice que sabe que Juliana iba a la escuela porque la veía salir con los hijos de don Antonio Santiago (entonces, después del *1916*, fecha en que llegaron los Santiago a Sabater) (t. 1855) y que nunca vio a don Manuel llevando a Juliana a la escuela (t. 1856). La fecha en que don Manuel llevaba ocasionalmente a Juliana a la escuela en su calesa, según la prueba de la demandante, era cuando Juliana estaba en la escuela de Sabana Llana, o sea, durante los años escolares 1914-1915 y 1915-1916.

Dice que en presencia de él nunca vio a don Manuel entregarle dinero a Cristina ni a Juliana (t. 1857–1858) y que estando él presente nunca se presentó Cristina llevando a Juliana para hablar con don Manuel (t. 1859). Dice que su casa estaba en la misma propiedad de don Manuel en una parte que le llamaban el Riego, bastante retirado de Sabater (t. 1873) y que él trabajaba en todas las colonias (t. 1870) y cuando estaba en otra colonia no sabía lo que pasaba en Sabater (t. 1874). Dice que a Sabater era donde menos él iba (t. 1874) y las pocas veces que estuvo en Sabater veía a don Manuel por allí (t. 1885) y cuando don Manuel llegaba, Cristina "se asomaba y lo saludaba y se iba otra vez para su trabajo" (t. 1885). Como se recordará, Sabad Reyes, entre el 1914 y 1915, estuvo diez meses sin trabajar porque se rompió una pierna (t. 1893).

El testigo Antonio Santiago hijo declara que desde el 1914 en adelante, conoció a la demandante Juliana Sanabria, quien vivía en Sabater en un cuartel de trabajadores con Cristina Curet, madrina de ella, "que la tenía a su cargo" (t. 2246). Dice el testigo que ellos vivieron en Sabana Llana hasta el 1914 y "allá por el mes de *enero de 1914* ya el viejo (Antonio Santiago padre) estaba en Sabater y como *dos meses después* fuimos nosotros" (t. 2266). Dice que para el 1914 no sabe donde vivía Cristina porque fue después que Cristina pidió

el cuarto (en el cuartel de trabajadores) (t. 2267). Dice que Cristina llegó a Sabater a fines del 1914 y no sabe donde vivían Cristina y Juliana antes (t. 2267). Dice que Cristina le pidió un cuarto al padre del testigo (Antonio Santiago padre, el mayordomo) (t. 2267) a *mediados* del 1914 y el padre del testigo no se lo dio pero a *finales* de 1914 se lo dio (t. 2267–2268). Dice el testigo que ya para el 1915, el testigo no vivía en Sabater (t. 2269). Dice que un mes después de haber llegado Juliana a Sabater, ellos (la familia del testigo) se ausentaron de Sabater y fueron a vivir a Besosa hasta julio de 1916 (t. 2269–2270) y él no sabe nada de la vida de Juliana desde fines de 1914 hasta julio de 1916, no sabe si don Manuel iba a casa de Cristina ni las relaciones que pudieran existir entre don Manuel y Cristina y don Manuel y Juliana (t. 2270).

Dice que en Sabater, la vieja Cristina tenía allí un negocito porque vivía muy pobre. Hacía dulces de coco y daba comidas a algunos allí y hacía un pirulí que se vendía a dos o tres centavos" (t. 2252). Dice que nunca vio a don Manuel entregarle dinero o cosa alguna a Cristina ni a Juliana (t. 2254) aunque "al tiempo"—entonces, después de julio de 1916—de estar Juliana en Sabater se le habló a don Manuel para que le diera un poco de leche a Juliana y ella iba con el testigo a buscar la leche (t. 2263–2264). Dice que nunca vio a don Manuel hablando con Juliana ni lo vio en casa de Cristina, ni hablando con ella (t. 2252). Dice que doña Ana María pasaba en automóvil por Sabater pero nunca se detenía (t. 2265).

El testigo Antonio Santiago padre, declara que *le parece* que fue a *principios* del año 1914 que empezó a trabajar en Sabater (t. 2290); después dice que fue a principios de año en octubre de 1914 (t. 2307); por último declara que él llegó a Sabater en los últimos meses del 1914, no en los primeros meses, sino en los últimos meses (t. 2321). Dice que él no se llevó en seguida la familia (t. 2291) sino "a los uno o dos

meses después" (t. 2309). Dice que él estuvo en Sabater como tres o cuatro meses y después lo mandaron a Besosa hasta julio de 1916 (t. 2295). De acuerdo con esta afirmación del testigo Santiago padre, el único período de tiempo que él pasa en Sabater, en el 1914, es de octubre a diciembre de 1914.

Dice que él mismo fundó el ranchón (el aeroplano) "y una casa que había particular" (t. 2291). Dice que Cristina Curet fue a pedirle un cuarto allí para trabajar—dándole almuerzo a la gente (t. 2310), "y yo le dí un cuarto a ella en el mismo aeroplano cuando se terminó" (t. 2291). Dice que eso fue en los primeros meses, como al mes y medio que el testigo estaba acabando el ranchón (t. 2311). Esto contradice la declaración de doña Ana María en el sentido que ya en el 1910 o 1911, don Manuel y ella le dieron un cuarto a Cristina en el aeroplano. Dice que cuando el testigo le dió la habitación, Cristina se trasladó enseguida con la muchachita Julia, como de diez u once años (t. 2312). De acuerdo con la observación del testigo, esto ha debido ser en el 1915 o 1916, fecha en que Juliana cumpliría esos años. Después dice que en el 1914 llegó Cristina a Sabater, "no Juliana porque no me fijé, sino Cristina" (t. 2319). Dice que después de darle el cuarto a Cristina el testigo se lo dijo a don Manuel "y él (don Manuel) me dijo que no; que eso lo quería para la gente de Yauco, pero me dijo, ya que está hecho, déjala ahí" (t. 2293). Dice que don Manuel iba a Sabater una o dos veces por semana (t. 2296) en días de trabajo como de nueve a diez de la mañana (t. 2297). Dice que nunca vió a don Manuel "pasarle dinero a las mujeres" para vivir (t. 2293) ni lo vió visitando a Cristina (t. 2294), ni cogiendo en la falda a Juliana (t. 2294). Esto ha debido ser después de julio de 1916, pues ya hemos visto que en el 1914, el testigo sólo estuvo dos meses en Sabater y todavía ni siquiera se había terminado el ranchón, que se terminó como al mes y medio de haber llegado a Sabater el testigo Santiago.

El testigo Miguel Santiago declara que conoció a la demandante Juliana Sanabria en Sabater en el *1916* (t. 2324). Dice que antes del 1916 no la había conocido y que en el 1914 no la vió ni vivía ella en Sabater (t. 2330) y asimismo, no recuerda haber visto a Cristina en el ranchón para el 1914 (t. 2330), aunque sí la vió (a Cristina) en el 1916 (t. 2331). Dice que Cristina "vivía del negocio, vendía pan, dulces y daba manutenciones" (t. 2333). Dice que ellos, (Antonio Santiago, la demandante Juliana Sanabria y el testigo) iban a la escuela a veces sólo por la mañana y a veces por la tarde únicamente (t. 2353). Dice que cuando les tocaba por la mañana tenían que salir de seis y media a siete, porque se entraba a clase a las ocho (t. 2354). Dice que vió al testigo Angel Ramón Zayas hablando con don Manuel "varias veces, así, por rareza", frente a la oficina de Sabater (t. 2351). Dice que no vió a don Manuel entregándole dinero a Cristina o a Juliana ni vió a don Manuel acariciando a Juliana (t. 2334). Dice que Juliana iba a buscar leche en compañía de ellos (Antonio y Miguel) bien temprano, casi oscuro, antes del amanecer (t. 2335).

La testigo Julia Beltrán declara que conoció a la demandante Juliana Sanabria en la vaquería de don Manuel González (t. 2361). Dice que la testigo veía a la demandante pasar todas las mañanas a buscar leche "había veces que pasaba a las cuatro, con el árabe ese (un árabe que iba en una guagua a comprar leche)" pero "cuando venía a pie, pasaba a las cinco de la mañana" (t. 2380–2381). Dice que era entre días que Juliana pasaba a las cuatro montada en la guagua del árabe, y aunque la testigo no la veía, el padre de la testigo le decía las veces que Julieta pasaba en la guagua del árabe (t. 2382). Dice que la repartición de leche terminaba de siete a siete y media u ocho de la mañana (t. 2395), pues, primero, le repartían la leche al árabe y entonces la de ellos "como costumbre de darnos a los pobres" (t. 2390). Es indudable que ni la familia Santiago ni la propia Juliana podrían catalogarse como "pobres". Los hijos de don Antonio

Santiago eran hijos del mayordomo de Sabater y Juliana, sobrina al menos de la hija natural de don Manuel, Isabel González.

Dice la testigo Beltrán que un lunes por la mañana Juliana no encontró leche, la testigo se fue a casa de doña Ana a desayunar y como a la media hora llegó Julieta llorando (t. 2364) y le dijo a la testigo que iba a ver si doña Ana le hacía el favor de recogerla porque Cristina la había golpeado toda (t. 2365). Dice la testigo que ella subió donde doña Ana y le dijo que había una muchachita huérfana de Sabater que había ido a ver si doña Ana le hacía el favor de recogerla, doña Ana le dijo que la subiera y entonces Juliana le explicó que su madrina le había golpeado porque no le había llevado leche y entonces doña Ana mandó a Juliana a desayunar a la cocina y mandó a buscar a la madrina a Sabater (t. 2366).

Dice la testigo que Cristina Curet vino y doña Ana le preguntó la razón por la cual le había dado de golpes a la muchacha y Cristina le dijo: "Doña Ana porque usted no sabe lo maldita que es esta muchacha y lo agradecida que estoy de que usted la coja" y entonces doña Ana le preguntó a Cristina que si quería que la mandara al Asilo de Huérfanas y Cristina le dijo que sí y entonces al otro día (doña Ana) *salió* para Ponce con las tres: Carmen Márquez y Adela Márquez y con Julieta (t. 2369–2370). Ahora dice que doña Ana no fue con ellas, que con ellas fue el chofer (t. 2371). Dice que don Manuel no estaba (¿en Puerto Rico?) y que los hijos estaban en los Estados Unidos y fueron ellas las tres huérfanas) y el chofer (t. 2371). La propia prueba de la sucesión demandada demuestra que tanto don Manuel como sus hijos estaban en Puerto Rico cuando Juliana sale para el colegio o asilo (t. 3419).

En cuanto al período comprendido desde mediados del 1919, fecha en que Juliana Sanabria ingresa en el colegio o Asilo de Ponce, hasta el 16 de octubre de 1944, fecha de la muerte de don Manuel, hay actos de reconocimiento que po-

drían ser atribuidos conjunta o separadamente al causante de la sucesión demandada, a su señora esposa doña Ana María o a su hija natural Isabel González. Para analizar este último período hemos escogido aquella parte de la prueba de la demandante que menos conflicto tiene con la prueba de la sucesión demandada.

La demandante declara que después de salir de casa de don Manuel en el 1919 (t. 486) la llevaron al Colegio Angel de la Guarda en Ponce (t. 498). El conflicto de la prueba en cuanto a este extremo es determinar si se trata de un colegio o de un asilo. La propia prueba de la sucesión demandada demuestra que la persona que enviaba a una pupila a dicho colegio tenía que dar una cantidad mensual para mantenerla allí, aparte de otras regalías (t. 3499–3501). Dice la demandante que alguna que otra vez, don Manuel iba al Colegio (t. 504), extremo corroborado por la testigo de la sucesión demandada, Francisca Figueroa (t. 1943). Dice la demandante que por ella pagaba doña Ana María (t. 509). Dice que estuvo siete años en ese colegio (t. 510). No hay conflicto en la prueba en cuanto a que la demandante Juliana Sanabria estudió en el Colegio del Angel de la Guarda desde el 1919 hasta el 1926. Dice que en ese colegio recibió la primera enseñanza, aprendió a bordar, marcar, a surcir con perfección, pintura y dibujo (t. 516). Dice que la embarcaron para la Habana con el fin de ingresarla en un convento (t. 517) y doña Ana María le proveyó todo lo que la testigo necesitaba para ingresar en el convento (t. 517).

Sigue diciendo la demandante, que unos días antes de embarcarse, ella fue a casa de don Manuel y él le dijo a la testigo: —"te tengo guardado un recuerdo ... te voy a dar este retrato que nadie tiene de este retrato, para que tú nunca en tu vida olvides quien fue tu padre". (t. 521). Este retrato es el exhibit 4 de la demandante. Como hemos visto, a pesar de los esfuerzos que hicieron los abogados la la sucesión demandada para que Isabel González declarara que Juliana pudo obtener ese retrato de la propia Isabel o de cualquier

otro familiar, Isabel González se limitó a contestar: "puede que sea que ella (Juliana) tuviera un retrato" (t. 1073).

Dice la testigo demandante que don Manuel le dijo a la testigo— "no te vayas, dime la causa por que tú te vas"—y la testigo le contestó—"no puedo, no puedo decir la causa, no quiero meter la cizaña en el matrimonio"—y entonces don Manuel abrazó a la testigo demandante y se despidió de ella (t. 521-522).

Dice la testigo demandante que ella embarcó para la Habana el 27 de marzo de 1926 (t. 524) y entró en el convento el 4 de abril de 1926 y estuvo en el convento hasta finales de 1937, como hermana de coro, que son las señoritas que tienen instrucción y que son de familias distinguidas (t. 532). Dice que a las hermanas de coro le cambian el nombre y a ella le pusieron Sor María de San Raimundo (t. 535). Dice que cuando salió del convento fue a casa de Conchita Rivera, en la Habana, una amiga de la testigo que tenía una niña educándose en el colegio y estuvo allí hasta diciembre de 1937 (t. 549-550). Dice que en enero de 1938, una asturiana que conocía a don Manuel González, llamada Sor Serafina, la mandó a buscar, la llevó al Colegio de María Inmaculada y ahí la dejó hasta que Sor Serafina le sacó un pasaje en avión para Puerto Rico (t. 550) regresando a Puerto Rico el 16 de febrero de 1938 (t. 551).

Continúa diciendo la demandante que al regresar a Puerto Rico, fue a vivir a casa de su hermana Isabel González donde vivió tres años (t. 551). Este hecho está aceptado como cierto por la testigo de la sucesión demandada Isabel González. Sigue diciendo la demandante que don Manuel proveyó a la demandante de todo lo que ella necesitaba hasta el momento mismo de la muerte de don Manuel (t. 552), o sea, hasta el 16 de octubre de 1944. Esta aseveración está corroborada por la declaración del testigo de la sucesión demandada Manuel Durán, quien declaró que Juliana recibió cincuenta dólares mensuales hasta el momento de fallecer don Manuel (t. 1911, 1922 y 1926). Dice la testigo demandante

que estando Isabel y ella con don Manuel en la sala de la casa donde ambas vivían, don Manuel le dijo a Isabel que daría orden en la oficina de don Genaro Cautiño para que en vez de los cincuenta dólares que recibía Isabel, le dieran cien dólares, cincuenta para Isabel y cincuenta para la testigo (t. 552–553). Don Genaro Cautiño era en aquel entonces gestor de la firma Sucesores de José González (t. 1911). Declara además el señor Durán que los pagos a Isabel y los que se siguieron haciendo "aunque fueran divididos" se le cargaban a don Manuel (t. 1924).

La versión de la testigo de la sucesión demandada Isabel González es distinta. Dice Isabel que de los cien dólares que ella recibía se le asignaron a Juliana cincuenta dólares para ir a estudiar a Estados Unidos. De acuerdo con el testimonio de Isabel González, esta división se hizo por propia voluntad de ella, sin que interviniera para nada don Manuel. De acuerdo con la prueba documental, esta división ha debido hacerse por instrucciones de don Manuel a don Genaro Cautiño, según veremos más adelante, al transcribir el exhibit 10. Pero sea en una forma u otra, es un hecho indisputado que desde el año 1941, posiblemente desde el mes de septiembre de 1941, hasta el 16 de octubre de 1944, fecha en que muere don Manuel, Juliana recibió cincuenta dólares mensuales con cargo a la cuenta de don Manuel (t. 1939), aun después de dejar de estudiar en Estados Unidos, lo cual significa que la versión de Isabel, en el sentido que el dinero era para que Juliana estudiara, está contradicha por la propia prueba de la sucesión demandada.

Dice la testigo demandante que cuando ella necesitaba dinero adicional iba a la colonia Teresa y don Manuel le daba dinero (t. 555–556). Este extremo de la declaración de la demandante está corroborado por la declaración del testigo de la sucesión demandada Audacio Marchi, según veremos más adelante. Dice que después de los tres años que la testigo vivió con Isabel (1938–1941), la testigo quiso ir

a Estados Unidos a coger un cursillo, fue a la colonia Teresa y don Manuel estuvo conforme y ella quedó confiada en que don Manuel daría la orden para que le dieran el dinero que necesitaba (t. 556). Dice que cuando pasaron unos cuantos días, en vista de que la orden no llegaba, la testigo le escribió a doña Ana (t. 556-557). Esta carta es el exhibit 54 y dice así:

"Guayama, P. R.
"Julio 25/41

"Mi Amadísima Doña Ana:

"Le escribo esta para enviarle por medio de estas líneas mi más sincera felicitación en el día de su santo, en el cual pediré al Señor todo lo que más ansia en esta vida.

"Doña Ana, le voy a decir una cosa y es que yo me quiero ir para los Estados Unidos a estudiar inglés, aquí veo que es perder el tiempo, yo estoy graduada de Comercio y me faltan tres inglés, biología y una historia para graduarme de científico, no las puedo coger por estar atrasada en inglés, no puedo sostener una discusión, y creo que allá adelantaría más en un año que aquí en tres años. Yo le suplico que Vd. *intercediera,* me ayudara para irme ¡que alegría que en sept. yo pudiera estar allá estudiando!

"Yo tengo una amiga muy buena que está casada y me cobraría por el hospedaje mensualmente $35, y además yo procuraría ayudarme por otro lado, hasta puedo estudiar día y noche porque allí hay esa ventaja.

"Doña Ana, yo deseo que Vd. me escriba y me diga si yo puedo ir a verla, porque quiero hablar personalmente con Ud; entonces yo escribiría a una amiga cubana que vive en Loíza Aldea para quedarme dos días en la casa de ella e ir a verla a Ud. no crea que lo que Ud. hace por mi lo perderá yo le aseguro que no lo pierde y sobre todo para el reino de los cielos lo tendrá ganado porque el que hace la caridad, Dios tiene que recompensar a esa alma.

"Bueno ya voy a terminar le suplico que me conteste *y que no tenga miedo porque nadie sabe mis cosas por eso, tengo apartado y además yo no doy cuenta de lo mío a nadie.*

"Bueno sabe que la quiero y junto con estas líneas le envío un abrazo y no la olvido delante de Jesús Sacramentado.

(Fdo.) *Julita Sanabria."*

(Transcripción de documentos 465-466)

Dice la testigo que doña Ana le contestó desde la Central San Vicente (t. 557). La carta de contestación es el exhibit 10 y dice así:

"San Vicente, P. R., 14 de agosto de 1941

Srta. Julia Sanabria
Box 392
Guayama, P. R.

Querida Julia:

Aunque hace tiempo que no te escribo, siempre te tengo cariño y he *estado hablando con Manuel* y le dije que de lo que le pasa a tu tía, me parece oportuno te *pasara* a tí la mitad y te *pagara* el pasaje a Estados Unidos.

*El me ofreció que así lo haría* y mucho me sorprende ver por tu carta que nada se ha resuelto. Si todavía no han hecho nada avísame para ver lo que puedo hacer por tí.

Sin otro particular, sabes siempre te aprecia de veras,

(Fdo.) *Ana María H. de González*"

Sigue diciendo la testigo demandante que doña Ana habló con don Manuel pero la testigo fue a la oficina de Cautiño y preguntó si había llegado la orden de don Manuel y le dijeron que no (t. 558) y es entonces cuando se cursa la siguiente comunicación:

"Guayama, P. R.

Sra. Doña Ana María:

Le escribo esta para pedirle un favor por caridad por amor a Dios, y es que habiendo tocado todos los resortes para evolucionar a fin de embarcarme en este mes con fin de poder empezar el año escolar en Sept. en los Estados Unidos, se me ha negado la ayuda, yo pienso hablarle a Don Genaro Cautiño para que él me ayude, prometiéndole yo que en cuanto empiece a trabajar pagarle todos los meses lo que pueda, pero antes de tener la entrevista con el Sr. Cautiño, me dirijo a Ud. a ver si me podría prestar $250. para yo poder desenvolverme, porque el ideal mío es estudiar y trabajar, pero hasta que uno no coja el piso tiene que tener algo para encaminarse, yo espero que Ud. no tendrá entrañas de piedra, porque una persona tan religiosa como Ud. no puede ser calificada de esta manera, yo deseo que me conteste enseguida, me dirijo a Ud. porque no es

lógico que una señorita le pida dinero a caballero, pero ya que toda ayuda me es negada, no tendré otro recurso, no le pido porque tengo derecho, pues no soy digna que Ud. me tire las migas de su mesa a una perra *pues siempre he reconocido mi sitio*, hubiera valido más que mi madre y mi padre junto conmigo nos hubieran amarrado una piedra al cuello y nos hubieran tirado los tres al mar antes que traer hijos al mundo a pasar trabajos y penas.

Terminando esta le pido perdón si en algo le he faltado, volviendo a suplicarle que me escriba para yo resolver pronto mi problema.

Quedo de Ud. con cariño y al mismo tiempo agradecida y al mismo le doy las gracias.

(Fdo.) *Julita Sanabria"*

(Exhibit 56—transcripción de documentos 469–470).

Sigue declarando la testigo demandante que a ella le dieron ciento cincuenta dólares para el viaje y cincuenta dólares más, y al mes siguiente le mandaron exactamente el dinero que don Manuel había dado órdenes que le entregaran (t. 559). Dice que vino enseguida a San Juan, sacó el pasaje y se fue a Estados Unidos donde permaneció ocho meses, o sea, de agosto o septiembre de 1941 hasta abril o mayo de 1942 (t. 560–561). Dice que además de los doscientos dólares, mientras estuvo en Estados Unidos, recibió cincuenta dólares mensuales por conducto de don Eusebio Vicente, a quien ella había autorizado a recoger el dinero que le correspondía a ella en casa de Cautiño (t. 562). Esta aseveración de la demandante está corroborada por el testigo de la sucesión demandada, Manuel Durán (t. 1916).

Dice la testigo demandante que después de transcurrir los ocho meses que estuvo en Estados Unidos, regresó a Puerto Rico, estuvo unos días en Santurce y fue a Salinas a ver a don Manuel (t. 567). Dice que vio a don Manuel a la entrada de la base en Salinas y le informó que había regresado porque había rumores que iban a bombardear a Nueva York (t. 568). Dice que don Manuel le propuso trabajar en El Cometa en Ponce y que él le buscaría un sitio

donde ella hospedarse, pero ella le contestó que prefería quedarse en Santurce (t. 569) y entonces don Manuel le dijo que él iba todos los sábados al Hotel Condado, de nueve a diez de la mañana y que cuantas veces la demandante lo quisiera ver fuera donde él (t. 569). Dice que durante todo el tiempo que ella vivió en Santurce, estando vivo don Manuel, o sea desde abril o mayo de 1942 hasta octubre de 1944, don Manuel le proveyó a la demandante todo lo que la testigo necesitó.

Dice que el dinero que le enviaban desde Guayama, entonces lo recibía mediante un giro postal que le mandaba María Porrata, la telefonista de Guayama porque don Eusebio, después que ella regresó de Nueva York, le dijo que él no podía seguirse ocupando de recogerle el dinero (t. 571–572). Esta aseveración de la testigo, en el sentido que ella siguió recibiendo los cincuenta dólares hasta el momento mismo de la muerte de don Manuel, y que mientras estuvo en Santurce el dinero lo retiraba María Porrata, está corroborada por el testigo de la sucesión demandada, Manuel Durán (t. 1916). Dice la demandante que siempre que ella necesitaba dinero adicional iba donde don Manuel al Hotel Condado y él siempre le daba (t. 569–570), y además doña Ana le mandó dinero en distintas ocasiones (t. 573). Esta última aseveración de la testigo sobre las dádivas de doña Ana María, está corroborada por la propia prueba de la sucesión demandada (t. 3484).

La testigo de la sucesión demandada, doña Ana María Hernández viuda de González, declara que con toda seguridad recuerda que ella conoció a la demandante en el verano de 1919 (t. 3494). Dice que durante ese verano estaban en Puerto Rico la testigo, su esposo don Manuel y los hijos del matrimonio (t. 3494). Dice que después se embarcó a Estados Unidos en agosto a llevar otra vez a los hijos y se quedó allí (t. 3494), hasta el 1922 (t. 3419).

Dice que cuando ella empezó a pagar por las niñas (Car-

men y Adela Márquez y la demandante Juliana Sanabria) "primero se dieron 15 (quince dólares) por. esas tres muchachas, después se aumentó a veinte con la Carmen Maneiro . . . y desde el 22 (1922) o 23 (1923) ya se fijó la cantidad en $25 mensuales" (t. 3499). Dice que no se pagaba por cada huérfana sino que se pagaba por todas juntas (t. 3499–3500). Dice que a la testigo "nunca me dieron recibo en el asilo, porque yo no podía pedirle a las hermanas que me dieran recibo. Yo les llevaba 80, 100 pesos" (t. 3500) "les mandaba zapatos, les mandaba vestidos . . . lo que necesitaban" (t. 3501). Dice que ella daba por las tres y por las otras que no eran de ella (t. 3502).

Dice que en el 1924 le empezaron a decir a la testigo que la demandante tenía vocación de monja (t. 3496). Dice que ella habló con Juliana y le dijo que ella creía que ella no tenía tal vocación, diciéndole además: "te pago el pasaje si regresas porque tú no tienes vocación de monja" (t. 3497). Dice que ella le dijo a Sor Lucía que mandara a la demandante a un convento después que cumpliera los veintiún años, o sea, después del 8 de marzo de 1926, porque la demandante no tenía vocación de monja y debía tener conciencia de lo que hiciera (t. 3506) ; que debía tener veintiún años "como fue Encarnación y mi prima Pilar también. Se oponían sus padres. De 21 años, para que tengan conocimiento de lo que hacen" (t. 3506). Dice la testigo que ella misma buscó un convento en España para la demandante en el 1924 y en el 1925, pero no aceptaban a la demandante (t. 3511). Dice que en el 1926, Sor Lucía le dijo a la testigo que había un convento donde la cogerían (en Cuba) (t. 3511).

Continúa declarando la señora Hernández viuda de González que fue don Manuel quien firmó el cheque por mil dólares de la dote de Juliana para el convento porque la testigo no podía firmar cheques (t. 3481). Dice que sus bienes privativos le daban rentas pero ella no podía firmar cheques porque no tenía la firma autorizada en el banco (t. 3532) y

describe sus bienes privativos como diez acciones en los Baños de Coamo (t. 3533). Dice que don Manuel, fuera de firmar el cheque, no tuvo ninguna otra intervención en el asunto (t. 3527). Dice que ella le había dado a don Manuel un poder "amplísimo y él parece que quizás me encontraba a mi un poquito gastadora. Así es que le daba a él todas mis rentas y por eso recurrí a él, porque esta muchacha me pedía una dote y como era un poquito demás de lo que yo podía, más que por eso le pedí que me diese el cheque cargándomelo entonces a mí" (t. 3480). Dice que en el año 1938 tuvo que pagarle a la demandante el pasaje de vuelta (de Cuba a Puerto Rico) (t. 3497 *in fine*) y lo hizo porque Sor Lucía le informó que Sor Serafina era la que le había dado el pasaje a la demandante (t. 3498).

Sigue diciendo la testigo que cuando recibió la carta de Juliana informándole la demandante que quería irse a Nueva York, "entonces le pedí a mi esposo que me hiciera el favor de hablar con la tía de esta señora (Isabel González) para de un dinero que le pasa Manuel ayudara por caridad a su sobrina (la demandante) para que pudiera estudiar, que ella era una obra de caridad, porque yo ya también estaba un poco cansada de todo lo que yo había hecho por ella, que era justo que la tía (Isabel) se sacrificara un poco; y que si ella (Isabel) le daba algo, yo le pagaría hasta el pasaje, si era necesario" (t. 3225). De acuerdo con la prueba documental, quien habría de pagar el pasaje sería don Manuel y no doña Ana María (exhibit 10). Dice la testigo que ella le habló al señor Cautiño para que le diera el pasaje y le diera algo si le ayudaba la tía para que fuese (t. 3528).

Dice la testigo que a partir de la fecha en que la testigo ingresó a la demandante en el Asilo de Huérfanas, la testigo mantuvo correspondencia con la demandante, cartas en las cuales la demandante solicitaba ayuda, dinero y que ella se las contestaba y "como pudiera siempre la complacía" (t. 3214). Dice que la demandante le escribió desde Nueva

York pidiéndole dinero para casarse y ella le dió la ayuda que pedía (t. 3484).

■■ Es llegado el momento de realizar el análisis final que conduciría a la resolución de los distintos conflictos de prueba y a la formalización de las nuevas conclusiones de hecho, aplicando la regla de la preponderancia de la prueba.

1. En cuanto a la prueba de las relaciones concubinarias o amorosas de don Manuel con Isilé Sanabria, el ilustrado Juez sentenciador no le dio crédito a la declaración del testigo de la demandante Francisco Romero por considerarlo inverosímil, contradictorio y exagerado. En ese sentido, el ilustrado Juez sentenciador se expresó en los siguientes términos: "Recuérdese que Francisco Romero declaró que de 1900 a 1901 era comprador de la casa de Don Manuel González, esto es que le daban una nota y lo mandaban a la tienda y él cogía las provisiones y entregaba la nota. Pero la prueba demostró que esto no podía ser cierto ya que a esa fecha era un niño de siete años. Por la forma de declarar Francisco Romero, sus vacilaciones en la silla de los testigos, las aseveraciones exageradas e inverosímiles que expuso en su testimonio y sus contradicciones con respecto a si Desilé era mayor que Isabel o si Isabel era mayor que Desilé, este Tribunal se vio compelido a no otorgarle crédito alguno a su testimonio. Por otro lado las declaraciones de Isabel González, Dolores Briganti y Alejandro Ramos Cartagena, corroboradas por la prueba documental presentada por los demandados inspiran a este Tribunal el más absoluto crédito . . .

"Francisco Romero quien pretendía conocer los hechos relacionados con el nacimiento de la demandante y todos los demás que siguieron hasta el fallecimiento de la madre de la demandante el 22 de octubre de 1912, manifestó que no vio a la madre de la demandante viviendo con Alejandro Ramos Cartagena, ni si tuvo un hijo de él, y que tampoco la vio viviendo con Gaspar Carrillo, a pesar de que la prueba toda demostró estos hechos, apareciendo además que en cuanto a

Olimpia Sanabria se refiere fue el propio Gaspar Carrillo quien informó el fallecimiento de dicha niña" (Leg. 98–99).

Parece que las objeciones del ilustrado Juez sentenciador al testimonio de Francisco Romero se dirigen más a la veracidad de su testimonio que al hecho de su presencia en casa de don Manuel durante los años cubiertos por su testimonio. Es un hecho que se desprende espontáneamente de la prueba, que después de San Ciriaco, los bajos de la casa de don Manuel y los cuarteles más abajo de la casa de don Manuel, le sirven de refugio a ciertas familias damnificadas. Francisco Romero es hijo de Vicente Romero, uno de los hombres de confianza de don Manuel (t. 78). No hay que olvidar que la institución del "niño entregado" o del "niño encargado" es demasiado corriente en nuestra sociología campesina para constituir un caso excepcional. En este mismo caso aparecen otros niños entregados a la familia González—Carmen y Adela Márquez, Carmen Maneiro, Julia Beltrán, por ejemplo.—Por otro lado, el trabajo infantil es una realidad nuestra que nos circunda por todas partes. No nos explicamos como el ilustrado Juez sentenciador pudo sorprenderse de la clase de trabajo que desempeñaba Francisco Romero, al enfrentarse con la modesta tarea que dicho Francisco Romero desempeñaba en casa de don Manuel: "como eso era asunto que me daban una nota y me mandaban a la tienda y yo cogía y entregaba la nota" (t. 51); "pues entonces lo que tenía yo era que estaba de mandadero, y de sembrar matas, de regar allí un jardincito que había en la casa" (t. 62–63). Francisco Romero no era un comprador, propiamente dicho, sino un simple peoncito de recados.

En cuanto a las contradicciones del testigo Romero con respecto a si Isilé era mayor que Isabel, lo que el testigo Romero declaró, en buena hermenéutica jurídica, fue por observación: "Lo que puedo explicarle a usted es que Isilé era más alta y mayor que la otra" (t. 61); "calculo que tendría como catorce años" (t. 61); "según mi creencia

me estaba a mí que era mayor" (t. 84). Según hemos visto, para el año 1900, Isilé, quien había nacido en el 1887, tenía trece años, o sea, un año, menos de lo que calculó, por observación, el testigo Romero. Posteriormente, sobre este mismo asunto, Isabel González declaró que para estos años—1899 a 1903—su hermana natural Isilé Sanabria era "una señorita completa" (t. 1171). La propia Isabel González, al preguntársele sobre los años que tenía su hermana Isilé Sanabria, no pudo decir la edad que su hermana tendría a dicha fecha (t. 1015).

Contrario a lo concluido por el ilustrado Juez sentenciador, el testimonio de Francisco Romero sobre los otros hijos de Isilé Sanabria es completamente diáfano. El testigo Romero llegó a casa de don Manuel, por primera vez, en el año 1900 y estuvo hasta el 1901 (t. 50); en el 1902 se salió y estuvo durante dicho año y el 1903 en Sabana Hoyos en una finca de su padre (t. 52); en el 1904 regresó y vivió en casa de don Manuel hasta el 1908 (t. 52–53) y en el 1908 se fue a Fortuna de Gual (t. 53) y hasta el 1912 cuando dejó de trabajar para don Manuel trasladándose a Barritos (t. 48–53). Dice que al volver a casa de don Manuel en el 1904, se decía que Isilé había tenido un hijo:—"Se decía eso pero yo no lo ví seguro. Lo que uno no lo ve no debe decirlo"—(t. 63). Sin duda, se refiere al primer hijo de Isilé, Luis Sanabria, nacido en septiembre de 1903 y muerto en diciembre de 1903, según la propia prueba de la sucesión demandada.

Sigue diciendo el testigo Romero que a fines del 1904,— septiembre a diciembre de 1904—salió Isilé de casa de don Manuel González para la casa de un tío de ella, Severo Sanabria (t. 37) y que "a los cuatro o cinco meses de haber estado allí dió a luz una muchacha" (t. 38). Sin duda, se refiere al segundo hijo de Isilé, Juliana Sanabria, la aquí demandante, nacida en 8 de marzo de 1905. Dice que no conoce al hijo de Alejandro Ramos Cartagena porque nunca lo

vió (t. 68). Sin duda se refiere a Nemesio, cuya fecha de nacimiento no consta de la prueba. Tampoco lo vió la testigo Dolores Briganti (t. 1643). La estipulación de las partes en el sentido "que si alguna relación sexual hubo entre el testigo (Alejandro Ramos Cartagena) . . . y Desilé Sanabria, . . . ello fue a fines del año 1907 y parte del mil novecientos ocho" (t. 1838–1839), se refiere, aunque vagamente, a este hijo Nemesio. La prueba sobre la existencia de este hijo no es tan satisfactoria como la prueba de los otros hijos. La propia estipulación de las partes sobre las relaciones sexuales de Isilé con Alejandro Ramos Cartagena es bastante cautelosa.

El testigo Romero había declarado que en el 1908, salió de la casa de don Manuel González para Fortuna de Gual (t. 53). La propia prueba de la sucesión demandada establece que en Fortuna de Gual vivía Vicente Romero, padre del testigo Romero y Pascuala Romero, tía del testigo Romero y mujer de Higinio Pérez (t. 1519–1520). La propia testigo de la sucesión demandada Dolores Briganti, declara, en aquellos momentos en que su testimonio parece ser más espontáneo, que Higinio Pérez, siempre vivió en Fortuna de Gual (t. 1566–1589). El hijo de Isilé con Alejandro Ramos Cartagena, ha debido nacer a finales de 1908 o a principios de 1909, según veremos más adelante, fechas ambas en que Francisco Romero está viviendo lejos de los Riegos.

Sigue declarando el testigo Romero que tampoco supo de los amores de Isilé con Gaspar Carrillo. El testigo Romero había declarado que en el 1912 abandonó la heredad de don Manuel: "y me salí y hasta la fecha" (t. 53). La cuarta y última hija de Isilé Sanabria, Olimpia Sanabria, nació el 1ro. de abril de 1912, en el barrio La Lapa de Salinas y murió el 24 de febrero de 1915, en el barrio Aguirre de Salinas, fechas ambas en que el testigo Romero ya se había ido de las fincas de don Manuel. La misma Isilé Sanabria murió el 22 de octubre de 1912 en el barrio Aguirre de Salinas, en el mismo año que nació su hija Olimpia. Esto deja un razonable mar-

gen de tiempo y espacio en el conocimiento del testigo Romero, a favor de su credibilidad. Nada hay en la prueba de la sucesión demandada que demuestre en forma alguna, prejuicio, interés o condición moral que puedan afectar la credibilidad de Francisco Romero.

¿Puede un niño de siete años recordar lo que cuenta el testigo Romero sobre los primeros amores de don Manuel con Isilé—cuando él (don Manuel) "entraba al cuarto de ella y se acostaba y jugaba ... y después cerraba la puerta, y juntaba la puerta, la jalaba"? (t. 32–33). Si estas relaciones amorosas las hubiera presenciado el testigo Romero una sola vez quizás podría dudarse de la capacidad de retención de un testigo infantil. Pero eso lo ve, el testigo Romero "por espacio de muchas veces" (t. 36) durante los años 1900 y 1901, o sea, a la edad de siete y ocho años y vuelve a contemplarlas en el 1904 cuando ya tiene once años, y sigue observando los actos de reconocimiento de don Manuel cerca de Isilé y de la demandante hasta el 1908, cuando ya tiene quince años. De todos modos, el período de observación que en realidad de verdad tiene importancia para concluir sobre las relaciones amorosas al momento de la concepción de la demandante—mayo a junio de 1904—es el segundo, cuando ya el testigo Romero tiene once años.

Las declaraciones de Isabel González y Dolores Briganti, que inspiran al ilustrado Juez sentenciador "el más absoluto crédito", son dos testimonios seriamente objetables. Isabel González se abroqueló en una fecha—junio de 1903—como la fecha en que su padre don Manuel se embarcó, empezaron a preparar la casa para una boda que había de celebrarse un año y dos meses después—3 de septiembre de 1904—y ella y su hermana Isilé abandonan la casa de don Manuel (t. 1104, 1177). Al preguntársele si al salir ambas de la casa de don Manuel en junio de 1903, notó a su hermana Isilé en estado de embarazo—a esa fecha Isilé tenía seis meses de embarazo—contestó que no lo notó (t. 1140) y, por el contrario, acusa a su hermana de haberse ido a vivir, dos meses

y quince días más tarde, con Higinio Pérez (t. .1001) en los mismos momentos en que Isilé está dando a luz su primer hijo Luis, concebido en noviembre o diciembre de 1902. Dice que después de eso no volvió a ver más a su hermana Isilé (t. 1001).

Dice haberle oído a su padre don Manuel informarle a la demandante Juliana Sanabria que él no era el padre de la demandante y que el padre de la demandante era un domador de caballos, Higinio Pérez, y cuando se le enfrenta a una declaración de su puño y letra en que reconoce a Juliana como su hermana—la dedicatoria del retrato que Isabel le envía a Juliana al convento en Cuba—trata de evadirse de su obligación como testigo mediante respuestas ambiguas y se niega a dar una muestra caligráfica de los rasgos de su escritura para el cotejo correspondiente.

Pese a toda sutileza jurídica, el envío por Isabel del retrato suyo a la demandante con esa dedicatoria, ese pronombre posesivo *"mi"*, ese término logístico, suficiente en si mismo, *"mi hermana"*, nos obliga a concluir que Isabel González, antes de la pretendida conversación de su padre con la demandante Juliana Sanabria, que ella relata, sabía que la demandante Juliana Sanabria no era hija de Higinio Pérez sino de don Manuel, y por lo tanto, hermana suya por parte de padre.

Esto explica muchos aspectos de la conducta de Isabel que de otro modo, resultarían bastante ilógicos; por ejemplo, el repudio *ab irato* de su hermana por parte de madre Isilé, al enterarse de sus amores, y su aceptación *in camera caritatis* de su hermana por parte de padre, Juliana, no sólo cuando era una niña que vivía en casa de María Curet, sino también después de haber Juliana violentado el plan de convertirla en una religiosa. La versión de que recogió a la demandante en su casa porque no podía dejarla en la calle no nos convence. Cuando Juliana va a vivir con Isabel en el 1938, no es una adolescente de catorce años, desamparada (t. 1452) como lo era cuando doña Ana María "se entregó en ella" (t. 1452) ni

una huérfana, puesto que Higinio Pérez muere en el 1946 (exhibit 5) sino una mujer de alrededor de treinta y tres años de edad (t. 1239), con diecinueve años de educación monjil.

El testimonio de Dolores Briganti es el caso típico del testimonio que no debe ser creído. En cuanto a un hecho tan sencillo como es el hecho de cuándo y a dónde fue a vivir durante los años comprendidos en las dos primeras concepciones de los dos primeros hijos de Isilé Sanabria, su testimonio ondula continuamente entre la contradicción y la componenda. Si fuéramos a darle crédito a la testigo Briganti sobre los "papeles de enamorados" (besarse y abrazarse), que ella observó entre Isilé e Higinio Pérez, allá por febrero de 1903, para esa fecha, Isilé tendría de tres a cuatro meses de embarazo de otro hombre, pues su hijo Luis ha tenido que ser concebido entre noviembre y diciembre de 1902. Sin duda fue esto lo que indujo a la testigo a declarar que en los últimos días del mes de diciembre de 1903, (t. 1547) durante las fiestas de la Navidad, vió vivo a un niño (t. 1546) como de cinco días de nacido (t. 1547), que en realidad de verdad, había muerto a la edad de tres meses, el 14 de diciembre de 1903.

Si fuéramos a darle crédito a la testigo Briganti sobre el *paso* de Isilé frente a la casa de la testigo, cargando un lío de ropa, acompañada de Higinio Pérez, allá por el mes de octubre de 1904, para esa fecha Isilé tendría de cuatro a cinco meses de embarazo de otro hombre, pues su hija Juliana ha tenido que ser concebida entre mayo y junio de 1904. Las veces que ella dice veía a Higinio Pérez en los Riegos "a diario por allí" han tenido que ser después de septiembre de 1904, fecha en que la testigo empieza a lavar el "ropaje" de doña Ana en los Riegos.

Ahora bien, ¿puede concluirse razonablemente que Higinio Pérez, un simple trabajador en las fincas de don Manuel González, tuviera la suficiente preeminencia—en el cuadro de intereses y afectos que presenta este caso—para tener re-

laciones amorosas con una hermana de una hija natural de don Manuel, recogidas ambas en su casa por éste, casi dentro de la propia casa de don Manuel, sacarla de allí con cinco meses de embarazo; obligar a un tío de ella, además tío de la propia hija de don Manuel, quien repudia la conducta de su hermana, a que le permita tener relaciones amorosas con ella en la casa del tío, quien vivía con su esposa en dicha casa según la testigo Briganti y con su sobrina Isabel González, hija de don Manuel, según la testigo González; sacarla de allí otra vez embarazada, obligar a un hermano de ella, además hermano de la hija de don Manuel, recogido por éste en su casa junto a las dos hermanas, a que le permita tener relaciones amorosas en la casa del hermano, quien también vivía con su esposa en dicha casa (t. 1526) según la testigo Briganti, todo esto a ciencia y paciencia de Isabel González, de Severo Sanabria, de Paco Sanabria y aún del propio don Manuel? Este sería el resultado alógico a que nos llevaría el testimonio de Dolores Briganti. No hay que pensar que los amores de Isilé con Higinio Pérez, por ser clandestinos, se escaparan a la observación de la familia González o de la familia Sanabria, pues la propia boca de la testigo Briganti nos dice que mientras Isilé estaba en la casa de don Manuel, "la barriga se le notaba" (t. 1543).

De todos modos, la versión de las relaciones amorosas de Isilé está mejor formalizada dentro del tiempo y el espacio en el testimonio de Francisco Romero que en el testimonio de Dolores Briganti, y es nuestro deber darle crédito al hecho directamente observado por un período de tiempo más largo y no dárselo a la mera conjetura sobre un hecho incompleto, episódicamente observado. El crédito judicial no es una intuición suprarracional, ni un acto de fe, sino un examen crítico. Siendo esto así, es nuestra obligación como juzgadores darle crédito a la declaración de Francisco Romero y negárselo a las declaraciones de Isabel González y Dolores Briganti, y cualquier conclusión en contrario es claramente errónea.

En cuanto al período de tiempo que cubre los primeros años de la infancia de Juliana Sanabria, o sea, desde el 8 de marzo de 1905—fecha del nacimiento de Juliana—hasta el 22 de octubre de 1912—fecha de la muerte de la madre de Juliana, Isilé Sanabria, contrastados los cuatro testimonios de Francisco Romero y la demandante Juliana Sanabria, por un lado, y de Dolores Briganti y doña Ana María Hernández por otro lado, resalta el hecho indisputado que en la casita junto al portón del Coquí vivía Severo Sanabria con su esposa Juana Vázquez, sitio donde afirman, tanto Francisco Romero como la demandante vivía Isilé Sanabria con su hija Juliana. En cuanto al testimonio de doña Ana María,— descartados sus frecuentes viajes a España y a los Estados Unidos— lo más probable es que no pasara por la entrada del Coquí en los primeros años de su matrimonio, que son casualmente los años en que el Coquí era la entrada a la finca donde quedaba la casa de don Manuel y su señora esposa. De haber pasado por allí ocasionalmente, el conflicto de la prueba quedaría circunscrito a la afirmación de doña Ana que no recuerda haber visto a ninguna persona adulta o niño viviendo en casa de Severo, fuera de Severo y su mujer Juana Vázquez.

En cuanto al testimonio de Dolores Briganti, ella asegura que Isilé originalmente vivió en casa de Severo "bastante tiempo" (t. 1449), que reduce más tarde a siete meses después de muerto el niño Luis (t. 1561). Ya hemos visto que esto ha debido ser hasta octubre de 1904. De dársele crédito a la parte de su testimonio que dice que vio a Isilé viviendo en casa de su hermano Paco Sanabria hasta dos años y meses después de nacida Juliana, su testimonio, en cuanto a este extremo, solo cubriría hasta abril, mayo, junio o julio de 1907.

La afirmación de la testigo Briganti, en el sentido que después del 1907, Isilé y su hija Juliana, pasan a vivir a casa de Gaspar Carrillo, no puede sostenerse, visto el hecho

estipulado que a fines del 1907 o a principios del 1908, Isilé tuvo amores con Alejandro Ramos Cartagena, presumiblemente en casa de Paco Sanabria, quien estaba casado con una hermana de Alejandro Ramos Cartagena llamada Fela Cartagena (t. 1827), y de esos amores nace un hijo llamado Nemesio, cuya fecha de nacimiento no consta, pero lo más probable es que naciera a finales del 1908 o a principios de 1909. Si esto es así, como cuestión de impugnación directa no se establece por la prueba adversa en qué sitio vive Juliana desde el 1907 al 1911, ésta última, única fecha posible en que empezaran los amores de Isilé con Gaspar Carrillo, contando desde la concepción de la única hija de ambos, Olympia Sanabria, que ha tenido que ser concebida entre junio y julio de 1911. Juliana ha podido vivir en la casita junto al portón del Coquí, sola o en compañía de su madre, o en casa de Paco Sanabria, algunas semanas, según establece la prueba de la demandante. De acuerdo con el testimonio de la testigo Briganti, el único hombre que le puso casa a Isilé Sanabria fue Gaspar Carrillo. Esto fue lo que obligó a la testigo Briganti a arrojar a Isilé en brazos de Gaspar Carrillo en el 1907, cuando todavía no habían empezado los amores de Isilé con Alejandro Ramos Cartagena ni hubiera podido nacer su hijo Nemesio.

La prueba de la sucesión demandada descansa en el hecho que Isilé vivió en casa de su hermano Paco hasta el 1907 y desde el 1907 en casa de Gaspar Carrillo, para demostrar, que cualquier subsistencia que necesitara, tanto Isilé Sanabria como su hija Juliana, ha debido proveerla su hermano Paco o su amante Gaspar. Esta deducción es más débil que la afirmación directa de Francisco Romero que era don Manuel quien suplía lo que la demandante Juliana Sanabria necesitaba para vivir, sobre todo desde el 1907 en adelante, cuando de acuerdo con el propio testimonio de Dolores Briganti, no vio más a la niña en casa de Paco.

En cuanto al período de tiempo que cubre desde el 22 de octubre de 1912—fecha de la muerte de la madre de Juliana—hasta junio, julio o agosto de 1919—fecha en que doña Ana María se hace cargo de la demandante hay dos conflictos en la prueba que dilucidar: (1) dónde vive Juliana del 1914 al 1916 y (2) quién la alimenta.

En cuanto al primero, la prueba de la demandante es que después de salir Juliana de Hoyo Inglés va a vivir a los Húcares a casa de Juan Colón, donde permanece hasta junio o julio de 1916 y la prueba de la sucesión demandada es que después de salir Juliana de Hoyo Inglés va a vivir a Sabater al "aeroplano". En cuanto al segundo, la prueba de la demandante afirma que la persona que sostiene tanto a Cristina como a la demandante Juliana Sanabria, es don Manuel González y la prueba de la sucesión demandada es que tanto Cristina como Juliana, vivían de lo que producía una fonda que tenía Cristina.

No hay duda que Juliana vive en Hoyo Inglés desde finales de 1912 o principios de 1913 hasta algún día antes del 14 de mayo de 1914, fecha en que se casa María Curet. La demandante declara que de Hoyo Inglés, ella pasó a vivir a los Húcares, a casa de Juan Colón. Esta afirmación de la demandante está corroborada por la declaración de Juana Velázquez, Eladio Acosta y Pedro Cruz.

La prueba de la sucesión demandada se bifurca en dos períodos durante los cuales Cristina Curet vive en el "aeroplano" de Sabater. El primero sitúa a Cristina Curet en el aeroplano de Sabater entre los años 1910 a 1913. La testigo de la sucesión demandada, doña Ana María Hernández viuda de González, declara que Cristina fue cocinera de su casa hasta el 1910 (t. 3452) y que "entonces le dimos (ella y don Manuel) (t. 3452-3453) un cuarto en el 'aeroplano' para tenerla cerca, por si se me iba la cocinera poder mandar a buscarla" (t. 3452). Dice que después de darle ese cuarto ella volvió a casa de la testigo, "algún día que no teníamos

cocinera venía y me ayudaba" (t. 3453). El testigo de la sucesión demandada Sabad Reyes declara que él conoció a Cristina en Sabater en el 1913 porque él iba a almorzar a una fonda que Cristina tenía en Sabater en dicha fecha. De acuerdo con la declaración de la testigo de la sucesión demandada María Curet, esta primera fonda de Cristina en Sabater "cayó" allá por los últimos meses de 1913 o los primeros meses de 1914, cuando Cristina va a casa de la testigo Curet por dos o tres meses a descansar. Es indudable que durante este primer período, 1910-1914, Juliana no vive con Cristina en Sabater.

El segundo período sitúa a Cristina Curet acompañada de Juliana, en el "aeroplano" de Sabater desde finales de 1914 hasta junio o julio de 1916. La testigo María Curet dice que Cristina salió con Juliana de la casa de la testigo en Hoyo Inglés antes del 14 de mayo de 1914 para el ranchón el "aeroplano" de Sabater. Pero el testimonio de Antonio Santiago padre y Antonio Santiago hijo, ambos testigos de la sucesión, la contradicen porque dicen que no fue hasta finales de 1914 que el "aeroplano" estuvo terminado y a pesar que Cristina pidió un sitio en el "aeroplano'" a principios de año, no fue hasta finales de 1914 que consiguió un cuarto en el "aeroplano". Hay por lo menos un hueco en la prueba de la sucesión demandada, de mayo a diciembre de 1914, que no explica donde viven Cristina y Juliana.

La testigo María Curet declara que después que Cristina salió de Hoyo Inglés ella visitaba a su tía en Sabater del 1915 al 1916 que eran los años que la visitaba con mayor frecuencia porque ya estaba casada y visitaba con su esposo a su tía (t. 1758). Esto, hasta cierto extremo, corrobora la versión contraria que establece que Cristina y Juliana salen de los Húcares hacia Sabater en junio o julio de 1916. Parece que las otras veces que María Curet visitaba a Cristina era antes del 1914.

Por el examen que hemos hecho anteriormente de los tres testimonios de la familia Santiago, es indudable que ellos no saben nada de la vida de Cristina y de Juliana antes de julio de 1916, fecha en que van a vivir a Sabater. Después del 1914 y antes del 1916, sólo queda la afirmación de María Curet que ella descubrió la pérdida de la fonda de su tía entre los años 1915 al 1916 que eran los años que visitaba a su tía con mayor frecuencia. Aplicando la regla de la preponderancia de la prueba, tenemos que concluir que durante este segundo período 1914-1916, Cristina y Juliana no viven en Sabater, sino en los Húcares.

La prueba de la demandante dice que todo lo que Juliana necesitaba se lo daba don Manuel a Cristina para que la tuviera con ella y que durante los años 1914 al 1916, cuando vivieron en los Húcares, Cristina no tenía ningún negocio y no hacía otra cosa que atender a la demandante, y ambas (Cristina y Juliana) vivían de lo que don Manuel les daba. La prueba de la sucesión demandada dice que Cristina y Juliana vivían de una fonda que Cristina tenía.

Es conveniente detallar que clase de nogocio era el que tenía Cristina en el "aeroplano" de Sabater. Doña Ana María Hernández declara que Cristina vivía de una fonda (t. 3453), que "no era una verdadera fonda. Hacía comidas y le daba platos al peonaje" (t. 3454) y que Cristina "en cuanto estaba en una necesidad iba a pedirme y si no tenía vestido iba a pedirlo" (t. 3453) o si no tenía vestidos ni zapatos iba a la casa (la de doña Ana María) "a completar lo que le faltaba" (t. 3453). Anteriormente había declarado que Cristina "siempre tenía unas botellitas de maví que vendía y tenía sus frituras y cosas allí" (t. 3422). Esta declaración indudablemente se refiere al primer período de la fonda desde el 1910 al 1913. La segunda descripción del negocio de Cristina la hace la testigo de la sucesión demandada María Curet. Dice que el negocio de Cristina era una "cosa ratona" y que Cristina "perdía que era una barba-

ridad" (t. 1783. Esta declaración indudablemente se refiere a algún período de tiempo entre 1914 y 1916.

La tercera descripción del negocio de Cristina nos la ofrece la propia demandante. Dice que Cristina " los sábados que era día de pago, ella hacía dulces de coco, bacalaos fritos y aprovechaba y los vendía por allí para tener su peculio," (t. 481). Esta declaración indudablemente se refiere al período de tiempo comprendido entre el 1916 y el 1919. La cuarta descripción del negocio de Cristina la da el testigo de la demandante Angel Ramón Zayas. Dice que Cristina "a veces freía bacalaos y le daba almuerzo y comida a dos o tres personas" (t. 156). Esta declaración indudablemente se refiere al período del negocio desde el 1916 al 1919.

La quinta descripción del negocio de Cristina la da el testigo de la sucesión demandada, Antonio Santiago hijo. Dice que "la vieja Cristina Curet tenía allí un *negocito* porque vivía muy pobre. Hacía dulces de coco y daba comidas a algunos allí y hacía un pirulí que se vendía a dos o tres centavos" (t. 2252). Esta declaración indudablemente se refiere al período del negocio desde el 1916 al 1919. A igual período se refiere el testigo de la sucesión demandada, Miguel Santiago, al brindarnos la sexta descripción del negocio de Cristina. Dice que Cristina "vivía del negocio, vendía pan, dulces y daba manutenciones también" (t. 2333).

El único testigo que habla del rendimiento de esta fonda de Cristina es la testigo de la sucesión demandada María Curet. Como se recordará, María Curet declaró que cuando su tía fue a Guayama a convalecer por dos o tres meses en el 1914, la fonda se le había caído porque no tenía quien la ayudara, y entonces, la testigo le recomendó a su tía que se trajera con ella a la demandante, porque como había aprobado el primer grado, podría ayudarla. Parece que el hecho de haberse traído a Juliana con ella no ayudó a Cristina, porque cuando María Curet, ya casada, va a visitar a su tía del 1915 al 1916, descubre que los peones apuntaban menos

de lo que cogían y que Cristina perdía "que era una barbaridad". De modo que no podemos concluir que la fonda de Cristina fuera una fuente de ingreso de la cual pudiera vivir Cristina y Juliana con la holgura que de acuerdo con el propio testimonio de María Curet, Cristina mantenía a Juliana cuando ésta vivía en casa de la testigo Curet en Hoyo Inglés.

Un análisis riguroso de los testimonios referentes a este período—1912 al 1916—nos obliga a concluir, que al salir Cristina acompañada de Juliana de Hoyo Inglés en Guayama no fue a vivir al "aeroplano" de Sabater sino a casa de Juan Colón en el barrio Húcares, donde viven desde el 1914 al 1916 y que durante ese período, Cristina no tiene ningún negocio de fonda ni se dedica a otra cosa que no sea cuidar de la demandante por encargo de don Manuel González.

En cuanto al período de 1916 al 1919, la propia prueba de la sucesión demandada demuestra que don Manuel González realiza ciertos actos de protección hacia las dos mujeres que están más en armonía con la versión de la prueba de la demandante que con la total incomunicación entre don Manuel y su hija natural que pretende establecer la prueba de la sucesión demandada. Es el propio testigo de la sucesión demandada, Antonio Santiago padre, quien declara que don Manuel estuvo conforme que se le diera un alojamiento a Cristina y Juliana en el ranchón conocido como el "aeroplano". Es el propio testigo de la sucesión demandada Antonio Santiago hijo quien declara que al tiempo de estar Juliana en Sabater se le habló a don Manuel para que le diera un poco de leche a Juliana y don Manuel estuvo conforme, aseveración que, corrobora la declaración de Juana Velázquez, en el sentido, que mientras Juliana vivió en los Húcares tenía una vaca para su leche. La misma doña Ana María declara que mientras Cristina vivió en el aeroplano, ella ayudaba a Cristina con vestidos y zapatos.

La prueba de la demandante, en cuanto a que, mientras Juliana vivía en Sabater, gozó de la protección y cuidado

de su padre, se encuentra robustecida por la declaración de un testigo digno de entero crédito, Angel Ramón Zayas. Aunque hay un débil intento en la prueba de la sucesión demandada de traer a colación una posible enemistad entre don Manuel y el testigo Zayas, tal versión resulta ridícula. La propia prueba de la sucesión demandada demuestra que al poco tiempo de estar Zayas trabajando de apuntador en Sabater (1916) (t. 157) se le asciende a mayordomo de la colonia Fortuna (t. 2259) donde trabaja hasta el 1922. Hay prueba que posteriormente Zayas vuelve a trabajar con la sucesión demandada a requerimiento de don Ramón González (t. 179).

La explicación que da la testigo Beltrán sobre la forma como Juliana llegó a la casa de doña Ana María es francamente increíble. La propia prueba de la sucesión demandada demuestra que Juliana iba todas las mañanas a buscar la leche con los hijos de don Antonio Santiago. Si esa mañana Juliana llegó sin leche a donde Cristina, ésta tenía oportunidad de verificar la información de Juliana, en el sentido, que la leche no había alcanzado para la repartición a los pobres, preguntándole a los hijos de don Antonio Santiago, quienes también regresarían a Sabater sin leche. La explicación que da doña Ana María de como vino Juliana a su casa y el tiempo que estuvo en ella, es francamente trivial. La propia prueba de la sucesión demandada demuestra que las otras niñas que iban al colegio o asilo junto a Juliana estuvieron en casa de don Manuel por bastante tiempo. A menos que no hubiera una razón especialísima para sacar a Juliana de la casa de don Manuel tan pronto llegó, tal conducta no sería lo normal dentro de las relaciones humanas observadas cerca de otras personas. Tal vez la razón fuera que doña Ana sabía que Juliana Sanabria era hija de don Manuel.

El intento de equiparar a Juliana con las hermanas Márquez y con Carmen Maneiro también resulta sospechoso.

Carmen y Adela Márquez eran hijas de una planchadora de la casa de don Manuel (t. 3422) y Carmen Maneiro era sobrina de una sirvienta que doña Ana María tuvo mucho tiempo (3426). Juliana Sanabria, era, por lo menos, sobrina de una hija natural de don Manuel González. A las hermanas Márquez y a Carmen Maneiro lo que le enseñaron en el colegio fue trabajo doméstico y labores, a limpiar, barrer, cocinar, fregar, lavar y planchar (t. 2058). A Juliana Sanabria le dieron primera enseñanza y aprendió a bordar, marcar, a surcir con perfección, pintura y dibujo (t. 516). Carmen Márquez salió del colegio a trabajar de sirvienta a casa de doña Sara Morales (t. 1970); Carmen Maneiro salió del colegio a trabajar de sirvienta en la casa de la propia doña Ana María (t. 2084). Cuando declaró el 9 de septiembre de 1948, Carmen Maneiro todavía era una sirvienta de doña Ana María (t. 2045). Juliana Sanabria salió del colegio a ser hermana de coro en un convento de Cuba, y la prueba demuestra que las hermanas de coro son señoritas que tienen instrucción y son de familias distinguidas (t. 532).

Si el caso llegara hasta el año 1919 y nada más, tal vez podría aceptarse que los actos de reconocimiento del padre quedaron sujetos al balance de posibilidades en que suele apoyarse, a grosso modo, en algún caso extremo, el crédito judicial. Pero es que desde agosto o septiembre de 1919 hasta el 16 de octubre de 1944, fecha en que muere don Manuel, la demandante goza de una atención y cuidado por parte del matrimonio González que no desmerece en absoluto las atenciones menudas de que disfrutó la demandante durante su niñez y primera adolescencia. Comparada la protección que recibe Juliana Sanabria con la protección que recibe Isabel González, reconocida como hija natural de don Manuel por la propia prueba de la sucesión demandada, hay momentos en que la protección a ambas es igual.

Como cuestión jurídica no es posible tampoco establecer

la tajante división que hizo el ilustrado Juez sentenciador entre los actos de la esposa o la hija natural de don Manuel y los actos del marido o padre, atribuyéndoles una consecuencia distinta a los efectos del reconocimiento. Entre marido y mujer hay un solo cuerpo de bienes, una voluntad directora única, una unidad familiar de la cual no se puede disponer por medio de una sutileza. Entre padre e hija hay una prolongación de la personalidad, un complejo de intereses y afectos y un sentido de interdependencia difícil de evadir. Cuando los estatutos filiatorios hacen una distinción entre los actos de reconocimiento del presunto padre y sus familiares—como es el caso del art. 135 del Código Civil Español, fuente posterior de nuestro propio Derecho—lo hacen entre el presunto padre y la familia anterior a la del presunto padre (abuelos, tíos, hermanos o sobrinos) pero no en cuanto a la familia que crea el presunto padre (cónyuge o hijos): Véase 3 Scaevola—Código Civil 391 et seq., cita precisa a la página 396; 5 Castán—Derecho Civil Español, Volumen II pág. 74; 106 Revista General de Legislación y Jurisprudencia 25 (1905), cita precisa a la pág. 30. De todos modos, en este caso, hay momentos en que la esposa no tiene más remedio que recurrir a su esposo, el presunto padre natural, para solucionar algunos de los problemas de la demandante.

El análisis de la prueba relacionada con este período 1919-1944, demuestra que Juliana Sanabria estuvo recibiendo ayuda directamente de la familia González, bien a través de su esposa doña Ana María como por parte del mismo don Manuel, puesto que es don Manuel quien hace las gestiones para que las dos hermanas se repartieran entre ellas los cien dólares anteriormente asignados a la hija natural de don Manuel, Isabel González. No tenemos duda tampoco que es el propio don Manuel quien da los fondos para la dote conventual de Juliana, según lo hizo en el caso de doña Pilar y doña Encarnación, dos familiares del matrimonio

González. La razón de que el cheque de la dote aparece firmado por don Manuel porque su señora no tenía su firma registrada en el banco no nos convence. Los abogados de la demandante recurrente nos llaman la atención hacia el exhibit 23 de la propia sucesión demandada (transcripción de documentos pág. 75) en el cual aparece doña Ana con una cuenta abierta en el Crédito y Ahorro Ponceño de la ciudad de Ponce en 3 de enero de 1927. Además cuando don Manuel interviene para que Isabel González le de a su "sobrina" Juliana—sobrina por parte de madre aunque hermana por parte de padre—la mitad de la pensión que don Manuel le pasaba a su hija natural Isabel González, don Manuel sabía que Juliana tenía la pretensión que él la reconociera como hija suya, si hemos de dar crédito a la declaración de la propia testigo de la sucesión demandada, Isabel González.

El exhibit 10 de la demandante que es la carta de doña Ana María de fecha catorce de agosto de 1941 a la demandante es clara en el sentido que quien pagaría el pasaje de la demandante a Nueva York sería el propio don Manuel y no doña Ana María: "te pagara el pasaje a Nueva York" dice textualmente la carta.

La interpretación que hace el ilustrado Juez Sentenciador de la última carta de la demandante a doña Ana María —exhibit 56, transcripción de documentos 469-470—no responde a un buen método analítico. Los documentos son huellas históricas de algunos hechos vitales que mantienen una estrecha correspondencia los unos con los otros. Veamos: la primera carta que le escribe la demandante Juliana Sanabria a doña Ana María el 25 de julio de *1941*—exhibit 54, transcripción de documentos págs. 465-466—solicitando ayuda para irse a estudiar a Estados Unidos, tiene algunas frases claves que merecen destacarse. La carta tiene un saludo elocuente: "mi amadísima doña Ana"; una súplica muy significativa: "Yo le suplico que ud. *intercediera*, me ayudara para irme" y una seguridad que responde a un

proceso psicológico muy definido: "le suplico que me conteste *y que no tenga miedo porque nadie sabe mis cosas,* por eso tengo apartado y además yo no doy cuenta de lo mío a nadie."

La contestación de doña Ana María a la demandante—exhibit 10 transcripción de documentos pág. 29—explicándole las gestiones de la primera en favor de la segunda, tiene también palabras claves que merecen destacarse. El saludo resulta también elocuente: "querida Julia"; una contestación categórica: "he estado hablando con Manuel y le dije que de lo que le pasa a tu tía, me parece oportuno te pasara a tí la mitad y te pagara el pasaje a Estados Unidos"; y una información inapreciable: "El me ofreció que así lo haría y mucho me sorprende ver por tu carta que nada se ha resuelto. Si todavía no han hecho nada avísame para ver lo que puedo hacer por tí."

Entonces viene el episodio de la colonia Teresa que describe el propio testigo de la sucesión demandada Audacio Marchi: en una ocasión vio a la demandante Juliana Sanabria acercarse a hablar con don Manuel, "fue estando yo en la Teresa en el volteo con don Manuel, en uno de los volteos él estaba allá en la casa de la Teresa, una casa que hay a orilla del mar cogiendo fresco allí, después que volteaba y a veces, a las cuatro o cinco se ponía a coger fresco en el balcón, y yo paraba allí, la casa es de dos pisos . . . Entonces estaba yo allí, el carro parado al lado de la casa, y yo me salí acá a la puerta, a hablar con la gente allí en lo que don Manuel cogía fresco o tomaba agua de coco, o lo que fuera, y llegó un automóvil público de Guayama. Esta señora (la demandante) se bajó del carro y fue hacia la casa, y don Manuel estaba ya medio dormido en el balcón de la casa sentado en el sillón allá,. yo observé desde acá, él hizo ademanes allá conversando, como yo estaba a distancia, se paró . . . Don Manuel se paró, vino y cogió el automóvil, 'vámonos' ordenó que nos fuéramos . . . ella (la demandante) trató de montarse al carro, pero él (don Manuel) me ordenó que nos fué-

ramos. Lo hizo en una forma airada, como con coraje y yo seguí" (t. 2625-2626) ; que don Manuel dijo: "Vamos, vamos, que no puedo estar aquí" (t. 2626) ; que haciendo memoria lo que don Manuel dijo fue: "Vámonos que estoy harto de tanta cosa" (t. 2626) ; que el carro en el cual llegó la señora se había ido (t. 2627) ; que don Manuel iba a voltear la Teresa y después que se cansaba de voltear, bastantes veces, "se subía a la casa de campo, una casa que había de hacer recepciones allí, a orillas del mar, una terraza, se sacaba un sillón y se estaba cogiendo fresco allí, había veces que estaba una hora o más" (t. 2627) ; contrainterrogado por uno de los abogados de la demandante contestó: que el episodio de la demandante con don Manuel, que el testigo ha relatado, haciendo un cálculo prudente, fue como dos años antes de él salirse (antes de 1943) (t. 2628) que sería en el 1941 más o menos (t. 2640).

En estas tensiones que van de la promesa a la repulsa se encuentran las tres partes comprendidas en la correspondencia que estamos analizando. Es indudable que la última carta de la demandante a doña Ana María—el exhibit 56— refleja claramente este juego de las tensiones en que se encuentran las tres partes aludidas. El distinto saludo, seco y rutinario de esta última carta "Sra. Doña Ana María" contrasta rudamente con el saludo de las dos cartas anteriores: Exhibits 54 y 55—"Mi amadísima doña Ana" (transcripción de documentos 465 y 467 et seq.) En ella se le informa a doña Ana que a la demandante "se me ha negado la ayuda", que la demandante piensa hablarle a don Genaro Cautiño para que la ayude "pero antes de tener la entrevista con el Sr. Cautiño me dirijo a Ud. a ver si me podría prestar $250 para yo poder desenvolverme, porque el ideal mío es estudiar y trabajar"; que ella espera "que Ud. (doña Ana) no tendrá entrañas de piedra, porque una persona tan religiosa como Ud. no puede ser calificada de esta manera"; que ella *desea* que doña Ana le conteste en seguida y se dirije

a ella "porque no es lógico que una señorita le pida dinero a caballero, pero ya que toda ayuda me es negada, no tendré otro recurso, no le pido porque tenga derecho, pues no soy digna que usted me tire las migas de su mesa a una perra pues siempre *he reconocido mi sitio*, hubiera valido más que mi madre y mi padre junto conmigo nos hubieran amarrado una piedra al cuello y nos hubieran tirado los tres al mar antes que traer hijos al mundo a pasar trabajos y penas."

Cualquiera que hubiera sido la relación de la demandante con el matrimonio González Hernández, esta carta constituye un acto de rebeldía y contiene una amenaza velada. Aquí ya no habla la protegida sumisa de una dama dadivosa, sino la protesta, desde su sitio de hija natural, de una hija abandonada por su padre. Al final de la carta se disculpa con doña Ana "si en algo le he faltado" pero no se disculpa de los otros que hayan podido negarle su ayuda. Además amenaza con ir a pedirle ayuda a un caballero que no pertenece a su familia y a pesar de sus escrúpulos sobre el particular, no tiene reparos en recibirla de don Manuel. No importa el propósito con que dicha carta fuera escrita, la misma obtiene un resultado altamente iluminador: a Juliana se le entregan doscientos dólares para su viaje a Nueva York y hasta la muerte de don Manuel se le asigna una pensión de cincuenta dólares mensuales. Concluir que todo esto no es otra cosa que "actos de caridad" de doña Ana María Hernández viuda de González, es obligarnos a imitar el delgado gesto ante la realidad que desde tiempo inmemorial ensaya el avestruz.

█ █ En su análisis de la prueba de la demandante, el ilustrado Juez sentenciador parece estar contrariado por haber demostrado la prueba de la sucesión demandada que ciertas aseveraciones hechas por la demandante y algunos de los testigos de ésta, resultaron ser falsas. Estas "falsedades" son las siguientes: primera, que Juliana declaró que recién muerta su madre Isilé, Juliana se encontró con don Manuel

González, y al éste preguntarle a la niña por qué no iba vestida de luto y ella contestarle que no tenía vestidos de luto, don Manuel le dijo a Juliana que su esposa doña Ana le mandaría unos trajes de luto, cosa que según el ilustrado Juez sentenciador no puede ser cierta, porque en esos días doña Ana María estaba en Barcelona. La prueba no establece la fecha en que los trajes de luto le fueron enviados a Juliana, bien por don Manuel, doña Ana o cualquiera otra persona (t. 459-607). La demandante se limita a declarar que ella no sabe quién se los envió, pero que después de esa conversación, se los enviaron "a los pocos días". Esta conversación de don Manuel con Juliana ha tenido que ser en los últimos días del mes de octubre o primeros días del mes de noviembre de 1912, puesto que la madre de Juliana muere el 22 de octubre de 1912. Si los trajes de luto tardaron en llegar siquiera un mes, existe la posibilidad que fuera la propia doña Ana María quien los enviara porque, según hemos visto, ésta regresa de Barcelona en diciembre de 1912 o enero de 1913. No se trata, pues, de un caso de falsedad absoluta, sino más bien de "falsedad" relativa, la que proviene de la falta de precisión o exactitud.

La segunda falsedad consiste en que Juliana se reconoció en un retrato tomado en el 1919 en la escuela nueva de Sabana Llana, como si ella formara parte del grupo cuando en realidad de verdad, ella ya no estaba en dicha escuela. El retrato fue llevado al tribunal por Eladio Acosta para probar que él había estudiado en dicha escuela y las maestras que llegaron allí en el 1919 reconocen que Eladio Acosta está en el grupo. Eladio Acosta vino a declarar a favor de la demandante en este caso, porque el testigo de la sucesión demandada, Serafín Pabón, le informó a los abogados de la demandante que quien podría saber quienes fueron las personas que estudiaban en dicha escuela en los grados más bajos era Eladio Acosta. La demandante no se recordaba de estos primeros años escolares. Lo demuestra el hecho que

son sus propios abogados los que tienen que realizar la investigación sobre los mismos a los efectos de organizar su prueba. La manera como la demandante describe a la única maestra de la cual se acuerda "una que se pasaba todo el día hablando por la ventana con un gallego que la enamoraba" demuestra que no tenía una memoria muy clara sobre el nombre de esta maestra. Eladio Acosta declara antes que ella y delante de ella que la demandante estudiaba el segundo grado —posiblemente el segundo grado atrasado, porque así estaba dividido el cuarto, según demuestra la prueba—con una maestra que se llamaba la señorita Silva y entonces Juliana cree que la maestra que les hacía perder el tiempo porque se pasaba todo el día hablando con un gallego por la ventana es la señorita Silva y que la fotografía que muestra por primera vez Eladio Acosta, corresponde al año que ella estudiaba con la señorita Silva. Entonces dice que ella estudió con la señorita Silva y que "esa chinita que está ahí" es ella.

La sucesión demandada trae un impresionante número de testigos para probar que la escuela donde se tomó el retrato fue construída después de la testigo haber salido de la escuela, que la señorita Silva no llegó a esa escuela hasta el año 1919 y que la niña que Juliana señala no es la demandante, sino otra niña. La propia prueba de la sucesión demandada demuestra que fue durante el curso escolar 1915-1916 que se construyó la nueva escuela (t. 1267-1268) y ese es el último año que la demandante pasó en la escuela de Sabana Llana. No es de extrañarse, pues, que por lo menos el sitio le fuera conocido. Su "falsedad" queda circunscrita a confundir la maestra que se pasaba todo el día en la ventana hablando con el gallego con la señorita Silva y a situarse ella en el retrato en el lugar que le correspondía a Valentina González Ruiz (t. 1273-1274).

Es indudable que la demandante no aparece en el retrato, y que su afirmación en contrario, es una lamentable exagera-

ción. Pero esto no es suficiente para restarle crédito al resto de su testimonio sobre sus primeros años escolares en Sabana Llana, pues su testimonio está en gran parte corroborado por los testigos de la sucesión demandada, que la sitúan en el 1916, no en el 1914, como inútilmente trató de hacerlo la prueba de la sucesión demandada, estudiando su segundo grado en la escuela del Coquí mientras ella vivía en Sabater.

En situaciones como éstas la norma más justa suele ser la que sentamos en el caso de *Alicea* v. *Antuñano*, 50 D. P. R. 923, (Travieso), (1937), cita precisa a la página 933: "Sucede en muchas ocasiones que los testigos exageran, que abultan los hechos, que dicen más, especialmente en casos de esta naturaleza, de lo que realmente aconteció, pero ello no quiere decir que sus testimonios en lo substancial no sean ciertos."

La tercera "falsedad" de la prueba de la demandante se refiere a que la demandante declaró que estuvo viviendo en casa de don Manuel hasta octubre de 1919, fecha en que pasó al colegio o Asilo de Ponce, y que a ella la llevaron al Colegio don Manuel y doña Ana María, y la prueba documental demuestra que esto no ha podido ser cierto, porque una información periodística (exhibit e) establece que don Manuel, su esposa doña Ana María y los hijos del matrimonio embarcaron hacia Nueva York el 21 de agosto de 1919. Como se ve, se trata en cuanto a este extremo, de una falsedad relativa, la que se origina en la inexactitud o falta de precisión, y no de una falsedad absoluta. La prueba de la sucesión demandada demuestra que cuando la niña viene huyendo de los azotes de Cristina, en algún tiempo entre junio y agosto de 1919, se refugia en casa de don Manuel González y de allí es enviada al colegio o asilo de Ponce. Que esto fuera al día siguiente o varios meses después no le cambia el carácter de inexactitud o imprecisión característico de la falsedad relativa. La propia prueba demuestra que de este viaje de agosto de 1919, don Manuel regresó al mes

siguiente, en septiembre de 1919 (exhibit I). Si la demandante hubiera declarado que fue solamente don Manuel, quien la acompañó al colegio, su testimonio, en cuanto a este extremo, hubiera entrado en el balance entre la posibilidad y probabilidad característico de todo testimonio judicial.

La cuarta "falsedad" de la prueba de la demandante se refiere a que la demandante y su testigo Carmen Faura García declararon que estando Juliana y su testigo Carmen en el convento en Cuba, entre los años 1927 a 1928, don Manuel fue a Cuba y estando allí visitó a su hija en el convento, y en una ocasión en que don Manuel sale a pasear con la demandante por la Habana, Juliana le muestra el Hotel Nacional. La sucesión demandada trae un cúmulo de prueba documental y testifical para demostrar que don Manuel no estuvo en Cuba durante esos dos años. De acuerdo con una certificación del Director General de Inmigración se establece que desde el 1ro. de enero de 1927 al 31 de diciembre de 1928, el ciudadano español, residente en Puerto Rico, don Manuel González Martínez no entró en el territorio de la República de Cuba. Otra certificación establece que el Hotel Nacional de la Habana no se terminó hasta el 13 de diciembre de 1930. Una serie de cheques que empiezan desde el 3 de enero de 1927 al 24 de agosto de 1928 demuestran que durante este período de tiempo, don Manuel estuvo firmando cheques en Puerto Rico con pequeños intervalos de tiempo, algunos de seis, cinco y cuatro días. La prueba de la sucesión demandada demuestra que don Manuel, acompañado de su familia embarcó para España vía Nueva York, y que estando en Nueva York recibió la noticia del ciclón de San Felipe que azotó la isla el 13 de septiembre de 1928 y don Manuel decidió regresar a Puerto Rico, llegando a esta isla el 1ro. de octubre de 1928, permaneciendo en su finca de Salinas el resto del año 1928.

La única impugnación a estos dos testimonios de Juliana y Carmen, se refieren exclusivamente a las fechas de la

visita de don Manuel a Cuba y de la terminación del Hotel Nacional de la Habana. La prueba demuestra que la demandante Juliana Sanabria llegó a Cuba el 4 de abril de 1926 (t. 532) y regresó a Puerto Rico el 16 de febrero de 1938 (t. 551) mientras que Carmen Faura García llegó a Cuba en el 1921 (t. 33) y regresó a Puerto Rico en el 1940 (t. 364). De manera que el período de conocimiento o de observación de ambos testigos es más amplio que el período de tiempo impugnado por la prueba de la sucesión demandada que cubriría los años 1927-1930. Esto deja abierta la posibilidad que antes o después de esos años ha podido realizarse la visita de don Manuel al convento y el paseo de Juliana con don Manuel y el señor Menocal por los sitios históricos de la Habana. La propia testigo de la sucesión demandada, doña Ana María Hernández viuda de González, declara que durante los primeros años de su matrimonio don Manuel tenía negocios en gran escala en la isla de Cuba (t. 3446). Esto deja abierta la posibilidad de otros viajes de don Manuel a Cuba.

Es indudable que la fijación de la fecha de la visita de don Manuel a Cuba, tanto en el testimonio de su hija Juliana Sanabria, (t. 541) como en el testimonio de Carmen Faura García, (t. 347) se deduce de una serie de circunstancias fortuitas, tales como el cambio de velo de una novicia y hábitos conventuales. Queda siempre en el ánimo del juzgador la sospecha si esto hubiera sido siempre así de no haber resultado equivocado el único detalle en controversia —la fecha de una visita.—Esto, aparte del problema jurídico que plantean las certificaciones presentadas por la sucesión demandada, que tal vez no nos permitiría considerar su contenido como hecho indisputado. Pero no tenemos que llegar a eso, ya que el caso no descansa exclusivamente en ese único hecho.

Asumiendo, aunque sin resolverlo, que estas cuatro "falsedades" se hubieran probado en una forma absoluta, ¿significa

esto que estamos autorizados para descartar el resto de la prueba de la demandante? Nuestra contestación tiene que ser categóricamente en la negativa, máxime en un caso como éste, en que la mayor cantidad de contradicciones e inexactitudes están en la prueba de la parte contraria y una parte sustancial de la prueba en favor de la causa de acción, se encuentra corroborada por la propia prueba de la parte contraria.

▇▇▇ En el recurso ante nos, la sucesión recurrida continuamente nos advierte de nuestra falta de autoridad para dejar sin efecto las conclusiones de la ilustrada Sala sentenciadora. Esto nos obliga a formular una vez más el verdadero alcance de la Regla 43.1 de las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico.

La imposibilidad de reproducir ante los tribunales de apelación o de revisión, los elementos puramente expresionales de los testimonios orales, le impuso a dichos tribunales de apelación, o revisión, la obligación de respetar la apreciación que el juez sentenciador hiciera, de aquellos elementos de la credibilidad que se desprenden espontáneamente de la conducta del testigo, mientras presta declaración ante un juez de hechos.

No es este el momento de malograr la crítica de ese pequeño muestrario de los indicios expresionales, que se supone formen parte de la sagacidad de un juez de hechos. Con los conocimientos que tenemos hoy de psicología aplicada, sabemos que es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral de un testigo. Sálvese por algún tiempo el ingenuo muestrario de los indicios expresionales coleccionado por la experiencia de cada juez de hechos, para buscar la verdad a través de esa curiosa revelación plástica de la credibilidad que se supone pueda reflejarse sobre la figura humana. Confieso que mi experiencia de diez años como

juez de hechos, lo que me produjo fue una duda profunda sobre la eficacia del método. Para una crítica de la evidencia de conducta (*demeanor evidence*) véase el caso de *National Labor Relations Board* v. *Dinion Coil Co.*, 201 F.2d 484 (Frank) (1952), cita precisa a las págs. 487-490.

Por un largo tiempo, siguiendo la práctica del jurado civil o la práctica de la equidad, fue una regla bastante aceptable para los tribunales de apelación o de revisión, que si en la transcripción escrita de los testimonios orales, había alguna comprobación factual, (*sufficient evidence*), de la conclusión de hecho del juez sentenciador, los tribunales de apelación o de revisión no intervenían con dicha conclusión de hecho. Basta reflexionar un momento para darnos cuenta de lo absurdo que podría resultar en la práctica judicial, sobreponer la percepción rudimentaria de los elementos expresionales de la credibilidad a la concepción razonada de los elementos lógicos de la credibilidad.

La inclusión en la Regla 52(*a*) de las Reglas Federales de Procedimiento Civil, de la nueva disposición, que las conclusiones de hecho basadas en testimonio oral se dejarían sin efecto si resultaban claramente erróneas, (*clearly erroneous*), le dió una oportunidad a los tribunales progresistas de formular una nueva regla de práctica judicial, en el sentido, que la conclusión de hecho del juez sentenciador no prevalecería, aunque hubiera alguna evidencia que la sostuviera, (*sufficient evidence*), si dicha conclusión de hecho no representaba el balance más racional, justiciero y jurídico de la totalidad de la evidencia. Puesto en las palabras del ilustrado Juez Stanley Reed de la Corte Suprema de Estados Unidos: "una conclusión de hecho puede resultar 'claramente errónea', aunque haya evidencia que la sostenga, si del examen de la totalidad de la evidencia el tribunal de revisión queda definitiva y firmemente convencido que un error ha sido cometido": *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 92 L. ed. 746, (Reed), (1948), cita precisa a

la pág. 395 U. S. o a la pág. 766 L. ed. Contraria a la suposición, que lo interpretado por la Corte Suprema de Estados Unidos, obedecía a un caso excepcional que en nada intervenía con la vieja práctica de la conclusividad, se ha convertido en una regla uniforme, para todos aquellos casos donde las conclusiones de hecho del juez sentenciador, estén en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, *(the weight of the evidence)* : *Arnolt Corp.* v. *Stansen Corp.*, 189 F.2d. 5, (Finnegan), (1951), cita precisa a la pág. 9; *Smith* v. *Manning*, 189 F.2d. 345, (Kalodner), (1951), cita precisa a la pág. 349; *Gildorff* v. *Prince,* 189 F.2d. 897, (Clark), (1951), cita precisa a la pág. 898; *Pennsylvania Threshermann & Farmers' Mut. Cas. Ins. Co.*, v. *Crapet*, 199 F.2d. 850, (Rives), (1952), cita precisa a la pág. 853; *Sturm* v. *Washington Nat. Ins. Co.*, 208 F.2d 97, (Gardner), (1953), cita precisa a la pág. 102; *Salaky* v. *The Atlas Barge No. 3*, 208 F.2d. 174, (Clark) (1953), cita precisa a la pág. 175; *Home Indemnity Co. of New York* v. *Standard Acc. Ins. Co.*, 167 F.2d 919, (Garrecht), (1948), cita precisa a la pág. 923; *State Farm Mut. Automobile Ins. Co.* v. *Bonacci*, 111 F.2d. 412 (Gardner), (1940), cita precisa a la pág. 415.

Cuando la evidencia consista no sólo de testimonios orales, sino también de documentos públicos o privados, de deposiciones judiciales de testigos ausentes, de estipulaciones escritas u orales de hechos aceptados, o de hechos incontrovertidos por las alegaciones o la prueba, la regla de la conclusividad se aplica exclusivamente a los testimonios orales vertidos en presencia del juez de hechos, pero no se aplica al resto de la evidencia, por entenderse que los tribunales de apelación o de revisión, están en igual situación que la sala sentenciadora, para formar juicio sobre el resto de la evidencia. Con esto, la regla de la conclusividad quedó restringida exclusivamente, a aquella parte de la evidencia oral de la cual se desprenda un conflicto irreconciliable, aunque racio-

nalmente probable, entre dos versiones contradictorias sobre un hecho esencial, que no pueda ser esclarecido por ninguna otra parte de la evidencia, o que para su esclarecimiento, necesite de aquellos elementos expresionales de la credibilidad que brinda a la convicción del juzgador, la observación del testigo mientras presta su declaración: *Wigginton* v. *Orders of United Commercial Travelers*, 126 F.2d. 659, (Minton), (1942), cita precisa a la pág. 661, (hechos estipulados); *Johnson* v. *Griffiths S. S. Co.*, 150 F.2d 224, (Garrecht), (1945), cita precisa a la pág. 255, (deposiciones), *Kuhn* v. *Princess Lida of Thurn & Taxis*, 119 F.2d. 704 (Jones), (1941); cita precisa a la pág. 706 (hechos no controvertidos); *Carter Oil Co.* v. *McQuigg*, 112 F.2d. 275 (Evans), (1940), cita precisa a la pág. 279 (documentos); *Equitable Life Assur. Soc.* v. *Irelan*, 123 F.2d. 462, (Healy), (1941), cita precisa a la pág. 464 (deposiciones); *Fleming* v. *Palmer*, 123 F.2d. 749, Mahoney), (1941), cita precisa a la pág. 751 (documentos). Claro es, que en aquellos casos donde la supremacía de la evidencia oral se manifiesta, y el conflicto entre los testimonios irreconciliables ha sido resuelto por el juez, aceptando la versión de una de las partes, la regla de conclusividad se aplica sin reserva de clase alguna, a menos que no resulte contraria al orden natural de las cosas o al orden racional de la inteligencia humana. Véase, como ejemplo, *Gildorff* v. *Prince*, supra, cita precisa a la pág. 898; en cuanto al alcance conjetural de la conclusión de hecho, véase *Hunter* v. *Dowd*, 198 F.2d. 13, (Lindley), (1952), cita precisa a la pág. 17; en cuanto a la correcta actitud judicial frente a una jurisprudencia de la improbabilidad, véase *Old Colony Bondholders* v. *New York, N. H. & H.R. Co.*, 161 F.2d. 413, (Frank disidente), (1947), cita precisa a la pág. 443.

La imposibilidad teórica de separar totalmente las cuestiones de hecho y de derecho, en aquellas conclusiones que resulten conclusiones mixtas de hecho y de derecho, ha creado a su vez, la necesidad de distinguir entre las inferencias puramente testimoniales (*testimonial inferences*) y las infe-

rencias secundarias o derivadas de las inferencias puramente testimoniales. Si el hecho probado es suficiente para inferir de él otro hecho, el tribunal de apelación o de revisión debe respetarlo. Pero si del hecho probado, o del hecho inferido directamente del hecho probado, el juez sentenciador deduce o infiere otras conclusiones de hecho o de derecho, que ya no tienen carácter factual propiamente dicho, sino carácter jurídico, esta segunda inferencia derivada de la apreciación de los hechos, se considera una conclusión de derecho, la cual siempre está sujeta a examen y revocación por el tribunal de apelación o de revisión: *Kuhn* v. *Princess Lida of Thurn & Taxis*, supra (Jones), (1941), cita precisa a las págs. 705 y 706; *E. F. Drew & Co.* v. *Reinhard*, 170 F.2d. 679, (Learned Hand), (1948), cita precisa a las págs. 683 y 684; *American Tobacco Co.* v. *The Katingo Hadjipatera*, 194 F.2d 449 (Frank), (1951), cita precisa a la pág. 451; *Ball* v. *Paramount Pictures*, 169 F.2d 317, (McLaughlin), (1948), cita precisa a la página 318, *Orvis* v. *Higgins*, 180 F.2d 537 (Frank), (1950), cita precisa a las págs. 538, 539, 540.

Resumiendo: las conclusiones de hecho del juez sentenciador serán mantenidas, cuando después de examinada la totalidad de la evidencia, representen el balance más racional, justiciero y jurídico de la misma y no contravengan el orden natural de las cosas ni el orden racional de la inteligencia humana. Cualquiera deducción o inferencia de un hecho probado, que no represente una deducción o una inferencia de tal hecho, sino que represente la aplicación de un principio de ley, de un razonamiento lógico o de una opinión jurídica al hecho probado, o al hecho deducido o inferido del hecho probado, se considerará una conclusión de derecho, abierta al examen y repudiación del tribunal de apelación o de revisión. Véase *Rivera* v. *Crescioni*, 77 D.P.R. 47 (1954), cita precisa a las págs. 67–71. Este caso podría ofrecerse como modelo de como las cuestiones de hecho, en virtud de las inferencias del juez sentenciador se pueden convertir en cuestio-

nes de derecho, y como tales, no obligatorias para un tribunal de apelación.

 Réstanos ahora considerar si la presente acción está prescrita. La prueba ha demostrado que la demandante Juliana Sanabria nació el 8 de marzo de 1905 y que al tiempo de la concepción de la demandante don Manuel González e Isilé Sanabria hubieran podido casarse con dispensa o sin ella, porque las primeras nupcias de don Manuel fueron el 3 de septiembre de 1904. Por lo tanto, la demandante Juliana Sanabria tiene la condición de hija natural y se le aplica, en cuanto a prescripción la disposición de la Ley número 73 de 1911—art. 126 del Código Civil de Puerto Rico—que dispone que los hijos naturales pueden interponer su acción de reconocimiento en vida de sus presuntos padres o un año después de su muerte—*Fuentes* v. *Tribunal de Distrito*, 73 D.P.R. 959 (Ortiz), (1952) cita precisa a las págs. 974–975; *Figueroa* v. *Sucn. Carrasquillo*, 74 D.P.R. 1 (Pérez Pimentel) (1952) cita precisa a la pág. 5.

La prueba demuestra que don Manuel González falleció el 16 de octubre de 1944 y la demanda en este caso se radicó el 7 de mayo de 1945, o sea, dentro del año después de muerto el presunto padre natural. Siendo esto así, la acción de la demandante no está prescrita.

Debe revocarse la sentencia del Tribunal Superior de Puerto Rico, Sala de San Juan de fecha 30 de noviembre de 1950 que declaró sin lugar la demanda y dictarse otra declarando a la demandante Juliana Sanabria, hija natural reconocida de don Manuel González Martínez y devolverse el caso al Tribunal de instancia para cualesquiera otros procedimientos no incompatibles con esta opinión.

El Juez Presidente Sr. Negrón Fernández y los Jueces Asociados Srs. Pérez Pimentel, Serrano Geyls y Blanco Lugo no intervinieron.

El Juez Asociado Sr. Dávila concurre con el resultado pero hace constar que no está de acuerdo con aquella parte de la opinión que discute el alcance de la Regla 43.1 de las Reglas de Enjuiciamiento Civil para las Cortes de Puerto Rico.